# 25-2652-cv

## In the United States Court of Appeals for the Second Circuit

PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., AND PDV HOLDING, INC.,

*Plaintiffs-Counter-Defendants-Appellants*,

*v.*

MUFG UNION BANK, N.A. AND GLAS AMERICAS LLC,

*Defendants-Counter-Claimants-Appellees*.

*On Appeal from the United States District Court for the Southern District of New York*

**BRIEF FOR PLAINTIFFS-APPELLANTS**

**(FILED UNDER SEAL)**

<table>
<tr><td>

KURT W. HANSSON<br>
JAMES L. FERGUSON<br>
ZACHARY D. MELVIN<br>
PAUL HASTINGS LLP<br>
200 Park Avenue<br>
New York, NY 10166<br>
(212) 318-6000<br><br>

IGOR V. TIMOFEYEV<br>
PAUL HASTINGS LLP<br>
2050 M Street, N.W.<br>
Washington, D.C. 20036<br><br>

*Counsel for Petróleos de Venezuela,<br>
S.A. and PDVSA Petróleo, S.A*

</td><td>

MICHAEL J. GOTTLIEB<br>
WILLKIE FARR & GALLAGHER LLP<br>
2029 Century Park East<br>
Los Angeles, CA 90067<br>
(202) 303-1000<br><br>

ERICA L. ROSS<br>
SAMUEL G. HALL<br>
KRISTIN E. BENDER<br>
WILLKIE FARR & GALLAGHER LLP<br>
1875 K Street, N.W.<br>
Washington, D.C. 20006<br><br>

*Counsel for PDV Holding, Inc.*

</td></tr>
</table>

[Additional Counsel on Inside Cover]

AARON E. NATHAN
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019

ALYXANDRA VERNON
WILLKIE FARR & GALLAGHER LLP
333 Bush Street
San Francisco, CA 94104

*Counsel for PDV Holding, Inc.*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

PDVSA Petróleo, S.A ("Petróleo") and PDV Holding, Inc. ("PDVH") are wholly owned by Petróleos de Venezuela, S.A. ("PDVSA"), which is wholly owned by the Bolivarian Republic of Venezuela (the "Republic" or "Republic of Venezuela").

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT ......................................................................3

STATEMENT OF ISSUES ..................................................................................3

STATEMENT OF THE CASE..............................................................................4

     I.     Factual Background..................................................................................4

     A.    The Maduro Regime's 2016 Exchange....................................................4

     B.    The United States' Recognition of the National Assembly and Rejection of the Maduro Regime ..........................................................5

     C.    The National Assembly's Oversight of National Public Interest Contracts..................................................................................................6

     D.    PDVSA's Position within the National Executive.............................7

     E.    The National Assembly's Rejection of the Exchange ........................8

     II.    Procedural History..................................................................................13

     A.    The Initial District Court Proceedings and this Court's Prior Decision.................................................................................................13

     B.    The Proceedings on Remand..................................................................14

     C.    The District Court's Summary Judgment Decision ..........................16

          1.    Interpretation of Venezuelan Law ..........................................16

          2.    Consideration of Venezuelan Government's Views................17

          3.    Act of State Doctrine ..............................................................18

SUMMARY OF ARGUMENT .........................................................................18

STANDARD OF REVIEW ................................................................................24

ARGUMENT ......................................................................................................24

     I.     THE DISTRICT COURT MISINTERPRETED VENEZUELAN LAW BY RESTRICTING THE SCOPE OF NATIONAL PUBLIC INTEREST CONTRACTS IN ARTICLE 150. ..........................................24

     A.    Article 150's Text and Purpose Demonstrate that "National Public Interest Contracts" Encompass Contracts Executed by Decentralized Public Entities. ................................................................25

B.     Consistent Constitutional Practice Demonstrates that National Public Interest Contracts Encompass Contracts by Decentralized State Entities. ................................28

C.     The District Court's Reliance on Andrés Velásquez Is Unavailing. ................................32

D.     The District Court Misinterpreted the Constitutional Chamber's Other Decisions ................................38

II.     THE DISTRICT COURT ERRED IN REJECTING VENEZUELA'S OFFICIAL INTERPRETATION OF VENEZUELAN LAW. ................................42

     A.     The Republic's Submissions Are Clear, Thorough, and Well-Supported. ................................44

     B.     The Republic's Legal System Is Transparent. ................................45

     C.     The Republic Is the Proper Authority to Offer the Submissions. ................................45

     D.     The Republic's Position Is Consistent. ................................46

     E.     The Context and Purpose of the Republic's Submission Support Deference ................................47

III.     THE DISTRICT COURT CONTRAVENED THE ACT OF STATE DOCTRINE. ................................50

     A.     The May 2016 Resolution ................................53

     B.     The September 2016 Resolution ................................55

     C.     The October 2019 Resolution. ................................60

     D.     The District Court Misapplied Allied Bank. ................................62

CONCLUSION ................................64

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ................................66

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Bank International v. Banco Credito Agricola de Cartago*,
757 F.2d 516 (2d Cir. 1985) ....................................................................*passim*

*Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co., Ltd.*,
585 U.S. 33 (2018)....................................................................................*passim*

*Banco de Espana v. Fed. Rsrv. Bank of N.Y.*,
114 F.2d 438 (2d Cir. 1940) ..............................................................................63

*Burgess v. United States*,
553 U.S. 124 (2008)............................................................................................35

*Celestin v. Caribbean Air Mail, Inc.*,
30 F.4th 133 (2d Cir. 2022) ...............................................................................24

*Emden v. Museum of Fine Arts, Houston*,
103 F.4th 308 (5th Cir. 2024) ............................................................................64

*Fed. Treasury Enter. Sojuzplodoimport, OAO (FTE) v. Spirits Int'l B.V.*,
809 F.3d 737 (2d Cir. 2016) ..............................................................................64

*Jiménez v. Palacios*,
250 A.3d 814 (Del. Ch. 2019) ...........................................................................13

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
313 F.3d 70 (2d Cir. 2002) .................................................................................50

*Konowaloff v. Metro. Museum of Art*,
702 F.3d 140 (2d Cir. 2012) ..............................................................................56

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
235 N.E.3d 949 (2024).......................................................................................17

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   41 N.Y.3d 462 (2024) ...................................................................................14

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   106 F.4th 263 (2d Cir. 2024) ("*PDVSA IV*") ...............................................*passim*

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
   51 F.4th 456 (2d Cir. 2022) ("*PDVSA II*") ..................................................*passim*

*Petroleos De Venezuela S.A. v. MUFG Union Bank, N.A.*,
   No. 20-3858 (2d Cir. Mar. 22, 2021)..........................................................17, 47

*In re Sarex Corp.*,
   509 F.2d 689 (2d Cir. 1975) ........................................................................36

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
   899 F.3d 1064 (9th Cir. 2018) .....................................................................64

*Skaftouros v. United States*,
   667 F.3d 144 (2d Cir. 2011) ........................................................................44

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S.
   Dist. of Iowa*,
   482 U.S. 522 (1982)......................................................................................48

*U.S. Olympic Comm. v. Intelicense Corp., S.A.*,
   737 F.2d 263 (2d Cir. 1984) ........................................................................63

*In re Vitamin C Antitrust Litig.*,
   No. 06-md-1738 (E.D.N.Y. June 29, 2006), Docket No. 30-2..........................49

*In Re: Vitamin C Antitrust Litigation*,
   8 F.4th 136 (2d Cir. 2021) .......................................................24, 45, 46, 49

*United States ex rel. Von Heymann v. Watkins*,
   159 F.2d 650 (2d Cir. 1947) ........................................................................64

*VR Global Partners, L.P. v. Petróleos de Venezuela, S.A.*,
   2024 WL 4891271 (2d Cir. Nov. 26, 2024) .....................................................11

**Venezuelan Cases**

Supreme Tribunal of Justice, No. 618,
*Brigitte Acosta Isasis*, July 8, 2016 ...............................................................40

Supreme Tribunal of Justice, No. 1460,
*Attorney General of the Republic II,* July 12, 2007................................................40

Supreme Tribunal of Justice, No. 2241,
*Andrés Velásquez and others, the partial annulment of
Article 80 of the Organic Law of the Financial Administration
of the Public Sector*, Sept. 24, 2002.........................................................*passim*

Supreme Tribunal of Justice, No. 953,
*Electrificación del Caroní S.A.*, Apr. 29, 2003 ("*EDELCA*") ............................38

**Other Authorities**

Fed. R. App. P. 29(a)(6)......................................................................................48

Venezuelan Constitution 1961, art. 127...............................................................42

Venezuelan Constitution 1999, art. 150.........................................................*passim*

Venezuelan Constitution 1999, art. 187(3).............................................................6

Venezuelan Constitution 1999, art. 187(9)....................................................*passim*

Venezuelan Constitution 1999, art. 302..........................................................58, 59

Venezuelan Constitution 1999, art. 303...........................................................8, 58

Venezuelan Constitution 1999, art. 335..........................................................36, 37

**INTRODUCTION**

In October 2016, the regime of Nicolás Maduro prompted Venezuela's state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA"), to announce a bond swap (the "Exchange Offer") through which noteholders—primarily foreign hedge funds—could exchange unsecured notes due in 2017 for notes due in 2020 (the "2020 Notes") that would be secured by a pledge of a controlling interest in CITGO Holding, Inc. ("CITGO") (the "Pledge").[1]  Under Articles 150 and 187(9) of the Venezuelan Constitution, all "national public interest contracts" entered into with foreign, non-domiciled counterparties require legislative authorization.  Pursuant to this authority, Venezuela's National Assembly—the last democratically-elected branch of the Venezuelan government—enacted two resolutions.  The first (in May 2016) anticipatorily declared that any national public interest contract enacted without authorization would be "null and void," and the second (in September 2016) invoked Article 187(9) and expressly rejected the Pledge after a hearing that focused on the proposed Exchange Offer.  The Maduro regime disregarded those sovereign acts and purported to carry out the Exchange.

---

[1] The 2020 Notes, Pledge, and corresponding Indenture are the "Governing Documents."

1

The district court previously held that the 2020 Notes and Pledge were valid under New York law, but this Court vacated that decision following certification to the New York Court of Appeals, which held that Venezuelan law governs. On remand, the district court applied Venezuelan law, yet reached the same conclusion. In doing so, the district court misconstrued Venezuelan law, privileging the bondholders' interpretation of the Venezuelan Constitution and National Assembly Resolutions over the views of Venezuela's foremost legal experts, including the drafter of the relevant constitutional provisions, as well as the authoritative, thorough, clear, and consistent interpretation of Venezuelan law offered by the Republic. The district court further violated the act of state doctrine by holding, based on its own reading of Venezuelan law, that the National Assembly's sovereign acts (its Resolutions) were *ineffective in Venezuela* to accomplish the objective that the sovereign insists those acts did—namely, invalidating the Governing Documents by depriving them of the legislative authorization required under Articles 150 and 187(9). That approach was not just incorrect, but was destabilizing to a critical national asset, a foreign constitution, and the doctrines of international comity and act of state deference that the district court discussed only long enough to discard. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1332(a)(3) and 1367. The court entered judgment under Rule 54(b) on October 17, 2025. SPA-158-60. Appellants timely filed a notice of appeal. A-5621-23. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the district court erred in holding that the 2020 Notes and associated Governing Documents were valid and enforceable under Venezuelan law, despite the lack of legislative authorization required under the Venezuelan Constitution, and without sufficient consideration of the submitted views of the Venezuelan government.

2. Whether the district court erred in rejecting the interpretation of Venezuelan law offered by the recognized sovereign government of Venezuela, despite finding that all but one of the relevant *Animal Science* factors either weighed in favor of the Republic's position or were neutral.

3. Whether the district court contravened the act of state doctrine by denying legal effect to the National Assembly's exercise of its exclusive constitutional power to authorize national public interest contracts, including its categorical rejection of the Exchange Offer's proposal to pledge a majority of CITGO Holding's stock as collateral.

3

## STATEMENT OF THE CASE

**I.     Factual Background**

**A.     The Maduro Regime's 2016 Exchange**

Over two decades, the authoritarian Chávez and Maduro regimes ruined Venezuela's prosperity, A-3274, turning it into "one of the most miserable, mismanaged, hopeless countries on the planet," A-742. By 2016, with Venezuela's oil-dependent economy collapsing, PDVSA was heading toward default on certain notes coming due in 2017. SPA-7-8.

In September 2016, to stave off a potential political crisis from a high-profile default by Venezuela's national oil company, the Maduro regime offered to exchange the 2017 notes for new notes due in 2020.[2] The defining feature of the Exchange was the pledge as collateral of a controlling interest (50.1%) in CITGO, SPA-9-10; A-617-18; A-1480 ¶ 115, which was used to "sweeten the deal." *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 266 (2d Cir. 2024) ("*PDVSA IV*"). Despite this unprecedented feature of the Exchange, fewer than half of the 2017 noteholders tendered their notes for exchange. SPA-77; A450-51; A-203-04 ¶ 15.

---

[2] The 2020 Notes were issued pursuant to an Indenture entered into by PDVSA (as issuer) and Petróleo (as guarantor) with various foreign entities, including Appellees as Trustee and Collateral Agent. SPA-10; A-492.

### B. The United States' Recognition of the National Assembly and Rejection of the Maduro Regime

In December 2015, the Venezuelan democratic opposition won an overwhelming majority in the National Assembly—the Venezuelan Legislature—and began to "assert its prerogatives under the Venezuelan Constitution, including with respect to PDVSA" and castigate the Maduro regime for its economic mismanagement. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 462 (2d Cir. 2022) ("*PDVSA II*"). Since then, the U.S. Government has continuously recognized "the democratically-elected National Assembly [as Venezuela's] only legitimate legislative body" and reaffirmed U.S. support for the National Assembly in executive orders and public statements. *See, e.g.*, A-2048; A-2050; A-2054; A-2056; A-3553-54 ¶¶ 6-7; A-3555-56 ¶ 11; A-3556 ¶ 13; A-3559-61 ¶ 21; A-3564 ¶ 31.

On January 23, 2019, following a rigged presidential election, the United States declared the Maduro regime "illegitimate," reiterated that the National Assembly is Venezuela's "only legitimate branch of government," and officially recognized the National Assembly's President, Juan Guaidó, as the Interim President of Venezuela. A-3553 ¶ 6 & n.8; A-3557 ¶ 15. The United States has since continuously reaffirmed that the National Assembly is the only legitimate government of Venezuela. A-3553-54 ¶ 7; A-5520-21.

5

## C.     The National Assembly's Oversight of National Public Interest Contracts

The 1999 Venezuelan Constitution adheres to separation of powers principles, A-290-91 ¶ 47, under which the National Assembly "exercise[s] control functions over the government and the National Public Administration, in the terms enshrined in th[e] Constitution and by law."  A-443 (art. 187(3)); *see also* A-280 ¶ 21, A-291 ¶ 50.  In exercising these powers, the National Assembly acts as the first-instance interpreter of the Constitution, without being subject to presidential veto.  A-292 ¶¶ 51-53.

The National Assembly's "control" authority over national public interest contracts is established by Articles 150 and 187(9).  Article 150 provides, in part:

> The execution of national public interest contracts shall require the approval of the National Assembly in those cases in which such requirement is determined by law.
>
> No municipal, state or national public interest contract shall be executed with foreign States or official entities, or with companies not domiciled in Venezuela, or shall be transferred to any of them without the approval of the National Assembly.

A-442.  Article 187(9) reiterates this authority among the National Assembly's enumerated control powers:

> It is the role of the National Assembly to:
>
> […]
>
> 9. Authorize the National Executive to enter into contracts of national interest, in the cases established by law.

6

> Authorize contracts of municipal, state and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela.

A-442-43. Articles 150 and 187(9) reflect the long-standing constitutional restriction on state entities' ability to contract with foreign companies. A-5477 ¶ 41.

### D. PDVSA's Position within the National Executive

The Venezuelan Constitution establishes a National Public Administration, which has two components: the Central Public Administration and the Decentralized Public Administration. A-284 ¶ 33; A-3675-76 ¶ 26; A-3679 ¶ 37; A-3681 ¶¶ 44-45; A-3826-29 ¶ 54(a)-(b); A-5461-62. The Central Public Administration is the National Executive and consists of the direct organs of the government. *See* A-284 ¶ 33; A-446 (art. 225); A-3828-29 ¶ 54(b)(ii); A-5461-62 ¶ 14 & n.23. The Decentralized Public Administration consists of state-owned enterprises such as PDVSA. A-284 ¶ 33; A-5461-62 ¶ 14 & n.23; A-3828-29 ¶ 54(b)(ii). Entities within the Decentralized Public Administration are part of the National Public Administration and thus must comply with requirements applicable to public entities, including obtaining legislative approval for certain transactions. A-284 ¶ 33; A-2023 ¶¶ 52-53; A-3679-82 ¶ 38-50; A-5461-62 ¶ 14 & n.23; *see also* A-3827-29 ¶ 54(b); A-3820-31 ¶¶ 58-60. The National Executive oversees and coordinates entities of the Decentralized Public Administration, typically through the corresponding ministry. A-443 (art. 236(20)); A-969 (art.

7

239(2)); A-284 ¶ 33; A-5462-63 ¶¶ 15-16. The ministry secures any necessary legislative approvals on the decentralized entity's behalf. A-5462 ¶ 15.

As an entity created to manage the strategically important Venezuelan oil industry, A-443 (arts. 302-303); A-3608 ¶ 3, PDVSA is subject to constitutional provisions, such as Articles 150 and 187(9), that enable the National Assembly to exercise control over critical transactions affecting national interests, including PDVSA's transactions with foreign corporations. A-200 ¶ 3; A-2016 ¶ 20.

On multiple occasions prior to 2016, the National Assembly exercised its power to authorize (or not authorize) national public interest contracts involving PDVSA. *See* A-3609 ¶ 5. For example, in 2006, the National Assembly invoked Article 150 to authorize a joint venture agreement between a PDVSA affiliate and foreign corporations. A-200 ¶ 4. And in 2018, the National Assembly declared null and void a "litigation trust agreement" subscribed to by PDVSA. A-202-03 ¶ 10.

### E. The National Assembly's Rejection of the Exchange

Soon after the democratic opposition won control of the National Assembly, the Maduro regime embarked on a systematic campaign to usurp the Assembly's constitutional prerogatives, including its approval power over national public interest contracts. In January 2016, Maduro announced his intention to enter into national public interest contracts without National Assembly authorization. A-201 ¶ 5 & n.4. On May 13, Maduro issued an "emergency" decree purporting to

8

empower the "National Executive" to execute certain national public interest contracts without legislative authorization. A-300-01 ¶ 68; A-3609 ¶ 6. On May 26, the National Assembly responded by passing a resolution (the "May 2016 Resolution") reiterating its exclusive power under Article 187(9) to authorize *all* national public interest contracts. A-647; A-3519-20; *PDVSA IV*, 106 F.4th at 266. While specifically rejecting Maduro's decree, the Assembly emphasized the broad scope of its powers under Articles 150 and 187(9), declaring that "*any* activity carried out by an organ that usurps the constitutional functions of another public authority is *null and void* and shall be considered *non-existent*." A-648 (emphasis added). The Assembly further requested that foreign embassies in Venezuela "inform the[ir] Governments … and the corresponding companies about the nullity of the contracts that are concluded in contravention of Article 150 of the Constitution." *Id*.

Ignoring these objections, on September 7 and 8, Maduro's oil minister (and PDVSA's president) instructed PDVSA to carry out the Exchange. A-1474-75 ¶¶ 78-80, 82. The regime formally announced the Exchange on September 16. SPA-9.

The National Assembly immediately convened a parliamentary session to review the Exchange. A-3610 ¶¶ 9-10; A-3611 ¶ 15. The president of the Assembly's Comptroller's Commission (responsible for "monitoring the investment

and use of public funds" by Venezuela's "financial and public entities," (A-3608 ¶ 2) declared that the Assembly "will not acknowledge any national interest contract that does not come before this National Assembly [and creditors] will not be able to ask us to honor the commitments of the irresponsible individuals who destroyed PDVSA," A-689; *see also* A-3611 ¶ 14. The National Assembly separately commissioned the opinion of a prominent legal expert, Juan Cristóbal Carmona Borjas, who concluded that the Exchange called for the execution of national public interest contracts that required the Assembly's authorization under Article 150. A-303-05 ¶¶ 76-81. A second opinion, authored by Jose Ignacio Hernandez, reached the same conclusion. A-2030 ¶ 106.

On September 27, the National Assembly passed a formal resolution (the "September 2016 Resolution"), which "expressly identified the Exchange," *PDVSA IV*, 106 F.4th at 266, invoked the Assembly's "control functions over the National Government and the Public Administration," and "*reject[ed] categorically*" the pledge of a controlling interest in CITGO "within the swap transaction." A-115 (emphasis added). Citing the National Assembly's Article 187(9) authority, the Resolution demanded an investigation into whether the Exchange "protects the

10

National Property," and summoned PDVSA's president to explain the Exchange. A-115; A-204 ¶ 16.[3]

As this Court has noted, "[t]he dispute over the validity of the 2020 Notes was well documented and publicly known at the time of their offering." *VR Global Partners, L.P. v. Petróleos de Venezuela, S.A.*, 2024 WL 4891271, at *1 (2d Cir. Nov. 26, 2024). In an article published by *El Nacional*—a leading Venezuelan news outlet—constitutional scholar Juan Manuel Rafalli warned that the Exchange was an unconstitutional attempt by Maduro to "annul[] the [National Assembly's] political control." A-695. In the same article, the president of the National Assembly's Finance Commission stated that the Exchange required legislative authorization under Article 150. *Id.* Other Venezuelan news outlets similarly reported that the National Assembly would not recognize the validity of the Exchange unless "authorized by the Legislative Branch in accordance with the Constitution." A-707; *see also* A-715-16.

Numerous market analysts similarly warned that the Exchange could be void absent the Assembly's approval. *See, e.g.*, A-1575 (UBS) ("the collateral should not be taken at face value as … this swap is being carried out without the consent of the

---

[3] The Maduro-controlled Supreme Tribunal of Justice purported to enjoin any investigation into the Exchange, A-302-03, which caused the U.S. Government to sanction members of the Tribunal, A-2045.

opposition-controlled National Assembly"); A-745 (Jeffries) (the pledged CITGO shares "should not be worth much" as collateral because the Assembly had not "blessed" the transaction); A-724 (Torino Capital) (noting "concerns about the legality of the [2020 Notes'] issuance"); A-698 (Nomura Securities) (noting concerns that the Exchange "would require legislative approval or otherwise risk illegality"); A-731 (Goldman Sachs) (noting that "the National Assembly ha[d] questioned the legitimacy of offering a 50% participation of CITGO as collateral" in the Exchange); A-735 (J.P. Morgan) (same).

The United States government also publicly cautioned that the Maduro regime was circumventing the National Assembly's constitutional prerogatives. Prior to the Exchange, the United States expressed concern "that the National Assembly has not been allowed to carry out its rightful role," and urged the Maduro regime to "respect the constitutional role of the National Assembly" and to "honor its own constitutional mechanisms … including the essential elements of the separation of powers and independence of the branches of government." A-1993; A-3240.

Notwithstanding widespread doubts regarding the transaction's legality, the Maduro regime directed PDVSA and its subsidiaries to complete it. *PDVSA IV*, 106 F.4th at 266. The Indenture and the Pledge Agreement were executed on October 27, 2016, and the 2020 Notes were issued on October 28, 2016. SPA-12.

12

On October 15, 2019, the National Assembly enacted another resolution (the "October 2019 Resolution"), which "reiterat[ed] the invalidity of PDVSA's 2020 Bonds." A-122-24. The Assembly emphasized that its September 2016 Resolution "questioned the irresponsible over-indebtedness of PDVSA, initiated an investigation into the bond swap offer, rejected the collateral of 50.1% of the shares in CITGO, and ordered the initiation of investigations for alleged crimes to the public patrimony derived from this transaction." A-122. The Assembly further "ratified" its prior finding that "the 2020 Bond indenture violated Article 150 of the Constitution … since it concerned a national interest public contract, executed with foreign companies, which was not authorized by the National Assembly." A-124.

On October 27, 2019, PDVSA defaulted on the 2020 Notes. SPA-14. Prior to that default, President Guaidó had appointed an ad hoc board of PDVSA, which replaced the Maduro-controlled board from the standpoint of U.S. law. *See Jiménez v. Palacios*, 250 A.3d 814, 828 (Del. Ch. 2019).

## II. Procedural History

### A. The Initial District Court Proceedings and this Court's Prior Decision

On October 29, 2019, Appellants filed suit seeking a declaration that the Governing Documents are invalid and unenforceable. A-103-04 ¶¶ 73-83. Appellees counterclaimed, seeking a contrary declaration and other relief. A-143-75 ¶¶ 107-253. The Republic of Venezuela submitted a letter explaining that the

Governing Documents were void *ab initio* under Venezuelan law.  JA_[Docket_80].

The district court granted summary judgment to Appellees, concluding that (1) New

York law governed, (2) the Governing Documents were valid under New York law,

and (3) the act of state doctrine was inapplicable.  SPA-1-68.

On appeal, this Court certified certain choice-of-law questions to the New

York Court of Appeals.  *PDVSA II*, 51 F.4th at 475-76.  The New York Court of

Appeals unanimously concluded that Venezuelan law governs the validity of the

Governing Documents.  *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,

41 N.Y.3d 462 (2024).  This Court then vacated and remanded.  *PDVSA IV*, 106

F.4th at 270.

## B.     The Proceedings on Remand

On remand, the district court invited supplemental briefing and expert reports.

A-3500-10.  The Republic submitted another *amicus* brief explaining why the

Governing Documents are invalid under Venezuelan law.  A-3511-40.  At the district

court's invitation, the United States submitted a new statement of interest.  A-5517-

18; A-5519-24.  Freddy Guevara, the former President of the Comptroller's

Commission, submitted a declaration reflecting the majority position of the National

Assembly at the time of the Exchange.  A-3608-13.

The district court again granted summary judgment to Appellees, declining to

defer to the Republic's amicus brief, ruling that the Governing Documents are valid

14

under Venezuelan law, and adhering to its prior conclusion that the act of state doctrine does not apply. SPA-69-157.

On both rounds of summary judgment briefing, Appellants submitted expert reports and declarations from two prominent Venezuelan legal scholars: Professors Allen R. Brewer-Carias and José Araujo-Juárez. CA-581-640; CA-641-700; CA-1063-79; CA-1108-16; A-3571-607; A-3617-22; A-4877-81; CA-1248-333; CA-1334-1400. Professor Brewer is one of the leading Venezuelan constitutional law scholars and, as a member of the 1999 Constituent Assembly, was one of the main drafters of the Venezuelan Constitution. A-276-77 ¶¶ 1-8; A-5473-76 ¶¶ 35-38. Professor Araujo is the author of the preeminent treatise on Venezuelan administrative law. A-3671-72 ¶¶ 1-8. Each of these scholars took considerable risks in advancing public positions critical of the Maduro regime.

Appellees submitted reports and declarations from two experts, whose identities the district court sealed because of purported security concerns. A-3256-57; A-4875-76. The first, "Doe," is a ███████████████████████ ███████████████████████████████████████████████ ████████████████████ CA-62 ¶¶ 1-4; CA-1069 ¶ 15. Following remand, Doe refused to participate in this case. CA-1117-18. The second, "Roe," is ███████ ██████████████████████████████████████ CA-1336-37 ¶¶ 1-3.

Roe ███████████████████████████████████

███████████████████████████████ CA-1119-23.

## C. The District Court's Summary Judgment Decision

### 1. Interpretation of Venezuelan Law

The district court ruled that the Venezuelan Constitution requires National Assembly authorization only for national public interest contracts executed by the National Executive. SPA-134. In doing so, the court rejected the official position and sovereign acts of the Venezuelan government, unrebutted testimony of a senior member of the National Assembly, and the position of the majority of Venezuelan constitutional scholars.

The district court started its analysis with the Constitutional Chamber's *Andrés Velásquez* decision. First, the district court concluded that *Andrés Velásquez* was binding despite its failure to invoke Article 335. SPA-98-99. Second, the court ruled that *Andrés Velásquez* "established that only contracts to which the Republic itself is a party are national public interest contracts." SPA-103. The court opined that its reading of *Andrés Velásquez* was "reaffirm[ed]" by the Constitutional Chamber's subsequent decisions. SPA-119. Finally, the district court asserted that while the National Assembly has historically approved PDVSA joint venture public interest contracts under Article 150, such approvals "do[] not in any way imply that

16

National Assembly approval is required for the debt offerings at issue here." SPA-118-19.

### 2. Consideration of Venezuelan Government's Views

The district court also rejected the views of the Republic of Venezuela, which it has expressed in *five* separate briefs in this litigation alone. *See* A-198-209; A-1699-1701; *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 235 N.E.3d 949 (2024); A-3511-40.

In each submission, the Republic explained that the Exchange was a national public interest contract requiring National Assembly authorization under Articles 150 and 187(9). *E.g.*, Amicus Brief of the Bolivarian Republic of Venezuela, *Petroleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 20-3858 (2d Cir. Mar. 22, 2021), A-1699-1701; A-3525-27. The Republic also explained that, consistent with the May 2016 Resolution, *all* national public interest contracts, including those executed by state-owned entities, like PDVSA, require legislative authorization. A-3518-30.

Despite agreeing that most of the relevant factors "cut in favor of the Republic, or are at the very least neutral," the court rejected the Republic's position because it was submitted close in time to Appellants' briefs and "supplement[ed]" them. SPA-130.

17

### 3. Act of State Doctrine

The district court acknowledged that the National Assembly's resolutions constituted "official acts" of a sovereign, SPA-91, but it refused to give them legal effect. The court concluded that the May 2016 Resolution was irrelevant to the Exchange because it referred exclusively to contracts involving the National Executive, rather than PDVSA. The court acknowledged that the September 2016 Resolution "reject[ed] the Pledge," "summon[ed] the President of PDVSA" to testify about the transaction, and "urge[d] the Public Ministry to open an investigation," but ruled that because it stopped short of declaring the *proposed* Exchange Offer invalid, it failed to invalidate the Exchange Offer. SPA-108-09. Finally, the district court held the act of state doctrine inapplicable under *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985). SPA-151-53.

### SUMMARY OF ARGUMENT

**I.A.** The district court ignored the text and purpose of Article 150 when it ruled that only the Republic can enter into national public interest contracts. Nothing in Article 150 limits national public interest contracts to contracts by the Republic, excluding contracts by decentralized entities, such as PDVSA. And such limitation would frustrate Article 150's purpose of ensuring National Assembly oversight over the entire National Public Administration (including decentralized state entities).

18

The district court sought support in Article 187(9)'s reference to the National Executive. But that provision simply reflects Venezuelan administrative practice, where in decentralized state entities request National Assembly approval through their supervising government ministry (a part of the National Executive). That provision does not restrict the term "national public interest contract" in Article 150.

**I.B.** The district court also ignored decades of Venezuelan constitutional practice of requesting National Assembly authorization for contracts concluded by decentralized state entities. Article 150 requires National Assembly authorization of national public interest contracts when (*i*) required by statute, and (*ii*) the counterparty is a foreign entity or a non-domiciled company. The National Assembly has routinely exercised its Article 150 authority to authorize (or reject) contracts concluded by decentralized state entities operating within the oil and gas sector, including by PDVSA's subsidiaries, because such approval is required by statute. The term "national public interest contracts" has the same meaning throughout Article 150, and this unchallenged long-standing practice conclusively demonstrates that it encompasses contracts by decentralized state entities.

**I.C.** The district court grounded its restrictive reading of Article 150 in the Constitutional Chamber's *Andrés Velásquez* decision, but it misread that decision. *Andrés Velásquez* did not consider the scope of the term "national public interest contracts"; it only held that the Organic Law on Financial Administration of the

Public Sector could not exempt certain debt transactions by the Republic from Article 150's requirement of obtaining National Assembly authorization for contracts with foreign or non-domiciled counterparties. Moreover, the district court's reading of *Andrés Velásquez* would lead to absurd results by rendering either unconstitutional or redundant portions of the Organic Law on Financial Administration. *Andrés Velásquez* did not issue any binding interpretation of the term "national public interest contracts."

**I.D.** The other decisions by the Constitutional Chamber (or its predecessor) cannot support the district court's interpretation either. The district court was forced to engraft various exceptions onto its contrived construction of Article 150, or to adopt fundamentally unsupportable distinctions. A faithful reading of these decisions—some of which expressly applied Article 150 to contracts by decentralized state entities (including PDVSA's subsidiary)—further confirms that the term "national public interest contracts" does not exclude these entities.

**II.** The district court further erred by rejecting the sovereign government of Venezuela's interpretations of its own laws, offered in a series of consistent, thorough, and clear submissions. In these submissions, the Republic has explained that: (i) Articles 150 and 187(9) of the Venezuelan Constitution require National Assembly approval for all national public interest contracts with foreign companies and that without this approval, these contracts are null and void *ab initio*;

20

(ii) Venezuelan law places the burden of obtaining National Assembly approval on the proponent of a national public interest contract; (iii) the Exchange constituted a national public interest contract requiring legislative approval; and (iv) the National Assembly's May and September 2016 Resolutions had the effect of invalidating the Pledge and thereby prevented the Governing Documents from coming into valid existence.

Under the Supreme Court's decision in *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co., Ltd.*, a foreign sovereign's submission regarding the interpretation of its own laws is "ordinarily" entitled to "substantial" weight. 585 U.S. 33, 46 (2018). The district court acknowledged that all but one of the *Animal Science* factors favored deference to the Republic's submissions, or were "at least neutral." But the district court nonetheless refused to credit the Republic's position *solely* because its filing was submitted "two days before the parties' opening briefs" and its legal position "largely aligns [with] that of Plaintiffs and their proffered experts." Were that a valid reason to withhold deference, *Animal Science* would require no deference at all. The district court's reasoning perversely penalizes only the parties with whom appearing foreign sovereigns agree, even though the most obvious reason why a sovereign will favor one party's litigating position over another's is because the supported litigant is correct about the meaning of foreign law. Accepting the district court's rule would nullify the Supreme Court's holding

that "a [sovereign] government's expressed view of its own law is *ordinarily entitled to substantial ... weight*" and is always entitled to "respectful consideration." *Id.* at 36, 46 (emphasis added). On *de novo* review, this Court should hold that affording "substantial weight" to a sovereign's views requires more than paying them lip service.

**III.A.** The district court also contravened the act of state doctrine by rejecting the National Assembly's acts that have purported to apply Article 150 to PDVSA's agreements. Instead of assuming that the National Assembly's May and September 2016 Resolutions "ha[d] the legal effects … they purport to have," *PDVSA II*, 51 F.4th at 466, the district court faulted the Assembly for what the Resolutions *did not say*. But the Resolution's purported effects, which aligned with the National Assembly's historical practice of asserting its authorization authority over PDVSA, A-200 -01 ¶¶ 4, 7; A-203 ¶ 11, were unambiguous: the May 2016 Resolution declared that any national public interest contract lacking appropriate advance authorization would be "null and void," and the September 2016 Resolution cited Article 187(9) and "categorically reject[ed]" the proposed Pledge of CITGO shares in the proposed Exchange Offer.

Rather than accept the Republic's acts and articulated legal interpretation, the district court did exactly what the act of state doctrine forbids: it "question[ed] the validity of the foreign act on the ground that it did not comply with that sovereign's

22

own legal requirements." *PDVSA II*, 51 F.4th at 467 (cleaned up).  The district court declined to give effect to the September 2016 Resolution's "categorical rejection" of the Pledge because the Resolution did not expressly "invalidate the Exchange Offer."  The district court's unexplained distinction between "rejecting" the Pledge and "invalidating" the Exchange Offer reflects precisely the kind of scrutiny of a "foreign sovereign's own legal requirements" that the act of state doctrine forbids.  The district court should have instead accepted, as a rule of decision for this case, the *legal effect* that the National Assembly intended the September 2016 Resolution to have—namely, that the Pledge, and with it the Exchange Offer, never came into valid legal existence.

**III.B.**  For the same reason, the district court wrongly held that the *Allied Bank* extraterritorial-takings exception applies to this case.  According to the district court, "papers were signed, contracts were executed, [and] payments are due in New York, and the collateral sits waiting in a vault in New York.  Venezuela['s] … ***impotence to complete the expropriation*** … makes clear that ***no taking*** has taken place in Venezuela."  SPA-152.  But the "papers," "contracts," and "payments due" reflect invalid property interests in the United States if the Exchange was void *ab initio*, which it was.  Because of the National Assembly's rejection of the Exchange, within *Venezuela*, there was no extant property interest—and thus no taking, extraterritorial or otherwise.

23

## STANDARD OF REVIEW

This Court reviews a district court's rulings on summary judgment *de novo*, *PDVSA II*, 51 F.4th at 456, including a district court's determination of foreign law, *In Re: Vitamin C Antitrust Litigation*, 8 F.4th 136, 142 (2d Cir. 2021), and its application of the act of state doctrine, *Celestin v. Caribbean Air Mail, Inc.*, 30 F.4th 133, 137 (2d Cir. 2022).

## ARGUMENT

### I. THE DISTRICT COURT MISINTERPRETED VENEZUELAN LAW BY RESTRICTING THE SCOPE OF NATIONAL PUBLIC INTEREST CONTRACTS IN ARTICLE 150.

Article 150 requires National Assembly approval of "national public interest contracts" when (*i*) "determined by law" or (*ii*) executed with foreign or non-domiciled entities. A-442. The district court ruled that Article 150 only applied to national public interest contracts concluded by the National Executive—and excludes decentralized state entities, like PDVSA. This construction cannot be reconciled with the provision's text and intent, and with long-standing constitutional practice of requiring legislative approval under Article 150 for contracts concluded by decentralized entities. This interpretation also contradicts decisions of the Supreme Judicial Tribunal's Constitutional Chamber, which the district court misread, the views of the Venezuelan government as to its own law, and the majority of scholarly opinion.

24

**A.  Article 150's Text and Purpose Demonstrate that "National Public Interest Contracts" Encompass Contracts Executed by Decentralized Public Entities.**

The text of Article 150 does not limit the term "national public interest contracts" to contracts concluded by the National Executive, nor does it exclude contracts executed by decentralized state entities.  A-5464 ¶ 19; A-283-84 ¶ 31; A-287-88 ¶¶ 40-41.  That reading aligns with Article 150's intent and the role of decentralized entities in Venezuelan governmental structure.  In today's Venezuela, it is rare to find contracts concluded directly by organs of the National Executive, such as the President or a specific ministry.  A-3574-75 ¶ 10.  Rather, entities within Venezuela's Decentralized Public Administration, like PDVSA, are the ones that typically exercise contracting power on behalf of the Venezuelan state.  These contracts—like the debt exchange at issue—often have significant implications for strategic sectors of Venezuela's economy.  A-288-89 ¶ 42.  The Article 150 power to authorize (or refuse to authorize) such contracts is one of the critical ways in which the National Assembly exercises its oversight authority over Venezuelan administrative state.  A-280 ¶¶ 21-23; A-3699-702 ¶¶ 108-20.

Unable to find textual support for its restrictive reading in Article 150, the district court looked instead to Article 187(9).  Article 187 enumerates the functions and powers of the National Assembly, with Article 187(9) reflecting the National Assembly's oversight authority over national public interest contracts.  A-442-43.

25

The district court opined that Article 187(9) supported its reading of Article 150 because Article 187(9)'s first sentence, which concerns approval of national public interest contracts where required by law, refers to "the National Executive." SPA-118. And, the district court asserted, "the second sentence of Article 187(9) does not contradict this limitation because it does not specify which entities … are authorized to enter into contracts of national … public interest with foreign entities." *Id.* (citing A-3823-24 ¶¶ 44, 47). The district court's analysis misunderstands the process of securing National Assembly approval. Every Venezuelan decentralized entity is assigned to a specific government ministry (a part of the National Executive), which oversees that entity. A-5461-63 ¶¶ 14-17; A-3692 ¶¶ 83-85. To obtain the National Assembly authorization required to execute a national public interest contract, the supervising ministry requests that authorization on the entity's behalf. A-5461-63 ¶¶ 14-16; A-5466 ¶ 24; A-5467-69 ¶¶ 26-28; A-3693 ¶ 87. That makes sense from the separation-of-power perspective: the National Executive (representing the executive branch) is the organ requesting authorization for national public interest contracts from the National Assembly (the legislative branch). That is why Article 187(9) at the outset references the National Executive as the body receiving the National Assembly authorization. A-5466-69 ¶¶ 24-27.

The district court's response—that "PDVSA cannot be considered part of the National Executive because it is a Decentralized Public Administration entity,"

26

SPA-117 (citations omitted)—is a non-sequitur. As Appellants' experts—two of the foremost scholars of Venezuelan constitutional and administrative law—explained, it is precisely because PDVSA is *not* part of the National Executive that the Ministry of Oil, as the responsible ministry of the National Executive, should have sought legislative authorization. A-5461-63 ¶¶ 14-16; A-5466 ¶ 24; A-5467-69 ¶¶ 26-28; A-3693 ¶ 87. The district court ignored this point, and Appellees' experts did not present any contrary evidence as to Venezuelan governmental practice.

In any event, the use of the term "National Executive" in the first sentence of Article 187(9) does not limit the term "national public interest contracts." The term "National Executive" does not appear anywhere in Article 150, and it is conspicuously absent from the second sentence of Article 187(9), which refers to the National Assembly's power to "[a]uthorize contracts of … national public interest … with companies not domiciled in Venezuela." A-442-43. Those unqualified references to national public interest contracts demonstrate a broader scope with respect to contracts with foreign or non-domiciled entities. A-5469 ¶ 28 & n.54.

The district court also ignored the purpose behind Article 150. Professor Brewer, a member of the National Constituent Assembly and one of the main drafters of the 1999 Venezuelan Constitution (and of Article 150 in particular), *see* A-277 ¶ 7, explained that, consistent with prior constitutional practice, Article 150

27

sought to encompass all contracts entered into by organs and entities of the National Public Administration, including decentralized state entities. A-5474-75 ¶ 36; *see also* A-3701 ¶ 117. Professor Brewer pointed out that his proposed Article 150 was designed to counter then-President Hugo Chávez's proposal, which sought to limit Article 150 only to contracts by the Republic. A-5474-75 ¶¶ 36-37. Professor Brewer's proposal prevailed, and was approved as the current Article 150, with public interest contracts comprising contacts by entities of both Central and Decentralized Public Administration. Professor Brewer's account of Article 150's enactment was not challenged by the district court (or by Appellees).

> **B.** **Consistent Constitutional Practice Demonstrates that National Public Interest Contracts Encompass Contracts by Decentralized State Entities.**

Article 150 requires National Assembly authorization of "national public interest contracts" in two scenarios: (i) when "determined by law" (first sentence) and (ii) when the contract is with a foreign or non-domiciliary counterparty (second sentence). A-5458 ¶ 6; A-3821 ¶ 39. The first scenario depends on the National Assembly enacting a statute requiring its authorization. The second scenario is a direct constitutional command and does not require implementing legislation.

Because Article 150 delineates when national public interest contracts are subject to National Assembly approval, the meaning of the term "national public interest contracts" must be the same for both sentences of Article 150. *Cf.* A-3821

¶ 37 (Appellees' expert acknowledging that constitutional provisions must be read harmoniously). If contracts with decentralized state entities can be national public interest contracts under Article 150's first sentence, they cannot be categorically excluded from the scope of the same term in Article 150's second sentence. *See* A-5457-61 ¶¶ 5-12.

For decades, the National Executive has submitted and the National Assembly has routinely reviewed and authorized under its Article 150 power contracts by decentralized entities under applicable statutes. This long-standing Venezuelan constitutional practice demonstrates that the Republic's participation is not required for a contract to be considered a national public interest contract. Thus, under Article 33 of the Organic Law of Hydrocarbons, enacted in 2001 (the "Hydrocarbons Law"),[4] Venezuela's Ministry of Energy and Oil is required to submit to the National Assembly for "prior approval" any joint venture agreements entered into by PDVSA or its affiliates. CA-821; *see also* A-3594 ¶ 39. In the decades since the passage of the Hydrocarbons Law, both before and after the *Andrés Velásquez* decision, the Ministry of Energy and Oil has consistently submitted PDVSA joint venture agreements to the National Assembly for approval. CA-1114-15 ¶ 11; A-3594-97 ¶¶ 38-41. And the National Assembly has expressly invoked its authority under

---

[4] The National Assembly amended the Hydrocarbons Law in 2006. A-1727-40.

29

Articles 150 and 187(9) in resolutions authorizing these contracts. CA-1114-15 ¶ 11; A-3594-98 ¶¶ 38-42; A-5459-61 ¶¶ 10-12.[5]

Appellees' expert conceded, and the district court did not question, that Article 33 of the Hydrocarbons Law, and the approval power conferred to the National Assembly under that statute, are a valid exercise of the power vested in the National Assembly under the first sentence of Article 150:

> Article 150 of the Constitution provides that National Assembly authorization will be required "*in the cases determined by the law*." This means that the Constitution delegated to the National Assembly the possibility of determining, through legislation (via statute), which transactions require National Assembly authorization. …
>
> *The Hydrocarbons Law may be considered as an example of the National Assembly exercising that vested power*.

A-4932 ¶¶ 141-42 (emphasis added); *see also* A-3869 ¶ 160.

Venezuelan canons of constitutional interpretation (and elementary logic) dictate that if contracts entered into by decentralized public entities (as is the case with contracts subject to Article 33 of the Hydrocarbons Law) are national public interest contracts under the first sentence of Article 150, the term "national public interest contracts" in the second sentence of Article 150 cannot be restricted to

---

[5] These resolutions include: A-1814-56; A-1857-1904; A-1905-40; A-1941-91; A-3963-4015; A-4016-51; A-4052-73; A-4172-75; A-4834-43; A-4863-74; A-4176-81.

contracts where the National Executive itself is a party. Article 33 of the Hydrocarbons Law (and the resolutions passed by the National Assembly authorizing national public interest contracts subject to that statutory provision) demonstrate that contracts entered into by decentralized public entities fall within the definition of national public interest contracts.

The district court entirely missed this point, disregarding the settled constitutional practice of legislative review of contracts by decentralized state entities under Article 150 in a single sentence: "the fact that Article 150 allows for statutes such as Article 33 to require National Assembly approval in certain circumstances (*i.e.*, where approval is 'determined by law') does not in any way imply that National Assembly approval is required for the debt offerings at issue here." SPA-118-19. But if the term "national public interest contracts" is not limited to contracts by the National Executive, there is no basis to exclude the Governing Documents from the scope of that term. And the second sentence of Article 150 then mandates National Assembly approval because the counterparties to the Governing Documents are not domiciled in Venezuela, irrespective of whether the National Assembly has passed any laws that mandate its approval of such contracts.

Appellees' expert went further, opining that Article 150 "delegated to the National Assembly the possibility of determining, through legislation (via statute), which *transactions* require National Assembly authorization." A-4932 ¶ 141

31

(emphasis added); *see also* A-4933 ¶ 143 n.178 (speculating about "the possibility of the National Assembly exercising its vested power under Article 150 … to determine, through statute, whether *other types of contracts* may require National Assembly approval") (emphasis added).  Article 150 does not vest the National Assembly with that power.  The National Assembly's Article 150 authority to "determine[] by law" which contracts must be submitted for its review and approval can be exercised only with respect to contracts that fall within the category of national public interest contracts.  A-5458 ¶ 6.[6]  PDVSA joint venture agreements were national public interest contracts, which is why the National Assembly could require under Article 150 that they be submitted for its review and approval.

### C.  The District Court's Reliance on *Andrés Velásquez* Is Unavailing.

The district court based its narrow definition of national public interest contracts on the Constitutional Chamber's decision in *Andrés Velásquez*.  SPA-103-09.  But the court misread that decision.  In *Andrés Velásquez*, the Constitutional Chamber considered the constitutionality of Article 80 of the Organic Law on Financial Administration.  Article 80 permitted the Republic, upon the National Assembly's approval of the annual budget, to enter into additional debt transactions

---

[6] Appellees' expert also suggested that the National Assembly's decades-long practice of invoking Article 150 when approving PDVSA joint venture agreements was "*possibly mistaken*."  A3868-69 ¶ 158 (emphasis added).  That suggestion borders on the absurd.  A-5467-69 ¶ 27; A-5509 ¶ 102.

with foreign non-domiciled counterparties by *informing* the National Assembly rather than seeking *authorization*. A-2103; *see also* A-3580-81 ¶ 17(c), A-3599-600 ¶ 45; A-5479 ¶¶ 45-46; A-3690-91 ¶¶ 78-79; A-5419-20 ¶¶ 24-25. That statutory provision was challenged under Articles 150 and 187(9), insofar as it exempted national public interest contracts with foreign or non-domiciled entities from the requirement of obtaining National Assembly approval. A-2103.

The Constitutional Chamber agreed that Article 80 was unconstitutional in that respect. The Chamber reaffirmed that national debt contracts are national public interest contracts and thus are subject to National Assembly authorization when required by Article 150. A-2117; A-290-91 ¶¶ 47-51. The Chamber then held that, in contrast to Article 150's first sentence, Article 150's second sentence operated as a direct constitutional command that could not be circumvented by statute. A-2119 (the requirements of Article 150's second sentence are "inescapable"). The Constitutional Chamber therefore invalided Article 80 insofar as it exempted such contracts from that requirement. A-2120-21.

The district court made several missteps in its analysis of *Andrés Velásquez*. The Constitutional Chamber focused on national public interest contracts entered into by the Republic because those were only contracts referenced in Article 80. But nowhere in *Andrés Velásquez* did the Chamber suggest that the term "national public interest contracts" excludes contracts entered into by decentralized state entities like

33

PDVSA.  A-3691 ¶ 79; A-3573-74 ¶¶ 8-9; A-3578 ¶ 16; A-3580-81 ¶ 17(c); A-3588-89 25; CA-658 ¶ 24.

The district court's reading of *Andrés Velásquez* misunderstands the issue that was before the Constitutional Chamber.  The Organic Law on Financial Administration, which the Chamber considered in *Andrés Velásquez*, expressly applied to entities within *both* the Central Public Administration *and* the Decentralized Public Administration.  A-3111 (art. 98); *see also* A-312-15 ¶¶ 90-92; CA-116-18 ¶¶ 159-65; CA-188-89 ¶¶ 128-31; A-4921-22 ¶ 110.  Article 98 of the law provided that certain debt issuances by both centralized and decentralized entities be submitted to the National Assembly for approval.  A-3111 (art. 98); A-4921-22 ¶ 110.  Article 101 then excluded from that requirement specific decentralized entities, such as the Central Bank (art. 101.1) or companies created under the Hydrocarbons Law, like PDVSA (art. 101.4).  A-3112; *see also* A-4921-22 ¶ 110.

But it would be illogical to read the *Andrés Velásquez* decision as holding that public credit transactions entered into by decentralized entities under the Organic Law on Financial Administration are *not* national public interest contracts.  That would mean that the Constitutional Chamber in *Andrés Velásquez* was effectively invalidating (without saying so) Article 98's requirement of National Assembly approval for debt issuances by decentralized entities (which were not exempted

34

under Article 101). And it would render Article 101 redundant, for there would be no need for the Organic Law on Financial Administration to exempt specific decentralized entities from the law's requirement of obtaining National Assembly authorization if *all* decentralized entities were not subject to Article 150's requirement in the first place.

Rather, *Andrés Velásquez* recognizes that contracts between the Republic and foreign states or entities are just one type of national public interest contract. In fact, the Constitutional Chamber expressly noted that other contracts are included within the definition of national public interest contracts: "contracts concluded by the Republic through the competent organs of the National Executive to do so … would be *included within the species of national public interest contracts*." A-2116-17 (emphasis added). In other words, national public interest contracts can also include contracts by decentralized state entities like PDVSA.

The district court opined that this phrase was "meant to distinguish national public interest contracts from state or municipal public interest contracts. SPA-108. But the Constitutional Chamber did not say that contracts concluded by the Republic would be included within the larger term "public interest contracts" (which includes national, state, and municipal contracts); it said they are included within the term "*national* public interest contract," and "the word 'includes' is usually a term of enlargement, and not of limitation." *Burgess v. United States*, 553 U.S. 124, 131 n.3

35

(2008) (quoting 2A N. Singer & J. Singer, *Sutherland on Statutory Construction* § 47:7, p. 305 (7th ed. 2007)); *In re Sarex Corp.*, 509 F.2d 689, 691 (2d Cir. 1975) (same)

Moreover, the district court incorrectly interpreted *Andrés Velásquez* as a binding decision. SPA-98-99. For a decision to be binding, the Constitutional Chamber must expressly state that it is issuing a binding constitutional interpretation under its authority pursuant to the second sentence of Article 335. A-5483-85 ¶¶ 56-58; A-5419 ¶ 23; A-5420 ¶ 27. Every time the Constitutional Chamber issued a binding constitutional interpretation, it always did so expressly. CA-1368-70 ¶ 58 n.101 (listing examples).

The Constitutional Chamber in *Andrés Velásquez* did not say it was issuing a binding constitutional interpretation, much less a binding interpretation of the scope of the term "national public contracts" in Article 150. Rather, the Chamber exercised its power under Article 336 to "declare the total or partial nullity" of Article 80 of the Organic Law on Financial Administration as conflicting with the Constitution. CA-631-32 ¶¶ 110-11; CA-647 ¶ 4.c; CA-665-72 ¶¶ 40-54; A-3577-78 ¶ 14; A-5479 ¶ 45; A-5483-85 ¶¶ 55-58.

The district court opined that *Andrés Velásquez* in fact invoked its Article 335 authority because the Constitutional Chamber stated that it was "proceeding 'as maximum and ultimate interpreter of the Constitution.'" SPA-107 (quoting A-

36

2116). But the reference to being the "maximum and ultimate interpreter of the Constitution" comes from the *first* sentence of Article 335, which applies to *all chambers* of the Supreme Judicial Tribunal, not just to the Constitutional Chamber. *See* A-447. That reference has nothing to do with invoking the Constitutional Chamber's *exclusive authority* to issue binding constitutional interpretations under the *second sentence* of Article 335.

The district court opined that Appellants' experts shared its reading of *Andrés Velásquez* as adopting a binding rule that only contracts concluded by the Republic constitute national public interest contracts under Article 150. SPA-99-100; SPA-108. But Professor Brewer has explained, both to the district court below and in public academic writings, that his past statement was in error and contradicts his consistently held views. A-3598-606 ¶¶ 43-58; A-5489-93 ¶¶ 64-70; *see also* A5421-22 ¶¶ 30-33. And Professor Araujo explained that this view misrepresents his academic work. A3686-90 ¶¶ 63-75; A-5422-23 ¶ 35; A-5429-32 ¶¶ 59-67. Regardless, even if Professors Brewer and Araujo had once expressed that view, *Andrés Velásquez* did not issue a definitive restrictive construction of "national public interest contracts" in Article 150. *Supra* at 35-37.

Nor have other Venezuelan constitutional scholars read *Andrés Velásquez* in a restrictive way. For example, Professor Rafael Badell has written that contracts of public interest can be entered into by entities of the Decentralized Public

Administration "if they directly affect the interest of the Republic as territorial entity," and thus that "contracts signed by public companies may be considered as national public interest contracts when the  national interests that correspond to the Republic are directly affected."  A-2554-56; *see also* A-3133-34; A-1359-60 ¶¶ 38-39.  Likewise, Professor Luis Henrique Farías Mata wrote that "the Constitution does not establish distinctions regarding the organ that enters into the contract: if it is a contract of national interest, regardless of which organ of the Venezuelan Public Administration appears in it as a party, it must, in all cases, meet the requirements set forth therein."  A-2826-65.

> **D.** **The District Court Misinterpreted the Constitutional Chamber's Other Decisions**

The district court's misreading of *Andrés Velásquez* affected its consideration of the Constitutional Chamber's other decisions.  The court was forced to engraft exception upon exception onto its rule that only contracts concluded by the Republic qualified as national public interest contracts.  But those decision do not support the district court's restrictive interpretation.

Thus, in *Electrificacion del Caroni S.A.* ("*EDELCA*"), the Constitutional Chamber held that a contract between EDELCA, a Venezuelan state-owned utility provider (*i.e.*, a decentralized state entity), and a Brazilian company was a national public interest contract.  A-4530-32; A-3580-81 ¶ 17(c); A-3645 ¶¶ 104-05; A-5423 ¶ 38.  The district court distinguished *EDELCA* on the grounds that this contract

38

"stemmed from an agreement (a memorandum of understanding) between the Republic of Venezuela and the Federal Republic of Brazil." SPA120. But the Constitutional Chamber deemed the contract entered into by EDELCA to be a national public interest contract irrespective of the Venezuela-Brazil agreement. A-4531-32; *see also* A-5495-98 ¶¶ 75-81; A-5476-77 ¶¶ 39-40. The Constitutional Chamber stated that the "memoranda of understanding are *neither treaties nor agreements* from the point of view of international regulations," and that the EDELCA agreement was "a *stipulation of a contractual nature*, which constitutes a *public interest contract*," and "is *subsumed* within the limits defined by this Chamber, on public interest contracts." A-4528-30 (emphasis added). The Constitutional Chamber concluded that EDELCA, a decentralized state-owned enterprise, was one of the "bodies of the National Executive Branch" that can enter into national public interest contracts, and are subject to National Assembly authorization because the contract "generat[ed] obligations for the Republic in the exercise of its international representation, through a public interest contract," even though the Republic was not party to said contract. A-4530-31; *see also* A-5216 ("the Constitutional Chamber [in *EDELCA*] included decentralized entities among those authorized to enter into public interest contracts"). So, too, here. By pledging the majority shares of CITGO Holding, the Exchange effectively mortgaged a

39

strategic Venezuelan national asset—the foreign "crown jewel" of its oil industry. A-3274; *see also* A-199; A-3515.

The district court was forced to create yet another exception to explain *Attorney General II*. That case involved Article 247 of the Venezuelan Constitution, which requires the Office of the Attorney General to be consulted on national public interest contracts prior to their approval. *Attorney General II* held that certain promissory notes issued by Venezuela's state-run agricultural development bank, Banco de Desarrollo Agropecuario S.A. ("BANDAGRO") were national public interest contracts that required consultation with the Attorney General. A-2171-74. There is no dispute that BANDAGRO was a decentralized state entity. *See* A-343-44 ¶¶ 10-12; A-351-52 ¶ 30.

The district court opined that BANDAGRO's promissory notes were national public interest contracts because the Republic guaranteed them. SPA-122. But although the Constitutional Chamber's decision references the obligations being payable by the Republic, the decision does not turn on the Republic's role as the guarantor. Instead, what mattered was BANDAGRO's status as a state-run enterprise—a part of the Decentralized Public Administration. A-343-44 ¶¶ 10-12.

The district court then opined that the Constitutional Chamber's *Brigitte Acosta* decision which exempted the Central Bank of Venezuela from Article 150's authorization requirement, A-2225, supported its reading of *Andrés Velásquez*.

40

SPA-123-24. But the Constitutional Chamber in *Brigitte Acosta* based its holding on the Central Bank of Venezuela's special status in the Venezuelan public structure, emphasizing that because the Central Bank's independence in setting forth fiscal policy is imperative, it operates outside of the National Assembly's purview. A-2224-25; A-5478 ¶ 43. As the Constitutional Chamber underlined, the Central Bank is "neither part of the Central Administration or the *Functionally Decentralized Administration.*" A-2221-22 (emphasis added); A-5494-95 ¶ 74. If *Andrés Velásquez* had limited national public interest contracts to contracts involving only the Republic, there would have been no need for the Constitutional Chamber to analyze whether a contract by the Central Bank of Venezuela was subject to National Assembly approval. Nor would it have made sense for the Constitutional Chamber to stress that the Central Bank was not part of either the Central Public Administration or the Decentralized Public Administration. A-353-55 ¶¶ 36-37.

Finally, the district court side-stepped the *Simón Muñoz Armas* decision, where the Venezuelan Supreme Court of Justice (the Supreme Judicial Tribunal's predecessor) held that joint venture agreements between PDVSA's subsidiaries and foreign oil companies were national public interest contracts requiring National Assembly authorization. A-5030-31; *see also* A-5500-01 ¶¶ 86-88. The court opined that the decision was inapposite because it was decided under the previous Venezuelan Constitution. SPA-125-26. But there is no meaningful difference

41

between Article 150 and its predecessor provision—Article 127 of the 1961 Constitution. Both encompassed "all contracts signed … by the[] decentralized entities of public law," such as "a contract signed by a national … autonomous institute." A-5225, *quoted in* A-5474-75 ¶ 36. The scope of the term "national public interest contract" was the same under both 1961 and 1999 Constitutions. A-5502-03 ¶ 91.

## II. THE DISTRICT COURT ERRED IN REJECTING VENEZUELA'S OFFICIAL INTERPRETATION OF VENEZUELAN LAW.

The district court erred by failing to give sufficient weight to the Republic's consistent, well-reasoned interpretations of its own law. Throughout this litigation, the Republic has repeatedly articulated its position in thorough submissions to this Court, the New York Court of Appeals, and the district court. The Republic has explained that Articles 150 and 187(9) of the Venezuelan Constitution require National Assembly approval for all national public interest contracts with foreign or non-domiciled companies—including those by decentralized state entities—and that without this approval, these contracts are invalid. A-3525-27. The Republic has made clear that Venezuelan law places the burden of obtaining National Assembly approval on the proponent of a national public interest contract. A-3527-28. The Republic has provided a detailed explanation of why the Exchange constituted a national public interest contract requiring legislative approval, citing Venezuelan constitutional and statutory law, Supreme Judicial Tribunal case law, National

42

Assembly practice, and the Venezuelan executive's own analysis. A-3525-27; A3531-33. Finally, the Republic has clarified the meaning and effect of the National Assembly's May and September 2016 Resolutions, which "reject[ed] categorically" the Pledge. A-3534-39.

The Supreme Court has explained that a foreign sovereign's submission regarding the interpretation of its own laws is entitled to "substantial" weight. *Animal Sci.*, 585 U.S. at 46. "Relevant considerations include the [foreign sovereign's] statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." *Id.* at 43.

The district court *agreed* that these factors predominantly "cut in favor of the Republic, or are at the very least neutral." SPA-130. But while the court professed to afford "substantial weight and respectful consideration" to the Republic's views, SPA127, it did not actually do so. Instead, the district court *discounted* the Republic's views because it submitted its filings "two days before the parties' opening briefs" and its legal position "largely aligns [with] that of Plaintiffs and their proffered experts." SPA-130. The district court failed to explain why those facts mattered—much less why they should free a court to reject the otherwise clear,

43

consistent, and authoritative views of foreign law offered by a foreign sovereign. This Court should faithfully apply *Animal Science* and reverse.

### A. The Republic's Submissions Are Clear, Thorough, and Well-Supported.

The Republic's *amicus* brief below offered a meticulous explanation for its interpretation of Venezuelan law, including the history of the relevant constitutional provisions and governing Venezuelan legal authority. A-3525-27. And its repeated submissions in this litigation have patiently discussed the relevant authorities on the Venezuelan Constitution, the meaning of its provisions, the National Assembly's prerogative to authorize (or withhold authorization from) national public interest contracts, the categorization of the Exchange as a national public interest contract under Articles 150 and 187(9), and the effect of the National Assembly's multiple resolutions on the 2020 Notes' validity. A-198; A-3511.

Principles of international comity counsel against a federal court telling a foreign sovereign that it does not understand its own law. That principle is particularly important here, where the district court was provided a longstanding interpretation of a constitutional separation-of-powers provision (Article 150) from the branch of government responsible for implementing that provision (the National Assembly). The district court's refusal to give weight to the Republic's arguments, including the proper interpretation of decisions from Venezuela's Supreme Tribunal of Justice, is at odds with principles of comity. *See Skaftouros v. United States*, 667

F.3d 144, 156 (2d Cir. 2011) ("Technical objections to the [foreign] nation's compliance with its own law are particularly disfavored.").

### B. The Republic's Legal System Is Transparent.

Articles 150 and 187(9) of the Venezuelan Constitution are public, as are the National Assembly's Resolutions. A-108; A-406; A-641. This differs from *Vitamin C*, where this Court found this factor "inconclusive." 8 F.4th at 157. And while in *Vitamin C* this Court was "less inclined to trust the representations of a regime lacking transparency or democratic accountability," *id.*, no similar arguments can be made about the Venezuelan National Assembly. A-3258.

### C. The Republic Is the Proper Authority to Offer the Submissions.

In *Vitamin C,* this Court gave "considerable weight" to the Chinese Ministry's views because it was "China's highest administrative authority on export commerce" and "has 'attached great importance' to th[at] litigation." 8 F.4th at 157.

The same considerations support deference here. The National Assembly is the only "legitimate governing body of Venezuela," the "first-instance interpreter of the [Venezuelan] Constitution," and the branch of Venezuelan government most concerned with the proper application of Article 150's authorization requirement. A-292-93 ¶ 53; A-302 ¶ 73; *supra* I.B. And just as in *Vitamin C,* the Assembly has appeared *repeatedly* to explain the meaning and effect of laws over which it has both expertise and responsibility, and which go to the core of its powers within the

45

Venezuelan constitutional system. The district court contravened *Vitamin C* by refusing to credit the National Assembly's views, which fall squarely within its exclusive competence.

## D. The Republic's Position Is Consistent.

The Republic's position in this litigation remained consistent throughout its submissions, as the district court acknowledged. SPA-130-31.

The Republic's position is also consistent with the National Assembly resolutions and other official statements predating this litigation: (1) the historical practice of the Assembly in applying Article 150 to agreements involving PDVSA, *supra* I.D.; (2) contemporaneous floor statements of the Chairman of the Comptroller's Commission, A-3610-12 ¶¶ 9-17; (3) the September 2016 Resolution, which invoked Article 187(9) in reviewing the Exchange; (4) the legal opinion commissioned by the National Assembly, which concluded that the Assembly's Article 150 authorization was required, A-303-05 ¶¶ 76-81; (5) the Special Attorney General's legal opinion, which reached the same conclusion, A-2030 ¶ 106; A-2036 ¶ 130;[7] and (6) the October 2019 Resolution that confirmed the Exchange's invalidity.

---

[7] In its prior decision, the district court erroneously found inconsistency between the Republic's submission and the Special Attorney General's opinion. SPA-40-41. The district court did not rely on this purported inconsistency in its new decision.

46

### E. The Context and Purpose of the Republic's Submission Support Deference.

The Republic has offered its views in a proper context and for a compelling purpose: to protect "the National Assembly's constitutional role in authorizing contracts in the national public interest," and Venezuela's strategic national asset, CITGO. A-3530. It is difficult to imagine interests more deserving of "international comity," *Animal Science*, 585 U.S. at 43, than a sovereign's desire to enforce constitutional separation-of-powers principles and to prevent an illegitimate regime from plundering precious national resources.[8]

Nonetheless, the district court refused to credit the Republic's position because its brief was filed two days before the parties' opening briefs and was aligned with the Appellants' and their experts' view of Venezuelan law. SPA-130. If that, by itself, is a reason to withhold deference under *Animal Science*, then *Animal Science* requires no deference at all. The district court effectively adopted a rule of anti-deference whenever an appearing foreign sovereign agrees with the party it supports.

The district court failed to explain why the timing of the Republic's

---

[8] Venezuela enacted Articles 150 and 187(9) against the backdrop of a years-long struggle throughout Latin America to curb dictatorial exploitation of vital national interests. *See* Amicus Brief of Four Professors, *Petroleos De Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 20-3858 (2d Cir. Mar. 22, 2021), Docket No. 147-2 at 11-12, 28-30.

47

submission, its agreement with Appellants' views, or its desire to "vindicate[] the Republic's own interests," SPA-130, says *anything* about the merits of the Republic's legal position. The court's rule ignores that foreign sovereigns' submissions are typically provided in *amicus* briefs, which are always filed in proximity with the brief of the party supported. *Cf.* Fed. R. App. P. 29(a)(6). Nor is it unusual for a foreign sovereign to support the litigation position of its instrumentality. Indeed, a threat to a state-owned entity on a matter of national interest is precisely the type of action that one would expect to motivate a foreign sovereign to appear as an *amicus* in U.S. litigation. Moreover, while the Republic's position aligns with Appellants', the National Assembly's interests in enforcing the core separation-of-powers provisions in the Venezuelan Constitution are distinct from Appellants' economic interests. Indeed, a "sovereign interest expressed by a foreign state" is owed "due respect" in lawsuits even where the sovereign has "a coordinate interest in the litigation." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 546 (1982). And the district court's reasoning ignores the most fundamental reason why a sovereign is likely to favor its instrumentality's litigating position: the sovereign genuinely believes that the instrumentality is correct about the meaning of foreign law. That is surely true here, where rejecting the Republic's interpretation of Articles 150 and 187(9) would effectively declare that the Maduro regime, rather than the National Assembly,

48

correctly interpreted the Venezuelan Constitution.

The district court's skepticism of the Republic due to its perceived "synergy" with PDVSA contravenes this Court's decision in *Vitamin C*. There, the Chinese Ministry of Commerce had "unambiguously staked out a common interest with [the appellants]" and unquestionably had a national economic "interest in avoiding the imposition of U.S. antitrust penalties on Chinese companies." *In re: Vitamin C Antitrust Litig.*, 8 F.4th at 156-57. And the Ministry filed its initial amicus brief the day before the Chinese exporters (all subject to the regulation and control of the Ministry) served their motion to dismiss,[9] which, in turn, cited liberally from the Ministry's brief. This Court nevertheless granted "considerable weight to [the] consistently salient presentation of official views" by the Ministry. *Id.* at 157.

While "caution" may be warranted where a sovereign fashions a new legal position for litigation, *Animal Sci.*, 585 U.S. at 42-43, that is not the case here. The Republic's position on Venezuelan law—that PDVSA contracts affecting national assets are national public interest contracts requiring National Assembly authorization—is based on legal principles and public pronouncements long preceding this litigation. *See* A-200 ¶¶ 3-4; A-3537-38; A-3609-10 ¶¶ 4, 9; A-3612

---

[9] Amicus Brief of the Ministry of Commerce, *In re Vitamin C Antitrust Litig.*, No. 06-md-1738 (E.D.N.Y. June 29, 2006), Docket No. 30-2; Letter Reporting Service of Motion to Dismiss, *In re Vitamin C Antitrust Litig.*, No. 06-md-1738 (E.D.N.Y. June 30, 2006), Docket No. 34.

49

¶¶ 17-18; *supra* I.C., I.E.

In sum, the Republic's views strongly support the Appellants' interpretation, which correctly reflects the text, intent, and history of Article 150. To the extent this Court finds any ambiguity in the meaning of Venezuelan law, that ambiguity should be resolved by giving substantial weight to the Republic's considered views. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 92 (2d Cir. 2002) ("Where a choice between two interpretations of ambiguous foreign law rests finely balanced, the support of a foreign sovereign for one interpretation furnishes legitimate assistance in the resolution of interpretive dilemmas.").

## III. THE DISTRICT COURT CONTRAVENED THE ACT OF STATE DOCTRINE.

"The act-of-state doctrine is a rule of decision requiring that, in the process of deciding cases, courts accept as valid the acts of foreign sovereigns taken within their own jurisdictions." *PDVSA II*, 51 F.4th at 466 (citing *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990)). The doctrine reflects "separation of powers principles and a concern that the Judicial Branch's 'passing on the validity of foreign acts of state may hinder the conduct of foreign affairs.'" *Id.* (quoting *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990)).

When applying the act of state doctrine,

50

> "First, the court should assume that a foreign state's official acts executed within that state's territory are valid in that they have the legal effects—like transfers of title, assumptions or repudiations of contractual obligations, and grants of public authority—that they purport to have. Second, under that premise, the court should evaluate the merits of the legal claim or defense before it according to the posture of the case."

*Id.* (quoting *Celestin*, 30 F.4th at 140). The doctrine "'bars a court from questioning the validity of the foreign act on the ground that it did not comply with that sovereign's own legal requirements, international law, or U.S. law or policy.'" *Id.* at 467 (quoting Restatement (Fourth) of Foreign Relations Law § 441 cmt. (a)); *see PDVSA IV*, 106 F.4th at 269.

The district court correctly acknowledged that the 2015 National Assembly is the recognized sovereign government of Venezuela, and that the Resolutions constituted official sovereign acts. SPA-145-47. The district court was consequently required to "accept as valid" each of the Resolutions, and to "assume" that the Resolutions have "the legal effects … that they purport to have." *PDVSA II*, 51 F.4th at 466-67 (quotation marks and citation omitted). The district court was thus compelled to hold that—because the National Assembly's September 2016 Resolution purported to apply Article 187(9) to the Exchange while denying National Assembly authorization—that denial of authority serves as the rule of decision here, and under the Assembly's May 2016 Resolution, the Assembly's denial rendered the Governing Documents invalid. *PDVSA II*, 51 F.4th at 466.

51

Rather than assuming that the National Assembly's sovereign acts had the legal effect they purported to have, the district court minimized those acts in two ways: first, it disregarded the Assembly's historical practice of reviewing certain PDVSA contracts under Article 150, *see* A-200-01 ¶¶ 4, 7; A-203 ¶ 11; and second, it scrutinized, and criticized, the Resolutions for not following the district court's view of how the Assembly ought to have exercised its powers under Articles 150 and 187(9). SPA-147-51. The district court did exactly what the act of state doctrine forbids: it "question[ed] the validity of the foreign act on the ground that it did not comply with that sovereign's own legal requirements." *PDVSA II*, 51 F.4th at 467 (quotation marks and citation omitted).

Compounding its error, the court held that even if the 2016 Resolutions had the effect of preemptively invalidating the Exchange, preventing the Governing Documents from coming into legal existence, the extraterritorial limitation outlined in *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985), still precluded application of the act of state doctrine. That was wrong: the 2016 Resolutions stopped the 2020 Notes from validly issuing, meaning

52

there could not have been an extraterritorial taking because there was no property interest to be taken.[10]

## A.    The May 2016 Resolution

In the May 2016 Resolution, the National Assembly affirmed its constitutional authority, expressly invoking Article 150 and declaring that the absence of prior legislative authorization would render any national public interest contract "null and void in [its] entirety." A-648. The May 2016 Resolution provides key context for the Assembly's intent when issuing its September 2016 Resolution.

The district court determined that the May 2016 Resolution was directed only at national public interest contracts executed by the "National Executive," because the Resolution expressly focuses on those contracts. SPA-148-49. The district court's cramped reading of the May 2016 Resolution turns a blind eye to the circumstances of the Resolution's enactment and runs contrary to its text.

The May 2016 Resolution singles out the "National Executive" because it was issued in response to an "emergency" Maduro decree designed to empower the "National Executive" to execute certain national public interest contracts without legislative authorization. A-647. But the May 2016 Resolution goes well beyond

---

[10] The district court incorporated by reference the act of state doctrine analysis from its prior decision, SPA-135, accordingly, Appellants address the reasoning in both decisions here.

contracts with the National Executive: the resolution urged foreign embassies in Venezuela to "inform the[ir] Governments … and the corresponding companies about the nullity of the contracts that are concluded *in contravention of Article 150* of the Constitution and about the liabilities arising therefrom." A-648 (emphasis added).

Article 150, in turn, applies to national public interest contracts "entered into with foreign States or official entities, or with companies not domiciled in Venezuela." A-648. Nothing in Article 150's text distinguishes between contracts executed by the "National Executive" and contracts executed by other entities within Venezuela's National Public Administration, such as PDVSA—"a corporation anchored to state ownership by constitutional mandate." *PDVSA II*, 51 F.4th at 468. Following this interpretation, the National Assembly had previously enacted resolutions authorizing agreements executed by PDVSA entities as national public interest contracts under Article 150, resolutions which would appear to be invalid under the decision below. A-200 ¶ 4 & n.3; *supra* I.D. As the district court acknowledged, both the Republic and a former President of the National Assembly Comptroller's Commission have explained that the National Assembly has long understood national public interest contracts "to include, but not be limited to, those involving the National Executive as a party." SPA-148; A-609 ¶ 7. The May 2016 Resolution echoes that understanding in declaring, without limitation, that "those

54

contracts ... linked to major procurements that could seriously compromise the assets of the Republic or expose them to serious losses or international claims that might be detrimental to the sovereignty or integrity of the country … shall be deemed to be contracts of national public interest." SPA-647. The May 2016 Resolution thus demonstrates that any national public interest contract executed without authorization of the National Assembly would be null and void.

## B.    The September 2016 Resolution

The September 2016 Resolution "reject[ed] categorically" the Exchange's defining feature—the 50.1% pledge of CITGO. By rejecting the key component of the Exchange Offer, the Assembly necessarily rejected—*i.e.*, *denied legal authorization to*—the proposed Exchange Offer. A-203 ¶ 11. While the National Assembly was explicit as to the Pledge, it did not have to express its disapproval of the Exchange in any specific way, or even at all. Under Articles 150 and 187(9), the National Assembly needed only to withhold its "requisite constitutional authorization of the Exchange Offer pursuant to its determination that the Exchange Offer implicated the national interest." A-3612 ¶ 17. The Assembly did exactly that by issuing the September 2016 Resolution and *not* authorizing the Exchange Offer.

The district court refused to give effect to those sovereign acts based on its determination that those acts stopped short of what it believed was required to "invalidate the Exchange" under Venezuelan law. SPA-150. Despite "reaffirm[ing]

55

its conclusion that the September 2016 Resolution was an official act of a foreign sovereign," SPA-147, the district court fly-specked the "plain text" of the September 2016 Resolution in search of specific language stating that the National Assembly "purport[ed] to invalidate the Exchange," SPA-150. According to the district court, through the September 2016 Resolution, the Assembly "purport[ed] to": "reject the pledge," "summon the President of PDVSA" to testify about the transaction, "urge the Public Ministry to open an investigation," and instruct PDVSA to provide the National Assembly with an alternative plan for addressing its indebtedness, but failed to declare preemptively that the Exchange would be invalid if the regime ignored the Resolution. SPA-150. But even if Venezuelan law *required* the National Assembly to state its intent to invalidate a prospective transaction expressly when exercising its powers under Article 150 and 187(9), hair-splitting about whether a foreign sovereign's acts properly complied with foreign law is precisely what the act of state doctrine forbids. *PDVSA II*, 51 F.4th at 466-67; *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) ("When it is made to appear that the foreign government has acted in a given way … *the details of such action* or the merit of the result *cannot be questioned but must be accepted* by our courts as a rule for their decision.") (emphasis added) (citations omitted).

In declining to give the September 2016 Resolution its clear effect, the district court appears to have adhered to its prior reasoning as to the Pledge. In its 2020

56

opinion, the court declined to find that "the National Assembly acted to preempt the existence of the 2020 Notes and Governing Documents solely because it included within the Resolution a 'rejection' of one component of the Governing Documents." SPA-35; SPA-150. But the Pledge was the key feature of the Exchange Offer, as the offer made to the noteholders was to exchange their unsecured 2017 Notes verging on default for notes due in 2020 that were "secured" by the Pledge. The National Assembly's rejection of the Pledge makes sense given that it was the most critical component of the Exchange, and the aspect that both threatened the national public interest and triggered the National Assembly's invocation of its constitutional authority. Conversely, the district court's attempt to divorce the National Assembly's categorical rejection of the Pledge—the key to the swap transaction— from the Exchange is irrational, in part because it would interpret the Assembly's express rejection of the Pledge as counterintuitively authorizing the Exchange Offer *sub silentio*. In fact, even if the September 2016 Resolution amounted to nothing more than a bare rejection of the Pledge, the act of state doctrine would *still* require that the district court to give effect to that narrower rejection—which the court failed to do in declaring the Pledge valid and enforceable. *PDVSA II*, 51 F.4th at 466-67.

The September 2016 Resolution was express in invoking the National Assembly's exclusive authority to approve (or not) National Public Interest Contracts under Article 187(9). The Resolution referenced whether the "current

transaction protects the National Property, in accordance with *articles 187, section 9*, 302 and 303 of the Constitution," thereby demonstrating the Assembly's view that the provision applied to the Exchange. A-115. Article 187(9) contains one (and only one) power: the National Assembly's power to "[a]uthorize contracts of municipal, state[,] and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela." A-442-43. The Resolution's express invocation of Article 187(9) makes it impossible to read the categorical rejection of the Pledge as anything other than the Venezuelan sovereign recognizing its exclusive approval authority over the Exchange, which should have rendered *irrelevant* whether the Assembly was right or wrong to apply that approval prerequisite to the Exchange—instead, the Assembly's decision should have operated as the rule of decision here.

In its prior decision, the district court attempted to blunt the September 2016 Resolution's reference to Article 187(9) by claiming, without support, that it was offered only to justify an investigation. SPA-36. This plainly misunderstands the Resolution and the Venezuelan Constitution. The Resolution's reference to whether the "current transaction protects the National Property," A-115, does not question whether the Exchange qualifies as a national public interest contract under Article 150 or 187(9). In fact, Articles 302 and 303 view all of PDVSA's activities as matters of national interest. A-3608 ¶ 3. If the Assembly did not believe that the

58

Exchange implicated the national interest and Article 187(9), it would not have needed to consider the substantive merits of whether the Exchange Offer had *failed* to protect the national interest. But because the Assembly did, it ordered a criminal investigation to see whether the Exchange had fallen short of the constitutional mandate to protect the National Property. A-3612 ¶ 18.

A plain-text reading of the September 2016 Resolution thus demonstrates that the National Assembly invoked its Article 187(9) authority to disapprove the Exchange—not just in support of the Assembly's requested investigation. Indeed, even if, *arguendo*, the Assembly had intended the September 2016 Resolution only to urge further investigation, that decision would convey that the National Assembly had withheld the requisite approval.

The same holds true for the other actions the district court recognized the September 2016 Resolution purported to take. As noted, the National Assembly summoned the president of PDVSA to explain the attempt to execute an unauthorized national public interest contract, and it requested a refinancing plan because the Assembly rejected the Exchange, *i.e.*, PDVSA's *suggested* refinancing plan. Each of these components of the September 2016 Resolution underscores, at the very least, that the National Assembly was purporting to reject the Exchange Offer at that time.

The district court erred in faulting the Assembly for "evinc[ing] no intent to affirmatively invalidate the Exchange Offer." SPA-141. Given that the National Assembly was acting to reject the Exchange *before it was executed*, there was no transaction "to affirmatively invalidate" at the time. Even so, the Assembly evinced every intent to stop the Exchange from moving forward: it proactively issued the September 2016 Resolution that rejected the Exchange's core feature and called for a criminal investigation. The district court's determination—that the National Assembly's clear rejection of the Exchange failed to have its purported effect, *i.e.*, invalidating the resulting 2020 Notes—violated the act of state doctrine.

## C. The October 2019 Resolution.

As the district court acknowledged, the National Assembly's October 2019 Resolution "'ratifies' and 'reiterates'" the Assembly's earlier conclusion that the Exchange violated the Venezuelan constitution. SPA-150 (citation omitted); *see also PDVSA IV*, 106 F.4th at 266. While the October 2019 Resolution "did not *preemptively* invalidate the 2020 Notes and the Governing Documents," SPA-150, the Resolution corroborates the National Assembly's view that the Exchange was invalid before the Maduro regime attempted to execute it—and does so by "referencing both the May 2016 Resolution and the September 2016 Resolution." A-122; A-3612-13 ¶¶ 20-21.

60

Rather than take the October 2019 Resolution at its word, the district court previously opined that the Resolution "expressly admits that it was not until after 'investigations conducted in coordination with the Office of the Special Prosecutor, that it was concluded that the 2020 Bond indenture was a national public contract that should have been authorized by the National Assembly.'" SPA-37; SPA-124. But the National Assembly did not conduct a single, multiyear investigation into whether the Exchange Offer was a national public interest contract that concluded only in 2019. There were two investigations: the Public Ministry investigation contemplated by the National Assembly in the September 2016 Resolution, and the Guaidó Government's Special Prosecutor investigation addressed in the October 2019 Resolution. As the October 2019 Resolution makes clear, the National Assembly requested the 2019 investigation on April 24, 2019, in anticipation of further legal disputes following the Maduro regime's anticipated default on the 2020 Notes, the Assembly's decision to make an interest payment on the same under protest, and more. A-123-24. The fact that the National Assembly reached the same conclusion corroborates, but does not replace, the National Assembly's initial rejection of the Exchange. *See* A-122 ("Resolution that *Reiterates* the Invalidity of PDVSA's 2020 Bonds") (emphasis added).

61

**D.    The District Court Misapplied *Allied Bank*.**

The district court erroneously relied on this Court's decision in *Allied Bank* to conclude that even if the 2016 Resolutions *preemptively invalidated* the Exchange and the 2020 Notes, the extraterritorial limitation still precludes application of the act of state doctrine.  SPA-151-52.  As the United States Government recognized in this case, *Allied Bank* is not "on point with this matter" because it involved a *retroactive* repudiation of debt that was indisputably valid when issued.  A-3351-52 (8:23-9:5).

In *Allied Bank*, this Court held the act of state doctrine did not apply where Costa Rica attempted to extinguish Costa Rican banks' obligation to timely pay debt owed to Allied in New York.  757 F.2d at 521.  *Allied Bank* applied the "situs rule," determining that the act of state doctrine applies only when the taken property's "situs" is in the foreign sovereign's territory—not in the United States.  *Id.*  Key to the Court's analysis, Costa Rica was attempting to "take" validly issued property (the right to receive repayment from Costa Rican banks) that was located in the United States.  *Id.* at 522.  Here, by contrast, the 2020 Notes were *prevented* from ever coming into valid legal existence because the National Assembly construed the Exchange as a national public interest contract and withheld its authorization, precluding it from validly issuing.  This rendered the Offer Exchange and resulting 2020 Notes "null and void in their entirety" *ab initio*.  A-648.  As a result, Appellees

have *never* had a valid property interest in the United States that could be taken. *U.S. Olympic Comm. v. Intelicense Corp., S.A.*, 737 F.2d 263, 267 (2d Cir. 1984) (no "taking" where "property owner" "had no interest in the [property]").

Although the district court stated that its analysis applied "[r]egardless of whether … the Resolutions preemptively invalidated … the Exchange Offer and the 2020 Notes," SPA-151, its logic depends on a conclusion that the debt validly issued in the first place. According to the district court,

> [P]apers were signed, contracts were executed, [and] payments are due in New York, and the collateral sits waiting in a vault in New York Venezuela has no power, save by the actions of this Court or intervention by the United States, to stop Defendants from enforcing their contractual remedies. And it is that *impotence to complete the expropriation* that makes clear that *no taking* has taken place in Venezuela.

SPA-152 (emphasis added).

But the "papers," "contracts," and "payments due" could reflect valid property interests in the United States only if the Exchange was valid in the first place. Because it was not, there was no extant property interest—and thus there could be no taking.

Because this case concerns Venezuelan decrees, issued under Venezuelan law in Venezuela, directed at Venezuelan state-owned entities prior to the existence of the purported debt obligation, the situs test provides no basis to decline to apply the act of state doctrine. *Banco de Espana v. Fed. Rsrv. Bank of N.Y.*, 114 F.2d 438,

63

444 (2d Cir. 1940). This Court and others have held that domestic exercises of sovereign authority—*i.e.*, those that do not attempt to extinguish existing obligations abroad—like the National Assembly's preemptive rejection of the 2020 Notes and Pledge, warrant respect under the act of state doctrine. *Fed. Treasury Enter. Sojuzplodoimport, OAO (FTE) v. Spirits Int'l B.V.*, 809 F.3d 737, 744 (2d Cir. 2016); *United States ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 652 (2d Cir. 1947); *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1071 (9th Cir. 2018); *Emden v. Museum of Fine Arts, Houston*, 103 F.4th 308, 323 (5th Cir. 2024). A contrary conclusion would turn the act of state doctrine inside out, permitting U.S. courts to deny legal effect to a foreign sovereign's acts within its own territory, and effectively create property in the United States that the foreign sovereign rejected as invalid *ab initio* within its own borders.

## CONCLUSION

This judgment should be reversed.

December 22, 2025

Respectfully submitted,

/s/ *Kurt W. Hansson*

Kurt W. Hansson
James L. Ferguson
Zachary D. Melvin
Paul Hastings LLP
200 Park Avenue
New York NY 10166
kurthansson@paulhastings.com
jamesferguson@paulhastings.com
zacharymelvin@paulhastings.com

Igor V. Timofeyev
Paul Hastings LLP
2050 M Street, N.W.
Washington, D.C.  20036
(202) 551-1700
igortimofeyev@paulhastings.com

*Counsel for Appellants Petróleos de*
*Venezuela, S.A., and PDVSA Petróleo, S.A.*


/s/ *Michael J. Gottlieb*

Michael J. Gottlieb
Willkie Farr & Gallagher LLP
2029 Century Park East
Los Angeles, CA 90067
mgottlieb@willkie.com

Erica L. Ross
Samuel G. Hall
Kristin E. Bender
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, D.C. 20006
eross@willkie.com
shall@willkie.com
kbender@willkie.com

Aaron E. Nathan
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
anathan@willkie.com

Alyxandra Vernon
Willkie Farr & Gallagher LLP
333 Bush Street
San Francisco, CA  94104
avernon@willkie.com

*Counsel for Appellant PDV Holding, Inc.*

65

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to FED. R. APP. P. 32(g)(1), I certify the following:

1.      This document complies with the type-volume limitation ordered by this Court at ECF No. 345 because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 32(g), this document contains 13,908 words.

2.      This document complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this document has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: December 22, 2025

*/s/ Kurt W. Hansson* _____
Kurt W. Hansson
Paul Hastings LLP
200 Park Avenue
New York NY 10166

*Counsel for Appellants Petróleos de Venezuela, S.A., and PDVSA Petróleo, S.A.*