# 25-2652

## In the United States Court of Appeals for the Second Circuit

PETRÓLEOS DE VENEZUELA, S.A.; PDVSA PETRÓLEO, S.A.;
PDV HOLDING, INC.,
PLAINTIFFS-COUNTER-DEFENDANTS-APPELLANTS

v.

MUFG UNION BANK, N.A.; GLAS AMERICAS LLC,
DEFENDANTS-COUNTER-CLAIMANTS-APPELLEES

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 19-10023)
(THE HONORABLE KATHERINE POLK FAILLA, J.)*

**REDACTED FINAL FORM BRIEF OF APPELLEES**

JEFFREY J. RECHER
PAUL A. PATERSON
S. CONRAD SCOTT
JOSHUA A. ALTMAN
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *1285 Avenue of the Americas*
   *New York, NY 10019*

CHRISTOPHER J. CLARK
ANDREW J. RODGERS
BRIAN T. BURNS
CLARK SMITH VILLAZOR LLP
   *666 Third Avenue, 21st Floor*
   *New York, NY 10017*

KANNON K. SHANMUGAM
MASHA G. HANSFORD
AUSTIN W. PIATT
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *2001 K Street, N.W.*
   *Washington, DC 20006*
   *(202) 223-7300*
   *kshanmugam@paulweiss.com*

**CORPORATE DISCLOSURE STATEMENT**

Appellee GLAS Americas LLC is an indirect subsidiary of Unicorn Topco Ltd. Unicorn Topco Ltd. has no parent corporation, and no publicly held company owns 10% or more of its stock.

Since the commencement of this action, appellee MUFG Union Bank, N.A., has merged into U.S. Bank National Association, with the latter as the surviving entity. U.S. Bank National Association is a wholly owned subsidiary of U.S. Bancorp, Inc. U.S. Bancorp, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

(i)

# TABLE OF CONTENTS

Page

Introduction..................................................................................1

Statement of the issues .................................................................2

Statement of the case ...................................................................3

    A.  Factual background.............................................................3

    B.  Procedural history ..............................................................7

    C.  Post-judgment events .......................................................12

Summary of argument .................................................................13

Standard of review.......................................................................16

Argument......................................................................................17

I.    The district court correctly held that the 2020 Notes are valid under Venezuelan law ....................................................17

    A.  The district court correctly determined that the Republic must be a party to any 'national public interest contract' ............18

        1.  Binding precedent from Venezuela's Constitutional Chamber requires the Republic to be a party to a 'national public interest contract' ...........................................19

        2.  Decades of practice confirm that PDVSA's contracts are not 'national public interest contracts' .............................26

    B.  PDVSA's contrary arguments are unavailing..................................28

        1.  PDVSA's arguments about *Andrés Velásquez* are incorrect..................................................................28

        2.  PDVSA cannot rehabilitate its experts' credibility...............31

(ii)

3. *Andrés Velásquez* is consistent with other Venezuelan decisions ..................................................................32

4. PDVSA's textual arguments are incorrect ..........................37

5. PDVSA's remaining arguments are unavailing....................39

C. The district court was not required to give dispositive weight to the Republic's interpretation of Venezuelan law........................43

II. The 2020 Notes would be enforceable even if they were national public interest contracts ..............................................................48

III. The act-of-state doctrine does not apply .................................................50

A. The 2016 resolutions were not official acts of a foreign sovereign..................................................................................51

B. The resolutions are extraterritorial and thus not protected by the act-of-state doctrine ..................................................................53

C. Even if the 2016 resolutions were not extraterritorial, neither disapproved the exchange offer ......................................................58

Conclusion.................................................................................................63

(iii)

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allied Bank International* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985) ....................................................................*passim*

*Animal Science Products, Inc.* v. *Hebei Welcome Pharmaceutical Co.*, 585 U.S. 33 (2018) .................................................................*passim*

*Banco de Espana* v. *Federal Reserve Bank*, 114 F.2d 438 (2d Cir. 1940) ...........................................................................................................58

*Braka* v. *Bancomer, S.N.C.*, 762 F.2d 222 (2d Cir. 1985) ...............................56

*Bucklew* v. *Precythe*, 587 U.S. 119 (2019) ........................................................29

*Bugliotti* v. *Republic of Argentina*, 952 F.3d 410 (2d Cir. 2020) ......................17

*In re Charter Communications, Inc.*, 691 F.3d 476 (2d Cir. 2012) ..................49

*Crystallex International Corp.* v. *Bolivarian Republic of Venezuela*, Civ. No. 17-151 (D. Del. Jan. 19, 2018), Dkt. 49 .................. 44-45

*Crystallex International Corp.* v. *Bolivarian Republic of Venezuela*, No. 17-cv-151, 2025 WL 3281353 (D. Del. Nov. 25, 2025) ........................................................................................................12, 46

*Diaz* v. *Gonzalez*, 261 U.S. 102 (1923) ............................................................37

*DRFP LLC* v. *Republica Bolivariana de Venezuela*, 706 F. App'x 269 (6th Cir. 2017).........................................................................................22

*Elmendorf* v. *Taylor*, 23 U.S. 152 (1825).....................................................20, 37

*Emden* v. *Museum of Fine Arts, Houston*, 103 F.4th 308 (5th Cir. 2024) ........................................................................................................57

*Esteras* v. *United States*, 606 U.S. 185 (2025) ......................................................39

(iv)

Page(s)

Table of authorities—continued:

*Federal Treasury Enterprise Sojuzplodoimport* v. *Spirits International B.V.*, 809 F.3d 737 (2d Cir. 2016)..................57

*Financial One Public Co.* v. *Lehman Brothers Special Financing, Inc.*, 414 F.3d 325 (2d Cir. 2005) ...............................22

*FNC Bank* v. *Banco Para el Commercio*, 462 U.S. 611 (1983) .........................41

*Gater Assets Ltd.* v. *AO Moldovagaz*, 2 F.4th 42 (2d Cir. 2021) ................41, 45

*Guaranty Trust Co.* v. *United States*, 304 U.S. 126 (1938)........................52, 58

*Hilton* v. *Guyot*, 159 U.S. 113 (1895) .............................................20, 37

*Kashef* v. *BNP Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019) ...................................61

*Konowaloff* v. *Metropolitan Museum of Art*, 702 F.3d 140 (2d Cir. 2012) .........................................................53

*Nambiar* v. *Central Orthopedic Group, LLP*, 158 F.4th 349 (2d Cir. 2025)........................................................16

*O'Melveny & Myers* v. *FDIC*, 512 U.S. 79 (1994) ................................61

*Oetjen* v. *Central Leather Co.*, 246 U.S. 297 (1918)..............................52

*Sea Breeze Salt, Inc.* v. *Mitsubishi Corp.*, 899 F.3d 1064 (9th Cir. 2018) ........................................................57

*Stone* v. *INS*, 514 U.S. 386 (1995) .........................................63

*Underhill* v. *Hernandez*, 168 U.S. 250 (1897)......................... 52-53, 54

*United States Olympic Committee* v. *Intelicense Corp., S.A.*, 737 F.2d 263 (2d Cir. 1984) ..............................................57

*United States* v. *Graham*, 51 F.4th 67 (2d Cir. 2022) ........................48

*United States* v. *Pink*, 315 U.S. 203 (1942) ......................................52

*United States ex rel. Von Heymann* v. *Watkins*, 159 F.2d 650 (2d Cir. 1947)..........................................................57

Page(s)

Table of authorities—continued:

*Von Saher* v. *Norton Simon Museum of Art at Pasadena*, 897 F.3d 1141 (9th Cir. 2018) ..................................................................52

*W.S. Kirkpatrick & Co.* v. *Environmental Tectonics Corp., International*, 493 U.S. 400 (1990) ................................................51

**VENEZUELAN CASES**

Supreme Tribunal of Justice, No. 618,
*Brigitte Acosta Isasis*, July 8, 2016 ................................. 22, 32-34

Supreme Tribunal of Justice, No. 1460,
*Attorney General of the Republic II*, July 12, 2007.......................... 22, 35-36

Supreme Tribunal of Justice, No. 2241,
*Andrés Velásquez and Others, the Partial Annulment of Article 80 of the Organic Law of the Financial Administration of the Public Sector*, Sept. 24, 2002........................................................*passim*

Supreme Tribunal of Justice, No. 953,
*Electrificación del Caroní S.A.*, Apr. 29, 2003 ......................................... 34-35

Supreme Court of Justice,
*Simón Muños Armas* (*Apertura Petrolera*), Aug. 17, 1999.........................36

**CONSTITUTIONS, STATUTES, AND RULE**

Venezuelan Constitution of 1961.........................................................................36

Venezuelan Constitution of 1999.........................................................................36

Article 150.................................................................................*passim*

Article 187.................................................................................*passim*

Article 236..............................................................................19, 38

Article 335................................................................... 22, 28-30

Venezuelan Hydrocarbons Law ..................................................... 14-15, 39-42

Venezuelan Organic Law on Financial Administration ....................20, 28, 39-40

Page(s)

Table of authorities—continued:

Fed. R. Civ. P. 54(b) ...................................................................11

**MISCELLANEOUS**

Allan Randolph Brewer-Carias & Enrique Viloria, *El Holding Publico* 155 (1986)...............................................................41

Executive Order 13,835, 83 Fed. Reg. 24001 (May 24, 2018)...........................12

Matthew Lee, *US Takes First Steps to Possibly Reopen Embassy in Venezuela After Maduro's Ouster*, ABC News (Jan. 27, 2026), https://tinyurl.com/8hx96s5k.................................................13

**INTRODUCTION**

PDVSA obtained billions of dollars by issuing debt in the United States, secured by collateral that would protect the noteholders in the event of default. In enticing bondholders to exchange their existing bonds for the new notes, PDVSA represented that the issuance was lawful and comported with all requirements under Venezuelan law. For years, it reaped the benefit of the noteholders' billions. But when PDVSA defaulted, it immediately changed positions, contending that the notes and the associated guaranty, pledge, and indenture qualified as "national public interest contracts" that require approval of the National Assembly under Venezuelan law and that were void *ab initio* absent that approval. Put simply, PDVSA argues that it was free to accept billions of dollars from the noteholders while the consideration it offered should be retroactively extinguished.

PDVSA's belated attempt to rewrite Venezuelan law is incorrect for the reasons that the district court explained in a careful opinion that canvassed Venezuelan law and assessed the credibility of competing expert testimony. Binding precedent of Venezuela's Constitutional Chamber makes clear that only contracts to which the Republic of Venezuela is a party require National Assembly approval. That rule is confirmed by extensive expert testimony, the previous writings of PDVSA's own experts—who repeatedly acknowledged it

1

in their scholarship before being retained in this litigation—and PDVSA's decades-long practice. Moreover, even if the contracts here constituted "national public interest contracts" that required National Assembly approval, that would not render the contracts void *ab initio*, only voidable. Given the powerful equitable considerations against unwinding the deal, voiding the notes is not the proper remedy here.

Finally, the act-of-state doctrine does not apply. That doctrine, under which American courts decline to question the validity of a foreign sovereign's taking that occurs entirely within that sovereign's territory, has no bearing on transactions that occur even partly in the United States. And any effort by the National Assembly to invalidate the notes and related agreements, signed in New York, payable in United States dollars in New York, and secured by collateral physically located in New York, does not qualify. The district court's thorough opinion in this case was correct, and its judgment should be affirmed.

## STATEMENT OF THE ISSUES

1. Whether the 2020 Notes are "national public interest contracts" that required National Assembly approval under Venezuelan law.

2. Whether, if the 2020 Notes required National Assembly approval, the Notes are merely voidable and should be enforced in the circumstances here.

3. Whether, even if the 2020 Notes did not require National Assembly approval, the act-of-state doctrine nonetheless requires the Court to treat the 2020 Notes as null and void in light of the National Assembly's resolutions.

## STATEMENT OF THE CASE

### A. Factual Background

1. The dispute in this case concerns the validity of secured notes issued in 2016 by Venezuela's state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA"). In 2007, PDVSA began issuing more than $9 billion in unsecured notes due in 2017 (the "2017 Notes"). 106 F.4th 263, 265 (2d Cir. 2024). Consistent with its longstanding practice, PDVSA did not seek the approval of Venezuela's legislative branch (the National Assembly) before or after issuing the 2017 Notes, ███████████████████████████████. CA849.

By the mid-2010s, falling oil prices and the Chávez government's disastrous mismanagement had left Venezuela's economy in shambles, and the 2017 Notes were, PDVSA has acknowledged, "on the verge of default." PDVSA Br. 2, 106 F.4th 263 (2d Cir. 2024), Dkt. 142. PDVSA sought to avert catastrophe and "extend its runway" by refinancing the 2017 Notes. 106 F.4th at 265. In September 2016, it announced an "Exchange Offer," the bond swap transaction at the heart of this case. Under the Exchange Offer, holders of the 2017 Notes could exchange them for new notes due in 2020 (together with those

3

notes' guaranty, pledge, and indenture, the "2020 Notes"). JA2266. To encourage bondholders to participate, PDVSA offered to secure the notes with a pledge of a 50.1% equity interest in CITGO. JA2267. CITGO is the United States-domiciled oil company that is "widely considered to be one of Venezuela's most important assets." 106 F.4th at 265. Market analysts viewed the proposed transaction as beneficial to PDVSA. JA2270-2274.

2.      In 2016, Nicolás Maduro was the president of Venezuela. 106 F.4th at 265. At that time, the United States recognized Maduro as Venezuela's legitimate leader. JA2403. The National Assembly, however, was controlled by opposition parties. 106 F.4th at 265.

Under Articles 150 and 187 of the Venezuelan Constitution, the National Assembly has the power to authorize the National Executive to enter into "national public interest contracts" with foreign entities. JA442-443. The National Executive consists of the presidency, government ministries, and other federal entities that do not "hav[e] their own legal personality distinct from the Republic." JA820. State-owned enterprises (including PDVSA) are instead part of the Decentralized Public Administration. *See* SPA110; JA284.

In May 2016, Maduro declared a "State of Exception and Economic Emergency" and claimed various powers including the unilateral power to execute "national public interest contracts." 106 F.4th at 266. In response—and before PDVSA had announced its Exchange Offer—the National Assembly

4

enacted a resolution citing its authority under Articles 150 and 187 of Venezuela's Constitution, stating that "contracts of national . . . public interest concluded by and between the National Executive and . . . companies not domiciled in Venezuela, without the approval of the National Assembly . . . shall be null and void."  JA648; *see also* 106 F.4th at 266.  That resolution did not refer to PDVSA or other entities outside the National Executive.

In September 2016, following the announcement of the Exchange Offer, the National Assembly enacted another resolution that specifically addressed the Offer.  That resolution cited the Assembly's "control functions" to "obtain information" about transactions "that commit[] PDVSA's assets as collateral"; stated that the Assembly "reject[ed] categorically" the proposed pledge of 50.1% of CITGO to secure the 2020 Notes; "summon[ed]" PDVSA's president to "explain the terms of this bond swap transaction"; and "urge[d]" Venezuela's Public Ministry to open an investigation into whether the transaction adequately protected national property.  JA115; *see also* 106 F.4th at 266.  The resolution did not assert that the Exchange Offer required National Assembly approval.

Following announcement of the Exchange Offer, PDVSA consistently maintained that the Offer was valid under Venezuelan law.  PDVSA's counsel, Hogan Lovells, issued opinion letters from both its New York and Caracas offices confirming "[c]onclusively" that the Exchange Offer did not require the

5

National Assembly's approval, and assuring transaction participants that the issuance complied with Venezuelan law. JA2356-2366.

The exchange closed in September 2016, with investors representing about 39% of the aggregate principal amount outstanding—approximately $3.3 billion—tendering their 2017 Notes in exchange for the 2020 Notes. 106 F.4th at 266. The notes were issued and signed in New York; the governing documents stated that their construction would be governed by New York law; and the Notes were deposited in New York with a New York trust company. 51 F.4th 456, 461 (2d Cir. 2022).

Over the next three years, PDVSA made more than $2 billion in interest and principal payments on the 2020 Notes. 106 F.4th at 266.

3. Venezuela descended into political chaos following a 2018 presidential election widely considered fraudulent. "Maduro claimed he won the country's presidential election, but the National Assembly took a different position" and "issued a legislative order naming Juan Guaidó—the National Assembly President—as the Interim President of Venezuela." 106 F.4th at 266. In January 2019, the United States expressed its support for the National Assembly as constituted in 2015, which it described as "the only legitimate branch of the government of Venezuela," and recognized Guaidó as Venezuela's lawful Interim President. JA1703.

6

On October 15, 2019, the National Assembly passed a new resolution that attempted to invalidate the long-since-executed Exchange Offer and 2020 Notes. *See* 106 F.4th at 266; JA118. That resolution asserted that the National Assembly had previously "rejected the collateral of 50.1% of the shares in CITGO." JA122. Unlike the 2016 resolutions, the 2019 Resolution expressly purported to invalidate the Exchange Offer. It stated that, upon investigation, the Assembly had determined that "the 2020 Bond indenture is a national public contract that should have been authorized by the National Assembly, in accordance with Article 150 of the Constitution." JA124. The resolution purported to "ratif[y] that the 2020 Bond indenture violated Article 150 of the Constitution." JA124.

Less than two weeks later, on October 27, 2019, PDVSA failed to make a payment of principal and interest on the 2020 Notes. 106 F.4th at 266. Under the governing documents, that default authorized the noteholders to exercise their rights to enforce against a majority stake in CITGO. *See* 51 F.4th at 465; JA2318-2320.

### B. Procedural History

1. Two days after defaulting, PDVSA and two wholly owned subsidiaries—PDVSA Petróleo S.A. (which served as guarantor for the 2020 Notes) and PDV Holdings, Inc. (the Delaware-incorporated entity that owns CITGO and provided the pledge securing the notes)—commenced this action. The

7

PDVSA entities (collectively, "PDVSA") sued the 2020 Notes' trustee, MUFG Union Bank, N.A. (now U.S. Bank National Association), and the collateral agent, GLAS Americas LLC (collectively, "the creditors"). PDVSA alleged—in direct contradiction of its 2016 position—that the 2020 Notes are "invalid, illegal, null and void *ab initio*, and thus unenforceable." JA78; *see* 106 F.4th at 267.

2. The U.S. District Court for the Southern District of New York (Failla, J.) granted summary judgment to the creditors. SPA67-68. The court held that New York law governed the notes. SPA63-65. And it explained that the 2020 Notes were "indisputabl[y] valid[]" under New York law. SPA67. The court also rejected PDVSA's argument that, under the act-of-state doctrine, the National Assembly's 2016 and 2019 resolutions invalidated the governing documents. SPA20-47.

3. On appeal, this Court held that, in light of a provision of New York's Uniform Commercial Code stating that the issuer's jurisdiction governs the validity of the security, it was an open question under New York's choice-of-law rules whether New York or Venezuelan law governed the 2020 Notes. 51 F.4th at 467-474. The Court certified the question to the New York Court of Appeals. *Id.* The Court did not resolve the application of the act-of-state doctrine; but it noted that "*Allied Bank* [*International* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir. 1985)] forecloses any argument that

8

the October 2019 Resolution could operate on its own to retroactively void the 2020 Notes," and that the Court "d[id] not read [PDVSA's] brief as arguing otherwise." 51 F.4th at 466 n.6.

The New York Court of Appeals accepted the certified questions, 199 N.E.3d 897 (2022), and subsequently answered them, determining that Venezuelan law governs the validity of the 2020 Notes, 235 N.E.3d 949, 957 (2024). This Court then remanded to the district court to determine what Venezuelan law required. Although the Court recognized that it could resolve that question in the first instance, it deemed remand appropriate because "determinations of another sovereign's law frequently call for fact-like procedures that a district court is better situated to implement." 106 F.4th at 269 (internal quotation marks and citation omitted). The Court also left open "whether and how" the act-of-state doctrine might apply. *Id.*

4. On remand, the district court considered supplemental briefing, including an amicus brief submitted by the Republic, expert reports by Venezuelan legal experts, and thousands of pages of evidence about Venezuelan law. *See, e.g.*, JA3500, JA3511. The court also solicited the views of the State Department, which stated that the district court should give the Republic's views "the same respectful consideration owed to any foreign government's statements regarding its own domestic law" but expressed no position on the ultimate issues in this case. JA5526-5527.

9

The district court conducted an "exhaustive review of Venezuelan law" and ultimately determined that Venezuelan law "require[s] that the Republic itself, rather than a state-owned enterprise such as PDVSA, must be party to any national public interest contract." SPA70. The court emphasized that this requirement comes from *Andrés Velásquez*, a decision of the Constitutional Chamber of the Supreme Tribunal of Justice, which serves as Venezuela's ultimate authority on constitutional matters. SPA103-119. Expert testimony, the court added, powerfully supported its interpretation of Venezuelan law. The court deemed the creditors' experts persuasive, and it emphasized that PDVSA's own experts had previously agreed that *Andrés Velásquez* was a binding decision that limited "national public interest contracts" to contracts in which the Republic itself is a party. SPA110-119. The court found it "difficult to credit" those experts' explanations about why they had reversed their previous views after being retained by PDVSA in this litigation. SPA113; *accord* SPA100.

In concluding that the 2020 Notes were not "national public interest contracts" requiring National Assembly approval, the district court recognized that it was obligated to give "respectful consideration" to the Republic's views on Venezuelan law but was "not bound to accord [those views] conclusive effect." SPA129 (quoting *Animal Science Products, Inc.* v. *Hebei Welcome*

10

*Pharmaceutical Co.*, 585 U.S. 33, 36 (2018)). While the court "carefully considered the Republic's position," it found the Republic's amicus brief unconvincing. SPA131. The court emphasized that the "context and purpose" of the Republic's submission rendered it less persuasive because of the Republic's strong financial interest in the outcome of the case and in light of evidence of tactical coordination between the Republic and PDVSA. SPA130-131. Ultimately, the court could not "squar[e] the Republic's views with what Venezuelan law requires." SPA131.

Finally, the district court rejected PDVSA's act-of-state argument. SPA134-157. Applying this Court's decision in *Allied Bank*, the court explained that the act-of-state doctrine does not require American courts to accept as valid foreign sovereigns' extraterritorial takings. SPA151-154. And it determined that the 2020 Notes had their situs in the United States, not Venezuela, meaning that the National Assembly's resolutions had extraterritorial effect. SPA137-140. In the alternative, the court determined that the doctrine did not apply because neither of the National Assembly's 2016 resolutions purported to invalidate the bonds. SPA147-151.

5. On October 17, 2025, the district court entered partial final judgment for the creditors under Federal Rule of Civil Procedure 54(b), without resolving certain counterclaims by the creditors against PDVSA. SPA158-160. PDVSA timely appealed. JA5620-5621.

11

### C.     Post-Judgment Events

1.     Venezuela and PDVSA have defaulted on more than $20 billion in debt. *See Crystallex International Corp.* v. *Bolivarian Republic of Venezuela*, No. 17-cv-151, 2025 WL 3281353, at *2 (D. Del. Nov. 25, 2025). The 2020 Notes at issue here represent a small fraction of that debt.

Proceedings initiated in the United States District Court for the District of Delaware are seeking to address claims by all of the Republic's and PDVSA's judgment creditors. PDVSA's creditors initiated those proceedings to sell shares of PDV Holdings (the PDVSA entity that owns CITGO), subject to approval by the Office of Foreign Assets Control, in order to partially satisfy the judgment creditors' claims. *See Crystallex*, 2025 WL 3281343, at *2-3, *7-9.[1] On November 25, 2025, the Delaware court approved a bid by Amber Energy to purchase CITGO; that bid includes an agreement to offer 2020 Noteholders up to $2.1 billion to release the CITGO pledge and extinguish their notes. *Id.* at *3, *82. The Delaware court selected Amber Energy's bid as superior to a competing bid that lacked stable financing or a settlement with the 2020 Noteholders. The PDVSA entities, Venezuela, and other entities have appealed the sale order to the Third Circuit (No. 25-3347).

---

[1] An OFAC license is required because Executive Order 13,835 prohibits, without a license, certain transactions of an equity interest in an entity in which "the Government of Venezuela has a 50 percent or greater ownership interest." 83 Fed. Reg. 24001 (May 24, 2018).

2. On November 12, 2025, this Court granted in part PDVSA's motion to expedite this appeal in light of the proceedings in the Delaware case. Dkt. 42. The Third Circuit later expedited the *Crystallex* appeal, which will be fully briefed by March 2. Order, No. 25-3347 (3d Cir. Dec. 15, 2025), Dkt. 111.

3. On January 3, the United States captured Maduro and removed him to the United States, where he is currently awaiting trial on drug-trafficking and weapons charges. According to press reports, the United States has begun discussions with Maduro's former vice president, Delcy Rodríguez Gomez, about restoring diplomatic relations. *See* Matthew Lee, *US Takes First Steps to Possibly Reopen Embassy in Venezuela After Maduro's Ouster*, ABC News (Jan. 27, 2026), https://tinyurl.com/8hx96s5k.

## SUMMARY OF ARGUMENT

I. This Court should affirm the district court's holding that the 2020 Notes are not "national public interest contracts" and are thus valid under Venezuelan law.

A. Despite insisting that the 2020 Notes were valid in order to sell the Notes to investors, PDVSA now contends that the 2020 Notes are "national public interest contracts" that required National Assembly approval. The district court correctly rejected that argument as inconsistent with binding Ven-

13

ezuelan precedent.  Specifically, in the *Andrés Velásquez* decision, the Constitutional Chamber of the Supreme Tribunal of Justice—Venezuela's ultimate authority on constitutional interpretation—held that a "national public interest contract" requires, among other things, the Republic, acting through the National Executive, to be a party to the contract.  It is undisputed that the Republic was not a party to the 2020 Notes.  Expert testimony (including the statements of PDVSA's own experts in their pre-litigation scholarship) confirms this reading of *Andrés Velásquez*.  So too does PDVSA's decades-long practice of entering financing contracts with foreign counterparties without seeking National Assembly approval.

B.    PDVSA offers a smattering of counterarguments, but none overcomes the weight of *Andrés Velásquez*, expert testimony, and historical practice. PDVSA advances alternative readings of *Andrés Velásquez* and contends that the decision is not binding, but the plain text of *Andrés Velásquez*, subsequent Venezuelan decisions applying that precedent, and the expert testimony deemed credible by the district court refute those readings.  PDVSA next parses the text of the Venezuelan Constitution, but that approach conflicts with Venezuelan precedent and practice.  In any event, various provisions of the Venezuelan Constitution lead ineluctably to the same conclusion as *Andrés Velásquez*:  a contract is not a "national public interest contract" unless the Republic itself is a party.  PDVSA's invocation of the Hydrocarbons Law as

14

evidence of National Assembly authorization of its contracts is also inapposite. That law has nothing to do with "national public interest contracts" and at most reflects the National Assembly's power to require additional authorization by statute.

C.      Nor was the district court required to accept as conclusive the Republic's brief setting out a contrary interpretation of Venezuelan law. The court carefully considered the Republic's views. But it observed that the context and purpose of its submission, including the Republic's own financial interests and close coordination with PDVSA, rendered those views less persuasive. And it ultimately determined that the Republic's views could not carry the day in light of the powerful countervailing evidence of Venezuelan law. The court was not obligated to deem the Republic's views dispositive.

II.      Even if this Court were to conclude that National Assembly approval were required, the Court should nevertheless affirm because the 2020 Notes are at most voidable, not void *ab initio*. Voiding the 2020 Notes would be inconsistent with the Venezuelan doctrine of legitimate expectations, under which bondholders can reasonably expect PDVSA to abide by its repeated representations that the 2020 Notes were valid and did not require National Assembly approval.

III.      Unable to invalidate the 2020 Notes under Venezuelan law, PDVSA invokes the act-of-state doctrine, but that doctrine does not apply for

15

three reasons. *First*, the 2016 resolutions—enacted by the National Assembly years before the United States stripped the Maduro regime of recognition—were not sovereign acts, nor were they transformed into such acts by the United States' subsequent recognition of the National Assembly as legitimate. *Second*, even if the resolutions were sovereign acts, the attempted invalidation of bonds payable in United States dollars in New York and secured by collateral located in New York did not occur exclusively "within [Venezuela's] own territory." *Allied Bank International* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516, 520 (2d Cir. 1985). *Third*, even if the resolutions could be viewed as having effects solely in Venezuela, PDVSA identifies nothing in either of the 2016 resolutions that invalidated the 2020 Notes, and PDVSA concedes (as it must) that the act-of-state doctrine does not apply to the Assembly's explicitly confiscatory 2019 resolution. This Court should affirm the judgment below.

## STANDARD OF REVIEW

A district court's decision to grant summary judgment is reviewed de novo. *See Nambiar* v. *Central Orthopedic Group, LLP*, 158 F.4th 349, 357 (2d Cir. 2025).

16

## ARGUMENT

## I.   THE DISTRICT COURT CORRECTLY HELD THAT THE 2020 NOTES ARE VALID UNDER VENEZUELAN LAW

In 2024, in response to questions certified by this Court, the New York Court of Appeals determined that, under New York choice-of-law rules, Venezuelan law governs the validity of the Notes. 235 N.E.3d 949, 955 (2024). Following the New York Court of Appeals' decision, this Court remanded the case to the district court to determine in the first instance what Venezuelan law requires. Although it was "empowered to decide questions of foreign law," this Court "recognized that determinations of another sovereign's law 'frequently call for fact-like procedures that a district court is better situated to implement.'" 106 F.4th 26s3, 268-269 (2024) (quoting *Bugliotti* v. *Republic of Argentina*, 952 F.3d 410, 414 (2d Cir. 2020)). This Court expected the district court to analyze the parties' extensive briefing, the "thousands of pages of discovery," and the expert evidence "on the intricacies of Venezuelan law." *Id.* at 269 (citation omitted). The district court did just that. In a thorough, 89-page opinion, the court determined that the 2020 Notes were not "national public interest contracts" that would require National Assembly approval, and are thus valid under Venezuelan law. SPA133-134.

In reaching that conclusion, the district court credited expert testimony that, pursuant to a binding decision by Venezuela's highest constitutional authority, only contracts to which the Republic itself is a party qualify as national

17

public interest contracts. *See* SPA103-109. The court emphasized that PDVSA's own experts had taken that view before being retained in this case and reversing course. *See* SPA106-108 & n.8, SPA113-115. The district court's conclusion about Venezuelan law also reflects longstanding practice in Venezuela: for decades, PDVSA has entered into contracts worth billions of dollars with foreign entities without obtaining National Assembly approval—including the contract to purchase CITGO, the majority interest in which was pledged to secure the 2020 Notes. A contrary conclusion would render all those contracts unlawful under Venezuelan law and potentially void. The court also gave respectful consideration to the Republic's submission about Venezuelan law. But in light of the Republic's obvious financial interest post-default in invalidating the debts of its wholly owned subsidiary, and the weakness of its substantive analysis given the countervailing evidence, the court appropriately declined to deem the Republic's views conclusive. The district court's decision was correct, and PDVSA identifies no sound reason to disturb it.

### A. The District Court Correctly Determined That The Republic Must Be A Party To Any 'National Public Interest Contract'

PDVSA makes a single argument that the 2020 Notes—undisputedly valid contracts as a matter of American law, *see* 51 F.4th 456, 475 (2d Cir. 2022)—were nonetheless invalid under Venezuelan law: namely, that the Notes were "national public interest contracts," a special category of contract

18

that requires the National Assembly's prior approval. The district court correctly rejected that argument. Controlling Constitutional Chamber precedent, extensive expert testimony, and decades of practice all establish that only a contract in which the Republic participates as a party constitutes a "national public interest contract."

### 1. Binding Precedent From Venezuela's Constitutional Chamber Requires The Republic To Be A Party To A 'National Public Interest Contract'

The 2020 Notes were not "national public interest contracts" because that designation—and the accompanying requirement of National Assembly approval—applies only to contracts entered by the Republic, acting through the National Executive.

a. Articles 150, 187(9), and 236(14) of the Venezuelan Constitution create special rules governing "national public interest contracts." Article 236(14) provides that one of the "powers and duties of the President of the Republic" is the "ent[ry] into contracts of national interest, subject to this Constitution and applicable laws." JA443. Two other provisions require National Assembly approval for "national public interest contracts." Article 150 provides that "[n]o municipal, state or national public interest contract shall be executed . . . with companies not domiciled in Venezuela . . . without the approval of the National Assembly." JA442. And Article 187(9) explains that one "role of the National Assembly" is to "[a]uthorize contracts of municipal,

19

state and national public interest . . . with companies not domiciled in Venezuela." JA442-443.

b.      As the district court correctly recognized, the Constitutional Chamber's decision in *Andrés Velásquez* makes clear that only contracts to which the Republic itself is party can be "national public interest contracts." *See* SPA103-109.  That decision is particularly significant because, in finding the law of a foreign country, an American court "receive[s] the construction given by the courts of the nation as the true sense of law."  *Hilton* v. *Guyot*, 159 U.S. 113, 194 (1895) (quoting *Elmendorf* v. *Taylor*, 23 U.S. 152, 160 (1825)).

The Constitutional Chamber is Venezuela's "ultimate and last interpreter" on "constitutional rules and principles."  JA447 (Venezuelan Constitution).  In *Andrés Velásquez*, the Constitutional Chamber considered the constitutionality of a provision of the Organic Law on Financial Administration that authorized the Republic to borrow from foreign entities without National Assembly authorization.  *See* JA2113 (*Andrés Velásquez*); JA812 (Doe Report).  The Chamber concluded that this provision violated the constitutional requirement that the National Assembly authorize "national public interest contracts" with foreign counterparties.  *See* JA2119-2121 (*Andrés Velásquez*).  In reaching that conclusion, the Constitutional Chamber observed that the Venezuelan Constitution does not specify "which meaning should be attributed to the concept of public interest contract."  JA2116.  The Chamber took it upon

20

itself, acting "as maximum and ultimate interpreter of the Constitution" to define the term. JA2116. After taking into account prior interpretations and relevant authorities, the Chamber determined that "contracts concluded by the Republic through the competent organs of the National Executive," and that meet certain other criteria in terms of the interests they serve and the purposes they reflect, are "national public interest contracts" requiring National Assembly approval. JA2116-2117.

Reinforcing that holding, the Chamber emphasized that the "determining factor" in identifying a national public interest contract was "the participation of the Republic." JA2116. And in describing the National Assembly's authority to grant or withhold approval under Articles 150 and 187(9), the Chamber repeatedly referred to the National Assembly's authority over "national public interest contracts *entered into by the National Executive*" and "in all cases in which the Republic (as well as States and Municipalities) *through the National Executive*, executes contracts with foreign [counterparties]." JA2114 (emphasis added).

As the district court explained, *Andrés Velásquez* thus squarely held that the Republic's participation is "a necessary (but not sufficient) requirement of a national public interest contract." SPA106.

c. *Andrés Velásquez*'s definition of "national public interest contract" is authoritative under Venezuelan law. Although judicial decisions in

21

civil-law jurisdictions generally serve only as persuasive authority, *see, e.g.*, *Financial One Public Co.* v. *Lehman Brothers Special Financing, Inc.*, 414 F.3d 325, 343 (2d Cir. 2005), Article 335 of the Venezuelan Constitution makes the Supreme Tribunal of Justice, Venezuela's highest court, "the ultimate and last interpreter of th[e] Constitution." JA447. And it specifies that "[i]nterpretations established by the Constitutional Chamber"—one of the six subject-matter Chambers that comprise the Supreme Tribunal of Justice—on "the content or scope of constitutional rules and principles are binding" both on the "other Chambers" and on "other courts of the Republic." JA447; *see also DRFP LLC* v. *Republica Bolivariana de Venezuela*, 706 F. App'x 269, 277 (6th Cir. 2017) (explaining that the Constitutional Chamber's decisions are "the highest and most final statements of Venezuelan law"). Confirming that point, subsequent decisions of the Constitutional Chamber have treated *Andrés Velásquez* as binding and applied its rule in other cases. *See* JA1106 (*EDELCA*); JA2193 (*Brigitte Acosta*); JA2153 (*Attorney General II*); pp. 32-37, *infra*.

d. The expert testimony presented in the district court powerfully supports that analysis. The parties submitted expert reports about the meaning of Venezuelan law and of *Andrés Velásquez*. The district court was correct to credit the testimony of Dr. Roe and Professor Doe that *Andrés Velásquez*

22

established a binding rule that for a contract to be a national public interest contract, the Republic itself must be a party.  *See* SPA107-108.[2]

As relevant here, Dr. Roe testified that *Andrés Velásquez* "is binding and that it stands for the proposition that the participation of a political-territorial entity (i.e., the Republic, a state or a municipality) is a requirement for a contract to be of National Interest."  JA4903.  Similarly, Professor Doe stated that "[t]he primary rule established by the Constitutional Chamber, and repeatedly affirmed by respected Venezuelan legal scholars, is that only contracts to which the Republic is a party can qualify as Contracts of National Interest necessitating National Assembly approval."  JA769 (emphasis omitted).

Although PDVSA's experts urged a different interpretation, the district court did not deem those views persuasive.  SPA106-108 & n.8, SPA113-115.  The court emphasized that before being retained in this litigation, PDVSA's own experts had also read *Andrés Velásquez* as establishing a binding rule that a "national public interest contract" requires that the Republic be a party.

---

[2] PDVSA suggests there is something untoward about the withholding of these experts' names.  *See* Br. 15.  But Dr. Roe and Professor Doe testified under pseudonyms out of fear for their personal safety, and the district court found their concerns to be well-founded.  *See* JA3256-3257; JA4875-4876.  The fact that creditors' experts feared persecution by the Maduro regime also undermines PDVSA's attempt to frame this appeal as a dispute between that regime and the Venezuelan opposition.

23

In 2006, Professor Allan R. Brewer-Carías wrote that *Andres Velasquez* "established a binding interpretation[] and reduced the category of 'public interest contracts' . . . to those signed or concluded by the Republic, the States, and the Municipalities, thus excluding . . . enterprises such as PDVSA." JA1023 n.11 (citation omitted); *see* JA4924 n.147. Over a decade later, Professor Brewer wrote that the requirement of National Assembly approval "do[es] not apply to public contracts concluded by these decentralized national public entities, for example, . . . state companies." JA902 (emphasis omitted). For that reason, he correctly argued, the Constitutional Chamber's decisions mean that "public contracts signed by state companies, like Petróleos de Venezuela S.A. and its subsidiary companies, may be freely entered into . . . with companies not domiciled in Venezuela . . . without being it necessary to obtain authorization from the National Assembly." JA904 (ellipsis and emphasis omitted). Professor Brewer repeated statements like these in numerous publications over a decade, including as recently as 2019. *See* SPA99-100; JA901 n.12.

After the district court observed that those writings contradicted the expert reports Professor Brewer submitted on behalf of PDVSA in this litigation, JA3441-3442, PDVSA retained a new expert, Professor José Araujo-Juárez. But Professor Araujo, too, had previously written that the participation

24

of "a political-territorial entity, that is, the Republic, the States, and the Municipalities" is "a necessary condition for the conclusion of contracts of national interest." JA1154-1155; *see* JA3845; JA4896-4897.

The district court determined that the "inconsistency" between those prior writings and the two professors' interpretations of Article 150 after being retained by PDVSA "negatively impact[ed] [their] credibility." SPA99. And it found unpersuasive PDVSA's efforts to explain away that inconsistency. *See* SPA99-101, SPA111-117. The court noted that PDVSA's experts now express an expanded understanding of "national public interest contract"; but, in light of the professors' prior writings, the court read the experts' statements in this litigation as reflecting their opinions about what "the law *should be* rather than what the law currently *is*." SPA112. As to the latter question, the district court correctly observed that PDVSA's experts had expressly taken the same view as the creditors' experts: *Andrés Velásquez* establishes a binding rule that the Republic's involvement as a party is a required element of a "national public interest contract." SPA112. Those uniform expert views are powerful evidence that, under Venezuelan law, the Notes did not require National Assembly approval.

### 2. Decades Of Practice Confirm That PDVSA's Contracts Are Not 'National Public Interest Contracts'

Longstanding Venezuelan practice further confirms that interpretation of Venezuelan law.

Over 40 years, PDVSA and its subsidiaries have issued billions of dollars in debt on international markets and entered into major transactions with foreign counterparties. And PDVSA did not seek National Assembly approval for any of those financing agreements. *See* JA884-885; JA940-943; CA70, CA80-81, CA138. Indeed, PDVSA did not seek the National Assembly's authorization before purchasing CITGO—whose ownership lies at the heart of this case. CA710-711, CA804. Nor did it seek National Assembly approval before engaging in other international debt transactions secured by its interest in CITGO: for instance, when it pledged a 49.9% stake in CITGO as security for a loan from Russian oil company Rosneft. *See* CA764-765, CA800, CA813.

Even after adopting the position regarding National Assembly approval in this litigation, PDVSA and its affiliates have continued to issue debt secured by CITGO assets in the United States and with foreign counterparties without obtaining National Assembly approval for such financing agreements. JA3543-3545; CA80-81. As Professor Doe explained, "[n]o PDVSA bond has ever been sent to the National Assembly for its approval." JA884. Nor has PDVSA identified any decisions (whether in Venezuela or in the United

26

States) invalidating a PDVSA contract for lack of prior National Assembly approval.

National Assembly statements in the leadup to the Exchange are of a piece. Even when reasserting its constitutional authority to approve national public interest contracts during a showdown with the National Executive in 2016, the National Assembly asserted only the power to review contracts "concluded by and between the National Executive." JA646-648; *see* p. 59, *infra*. A National Assembly deputy involved in authoring the September 2016 resolution confirmed that "PDVSA does not require authorization from the [National Assembly] to issue debt." JA211; CA750. Given PDVSA's longstanding practice and the National Assembly's statements, it is unsurprising that PDVSA's own Venezuelan counsel at Hogan Lovells represented that National Assembly approval would be unnecessary in connection with the 2016 transaction. JA2356-2366.

Yet despite those statements, despite that unbroken record, and despite the fact that sophisticated parties have tied up billions of dollars in value in reliance on the contracts' validity, PDVSA's theory suggests that all of PDVSA's contracts—including dozens of financing transactions with New York choice-of-law provisions consummated without National Assembly approval—are presumably null and void. *See* JA3543; JA1662-1680. That cannot be correct.

27

### B. PDVSA's Contrary Arguments Are Unavailing

In an effort to evade the straightforward application of *Andrés Velásquez* previously accepted even by its own experts, PDVSA presents a grab-bag of arguments that the 2020 Notes were "national public interest contracts" requiring National Assembly approval. Those arguments lack merit.

#### 1. PDVSA's Arguments About Andrés Velásquez *Are Incorrect*

a. PDVSA first tries to brush aside the key language in *Andrés Velásquez*. It contends that the sole holding of *Andrés Velásquez* was that a provision of the Organic Law was unconstitutional, and it further contends that the decision's language stating that the Republic's involvement is a necessary element of a national public interest contract is only dictum. Br. 32-34. But that is not how the Constitutional Chamber viewed its decision: invoking its authority "as maximum and ultimate interpreter of the Constitution," the Constitutional Chamber explained that it would first "specif[y] the meaning that must be given to the concept of *national public interest contracts* contained in articles 150 and 187, section 9," and then apply that definition to the legal question before it. JA2116-2117 (*Andrés Velásquez*). Under the express text of Article 335, the Constitutional Chamber's "[i]nterpretation[]" concerning "the content or scope of constitutional rules and principles" is "binding." JA447; *see* JA3818 (Roe Declaration). In short, the Constitutional Chamber viewed

28

itself as setting out a comprehensive and binding definition of the phrase "national public interest contract," and the Venezuelan Constitution makes that determination binding.

In any event, even if common-law concepts of "dictum" and "holding" were relevant despite the Chamber's invocation of its Article 335 authority, the Chamber's definition of "national public interest contract" constitutes a holding. That definition was a key element of the Chamber's reasoning for invalidating the disputed provisions of the Organic Law. *See*, *e.g.*, *Bucklew* v. *Precythe*, 587 U.S. 119, 136 (2019). As the district court explained, that is "clear from the plain text" of *Andrés Velásquez*. SPA107.

Relatedly, PDVSA contends that *Andrés Velásquez* is not binding because the Constitutional Chamber did not "expressly state that it is issuing a binding constitutional interpretation" under Article 335. Br. 36. But nothing in Article 335 requires the Chamber to use any particular "magic words" in order to afford one of its interpretations binding force. SPA98 (citation omitted). As long as the Constitutional Chamber's interpretation concerns "the content or scope of constitutional rules and principles," it is "binding." JA447 (Venezuelan Constitution); *see* pp. 21-22, *supra*. In any event, even if an express invocation of Article 335 were required, the Chamber stated that it was proceeding as the "maximum and ultimate interpreter of the Constitution." That is an unequivocal invocation of the language of Article 335. *See* JA447

(providing that the Chamber shall be the "ultimate and last interpreter of this Constitution").

b. PDVSA also tries to dispute that the Chamber's definition of "national public interest contract" in *Andrés Velásquez* requires participation of the Republic. *See* Br. 34-35. PDVSA points to the Chamber's statement that Republic-entered contracts are "included within the species of national public interest contracts," JA2117 (*Andrés Velásquez*), and it argues that the Chamber made the Republic's involvement as a party sufficient, but not necessary, for a contract to be a national public interest contract. *See* Br. 35; *see also* Venezuela Br. 16. That is incorrect. *Andrés Velásquez* explains that the "genus" of public interest contracts consists of three "species": national, state, and municipal. JA2116-2117. And the language PDVSA invokes specifies that Republic-entered contracts belong in the first "species" or category, *i.e.*, national, rather than state or municipal, public interest contracts. Nothing in the opinion suggests that the "species" of national public interest contracts also includes unspecified other contracts to which the Republic is not a party. JA2115-2117. To the contrary, that participation is a necessary or "determin[ative]" feature of national public interest contracts. JA2116. And again, PDVSA's made-for-litigation reading contradicts the reading of *Andrés Velásquez* that its own experts had adopted before being retained in this case. *See* pp. 23-25, *supra*.

30

### 2. *PDVSA Cannot Rehabilitate Its Experts' Credibility*

PDVSA also attempts to rely on the views of its experts, *see* Br. 26-27, 37-38, but it cannot rehabilitate its experts given the inconsistency of their views.

As discussed above, Professor Brewer had long read *Andrés Velásquez* as establishing a binding interpretation that "national public interest contracts" must be "signed or concluded by the Republic." JA3841. When confronted with his change in position, Professor Brewer claimed that his 2006 writing about *Andrés Velásquez* was an "error" that was "not identified upon proofreading," and that his "usual support infrastructure of research assistants" would have caught had he not fled Venezuela. JA3601-3602. The district court correctly found this rationalization "difficult . . . to credit," given that Professor Brewer's supposedly erroneous reading of *Andrés Velásquez* continued to appear in his scholarship for over a decade. SPA100.

PDVSA's efforts to salvage the testimony of Professor Araujo are similarly fruitless. As with Professor Brewer, the district court found it "difficult to credit" Professor Araujo's new opinion that PDVSA can enter national public interest contracts, given his prior writings describing *Andrés Velásquez* as establishing a "*restrictive*" interpretation of "national public interest contracts." JA3863; SPA113; *see* JA3696-3697. Indeed, Professor Araujo's 2024

31

treatise—published years after PDVSA filed this suit—criticized *Andrés Velásquez* for espousing what Professor Araujo viewed as an "undue restriction of the notion of public interest contract," under which "public contracts signed by the other state entities with legal personality, such as, e.g., . . . government-owned companies would be excluded." JA4084; *see* JA3862. Professor Araujo therefore recognized that *Andrés Velásquez* adopts the very rule that the creditors invoke, but he disagreed with the Constitutional Chamber's binding rule as a "normative" matter. *See* SPA109. PDVSA now asserts that the creditors have "misrepresent[ed]" Professor Araujo's work, Br. 37, but it does not elaborate on that assertion. Professor Araujo's inconsistencies, like Professor Brewer's, speak for themselves. *See* D. Ct. Dkt. 336-26, at 501 (Araujo Treatise).

### 3. Andrés Velásquez *Is Consistent With Other Venezuelan Decisions*

Taking another tack, PDVSA contends that subsequent Constitutional Chamber decisions have weakened the force of *Andrés Velásquez*. *See* Br. 38-42. Not so. The subsequent decisions PDVSA cites do not undermine, and indeed reinforce—*Andrés Velásquez*'s holding that the Republic's involvement is a necessary ingredient of a "national public interest contract."

PDVSA first invokes the Constitutional Chamber's decision in *Brigitte Acosta*, *see* Br. 40-41; JA2193, but that decision supports the creditors' argu-

32

ments. There, the Constitutional Chamber held that a loan agreement between the Central Bank of Venezuela and the Latin American Reserve Fund was not a "national public interest contract" subject to National Assembly approval. *See* JA2225. In reaching that conclusion, the Chamber relied on *Andrés Velásquez*, explaining that the decision "specified the essential elements that impart to contracts a national public interest nature," including that "they be executed by the Republic." JA2213. Applying that rule, the Chamber reasoned that the loan agreement was not a national public interest contract because the Central Bank was "a legal entity under public law . . . endowed with autonomy" apart from the Republic. JA2221. *Brigitte Acosta* thus reiterated *Andrés Velásquez*'s interpretation; confirmed that it is binding; and applied it in circumstances similar to those here in determining that a contract was not a "national public interest contract." JA4912-4913 (Roe Reply).

Ignoring *Brigitte Acosta*'s statement about the "essential elements" of a national public interest contract, PDVSA zeroes in on its observation that the Central Bank was "neither part of the Central Administration or the *Functionally Decentralized Administration*." Br. 41 (quoting JA2221-2222 (*Brigitte Acosta*)). From that passing statement, PDVSA infers that contracts entered by decentralized entities such as PDVSA *can* qualify as "national public interest contracts." That overreads *Brigitte Acosta*, which included that statement in a lengthy list of reasons why the Central Bank is independent of the

33

Republic. *See* JA2221-2222. Nothing in *Brigitte Acosta* suggests that each of the listed features was necessary to its decision. And its articulation of the rule, *see* JA2212, JA2221-2222, makes clear that PDVSA's contracts would not be national public interest contracts. Tellingly, PDVSA's own expert, Professor Brewer, previously recognized that *Brigitte Acosta* meant that Article 150 and other constitutional provisions at issue in this case "do not apply to public contracts concluded by these decentralized national public entities, for example, the Central Bank of Venezuela, autonomous institutes *and state companies*" such as PDVSA. JA772 (emphasis added) (Doe Declaration); *see* JA1079 (2017 Brewer article).

Nor do the three other cases PDVSA invokes advance its position. PDVSA casts *Electrificación del Caroní S.A.* (*EDELCA*), JA1106, as a case where the Constitutional Chamber "deemed" a contract between a Venezuelan state-owned utility provider and a Brazilian company to be a national public interest contract. Br. 39; *accord* Venezuela Br. 17. In fact, *EDELCA* involved a memorandum of understanding among the Republic of Venezuela, the Federal Republic of Brazil, and three state-owned companies, "generating obligations for the Republic [of Venezuela] in the exercise of its international representation." JA1120. The Chamber specifically relied on *Andrés Velásquez* for the definition of a "national public interest contract," again reading it to require "the participation of the Republic" as an entity with obligations under

34

the contract. JA1120; *see* JA3849 (Roe Declaration). And it determined that the contract before it satisfied that requirement because it was "a consequence of . . . the obligations of the Republic" under the memorandum of understanding and "was entered into to discharge the Republic's international obligations." JA3852-3853, JA3866 (Roe Declaration); JA1120 (*EDELCA*).

PDVSA's reliance on *Attorney General II*, JA2153, is similarly misplaced. That case involved promissory notes that were issued by Venezuela's state-run agricultural development bank and that, on the face of the notes, "ha[d] the explicit backing of the National Government of the Republic of Venezuela" as a guarantor, meaning that the Republic could itself be held liable in the event of default. JA1145. The Constitutional Chamber held that those notes were "national public interest contracts." *See* JA2174. Again, however, *Attorney General II* relied on *Andrés Velásquez*: it quoted the decision at length and specifically applied the test set out by *Andrés Velásquez* that "the determinant" in a national public interest contract "would be the participation of the Republic." JA2172 (quoting *Andrés Velásquez*); *see* JA2170-2172. The Chamber determined that the Republic's role satisfied the *Andrés Velásquez* test. JA2174; *see* JA4911 (Roe Reply). As Dr. Roe recognized, the "critical underlying premise" in the Constitutional Chamber's analysis was the "Republic's direct assumption of those payment obligations," with the result that "the financial obligations at issue [were] payable directly by the Republic."

35

JA4907, JA4911 (Roe Reply) (emphasis omitted). Here, by contrast, the Republic had not guaranteed the 2020 Notes. For that reason, *Attorney General II* underscores that the Republic's bystander role as to the 2020 Notes is not sufficient.

PDVSA also invokes a decision, *Simón Muñoz Armas*, JA2923, that predates *Andrés Velásquez*. But that decision is inapposite for several reasons. *First*, as the district court observed, *Simón Muñoz Armas* was decided under the earlier 1961 Constitution, not the current 1999 Constitution, and it "did not even purport to interpret any of the provisions of the Venezuelan Constitution that are at issue here or consider the scope of Contracts of National Interest." SPA125-126 (quoting JA3864 (Roe Declaration)). *Second*, the case was decided by the Supreme Court of Justice, which issued decisions that lacked "precedential effect," JA3865 (Roe Declaration), rather than by the Constitutional Chamber. *Third*, that court "did not consider the meaning of Contracts of National Interest at all." JA3865 (Roe Declaration). For those reasons, it is not surprising that *Andrés Velásquez* did not so much as cite *Simón Muñoz Armas* in analyzing the meaning of the phrase. *Finally*, whatever *Simón Muñoz Armas* may have suggested about the "notion of public service" in an "administrative contract" under the 1961 Constitution, JA2926 (internal quotation marks omitted), *Andrés Velásquez* "resolved" any debate about the meaning of the phrase "national public interest contract" that appears in the

36

1999 Constitution by requiring, among other things, the Republic's participation as a party, SPA126 (quoting JA2116 (*Andrés Velásquez*)).

### 4. PDVSA's Textual Arguments Are Incorrect

Unable to reconcile its argument with *Andrés Velásquez*, PDVSA asks this Court to define "national public interest contract" based on its own parsing of the English translation of the text of Articles 150 and 187(9). *See* Br. 25-28. That request fundamentally misapprehends how American courts determine foreign law. As explained above, an American court "receive[s] the construction given by the courts of the [foreign] nation as the true sense of the law." *Hilton*, 159 U.S. at 194 (citation omitted); *see also Elmendorf*, 23 U.S. at 159-160 (noting that "no Court in the universe" would "undertake to say, that the Courts of" any nation "had misunderstood their own statutes, and therefore erect itself into a tribunal which should correct such misunderstanding"). Indeed, PDVSA's request is particularly misguided because PDVSA offers no authority suggesting that Venezuelan courts would apply the same approach to interpreting their Constitution that American courts would to ours. *Cf. Diaz* v. *Gonzalez*, 261 U.S. 102, 105-106 (1923) (Holmes, J.) (urging caution "in dealing with the decisions of a Court inheriting and brought up in a different system from that which prevails here," because the "appellate jurisdiction [of American courts] is not given for the purpose of remodeling the Spanish-American law according to common law conceptions"). This Court should

37

therefore accept *Andrés Velásquez*'s construction of "national public interest contract" as authoritative.

In any event, Articles 150, 187, and 236(14) of the Venezuelan Constitution confirm, rather than undermine, the holding of *Andrés Velásquez*. In arguing to the contrary, PDVSA emphasizes that Article 150 does not expressly state that only the "National Executive"—*i.e.*, the Republic itself—may enter into contracts of "national public interest." *See* Br. 25, 27. But Article 150 does not purport to identify which entities can enter into "public interest contracts"; it simply defines two circumstances in which those contracts require National Assembly approval (namely, when approval is required "by law" or when the other contracting party is a "foreign State[] or official entit[y]" or a "compan[y] not domiciled in Venezuela"). JA442 (Venezuelan Constitution).

Two other provisions of the Venezuelan Constitution illustrate that entering national public interest contracts is the role of the National Executive. Article 236(14) lists the entry of "contracts of national interest" as one of the "powers and duties of the President of the Republic." And Article 187(9) likewise identifies among the "role[s] of the National Assembly" "[a]uthoriz[ing] *the National Executive* to enter into contracts in the national interest, in the cases established by law." JA442-443 (emphasis added); *see* JA3822-3823. Both of those provisions expressly identify a single actor—the "National Ex-

38

ecutive" or President—as the entity that enters into contracts of "national interest." That language creates a negative inference that other actors, including Decentralized Public Administration entities such as PDVSA, do *not* enter into such contracts. *See, e.g.*, *Esteras* v. *United States*, 606 U.S. 185, 195 (2025).

PDVSA reads too much into the lack of an express reference to the National Executive in the second sentence of Article 187(9), which charges the National Assembly with "[a]uthoriz[ing] contracts of municipal, state and national public interest, with States or official foreign entities or with companies not domiciled in Venezuela." JA443. It makes perfect sense that this sentence does not refer to the "National Executive," because the sentence also addresses municipal and state public interest contracts, which do not require the National Executive's involvement. *See* JA2116 (*Andrés Velásquez*). And there would be little reason for the Constitution's drafters to specify the entities that enter into each of the three species of public interest contract, especially because the preceding sentence already states that the National Executive enters national public interest contracts.

### 5. *PDVSA's Remaining Arguments Are Unavailing*

PDVSA raises a handful of other arguments. None is persuasive.

a.     Relying on Article 33 of the Organic Law of Hydrocarbons, PDVSA contends that the National Assembly routinely invokes its Article 150 power to authorize "contracts by decentralized entities" such as PDVSA. Br.

39

29.  But the Hydrocarbons Law specifically requires National Assembly approval for joint-venture agreements.  It states, in relevant part, that "Venezuela's Ministry of Energy and Oil is required to submit to the National Assembly for 'prior approval' any joint venture agreements entered into by PDVSA or its affiliates."  *Id.*  The law does not apply to the 2020 Notes because it governs *joint-venture* contracts but does not speak to *financing* contracts. *See* SPA118-119.  And as explained above, PDVSA's unbroken practice has been to enter financing contracts with foreign entities without seeking or receiving the National Assembly's prior approval.  *See* pp. 25-27, *supra*.

The Hydrocarbons Law illustrates that the National Assembly can enact laws providing that certain contracts require its approval.  But that does not render all PDVSA contracts "national public interest contracts" that *require* National Assembly approval under Article 150 of the *Venezuelan Constitution*.  PDVSA observes (Br. 29-30) that the National Assembly invoked its authority under Articles 150 and 187(9) when issuing resolutions authorizing joint-venture agreements under the Hydrocarbons Law, but that does not mean that those provisions required authorization of their own force.  Indeed, if Articles 150 and 187(9) had independently required the National Assembly to approve the joint-venture agreements, the Hydrocarbons Law's requirement of National Assembly approval of those agreements would have been superfluous.  Nor do the National Assembly's authorizing resolutions themselves

40

treat the contracts as "Contracts of National Interest." *See* JA4173 (resolution text); JA4177 (same); JA3868-3869 (Roe Declaration). And to state the obvious, the National Assembly's views as to the scope of Article 150 cannot supersede the Constitutional Chamber's binding interpretation of that provision in *Andrés Velásquez*. JA1710 (Doe Supplemental Declaration).

b. PDVSA also seems to argue that, as a decentralized entity, it is overseen by the Ministry of Oil, and the Ministry of Oil in turn is part of the National Executive. *See* Br. 26-27. PDVSA's view seems to be that, because contracts entered into by the Ministry of Oil could be national public interest contracts, PDVSA's contracts should also qualify. *See id.* That argument fails because it conflates PDVSA with the Ministry of Oil. As explained above, PDVSA is distinct from the National Executive, so PDVSA's contracts with foreign counterparties are not *ipso facto* the contracts of the National Executive. *See* p. 4, *supra*; JA3825-3826 (Roe Declaration); *accord* Allan Randolph Brewer-Carias & Enrique Viloria, *El Holding Publico* 155 (1986) (JA956) (recognizing "the fact that [PDVSA] has its own legal personality distinct from the Republic"). PDVSA's attempt to blur the line between itself and the Republic flouts the "strong" "presumption of separateness" between foreign sovereigns and the distinct juridical entities created by those sovereigns. *Gater Assets Ltd.* v. *AO Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021); *see FNC Bank* v. *Banco Para el Commercio*, 462 U.S. 611, 626-627 (1983) (same). And it disregards

41

actual practice in Venezuela: PDVSA has not identified any examples of the Ministry of Oil seeking National Assembly approval for PDVSA's many international transactions (other than those separately covered by the Hydrocarbons Law). *See* pp. 25-27, 40-41, *supra.*

c. Tellingly, PDVSA does not articulate a workable alternative to *Andrés Velásquez*'s interpretation of the phrase "national public interest contract." Throughout this litigation, PDVSA has vacillated between arguments that national public interest contracts must implicate "the collective interest of all Venezuelan citizens," PDVSA Mot. for Summ. J. 30, Dkt. 117; include contracts addressing "PDVSA's oil industry activities in Venezuela," PDVSA Summ. J. Reply at 19, Dkt. 193; and include all contracts entered by "state legal persons," including Decentralized Public Administration entities, PDVSA Supp. Summ. J. Br. 8, Dkt. 346. On appeal, PDVSA waffles about whether national public interest contracts require the involvement of either the Republic or a state-owned entity as a party, or need only "implicate[] the national interest" or "have significant implications for strategic sectors of Venezuela's economy." Br. 25, 59. Such an expansive and malleable definition of "national public interest contracts" would enable the Republic and state-owned companies to escape their obligations by claiming (as here) that contracts are sufficiently "significant" that they required—and are void without—

42

National Assembly preapproval.  This Court should not adopt an interpretation of the Venezuelan Constitution that not only is inconsistent with Venezuelan law, JA939 (Doe Rebuttal), but also risks throwing debt markets into confusion.

### C. The District Court Was Not Required To Give Dispositive Weight To The Republic's Interpretation Of Venezuelan Law

In urging its interpretation of Venezuelan law, PDVSA seeks to rely on the Republic's briefs in this case, which argued that PDVSA's contracts are contracts of national public interest.  PDVSA contends that the district court erred by failing to give dispositive weight to that submission under the Supreme Court's decision in *Animal Science Products, Inc.* v. *Hebei Welcome Pharmaceutical Co.*, 585 U.S. 33 (2018).  *See* Br. 42-50.  That contention is mistaken.

In *Animal Science*, the Supreme Court held that, in determining foreign law, "a federal court should accord respectful consideration to a foreign government's submission" about the meaning of its own laws "but is not bound to accord [it] conclusive effect."  585 U.S. at 36.  The Court cautioned that "the appropriate weight in each case will depend upon the circumstances," and it provided a non-exhaustive set of factors to assist a court in determining how much weight to afford the foreign state's views.  *Id.* at 43.  Those factors include "the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of

the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." *Id.*

1. The district court conscientiously complied with *Animal Science.* As a preliminary matter, it "accord[ed] substantial weight and respectful consideration to the Republic's views." SPA127. It articulated those views in detail, SPA127-129, and thoughtfully engaged with them, SPA129-131. The court acknowledged that several of the *Animal Science* factors "cut in favor of the Republic[] or are at the very least neutral." SPA130. But the court had to "temper[] due deference" because other *Animal Science* factors cut against the Republic and because other evidence of Venezuelan law pointed strongly against its interpretation. SPA131.

In particular, the district court determined that the "context and purpose" of the Republic's submission was to "vindicat[e] the Republic's own interests." SPA130. In reaching that conclusion, the district court emphasized that the 2020 Notes are "economically and politically important to the Republic." SPA131. After all, the Republic owns all of the shares of PDVSA, and thus indirectly owns the majority interest in CITGO pledged as security for the 2020 Notes. And the Republic has itself received billions of dollars in dividends from CITGO. *See* Tr. at 16-17, 31-32, *Crystallex International Corp.* v. *Bolivarian Republic of Venezuela*, Civ. No. 17-151 (D. Del. Jan. 19, 2018), Dkt.

44

49. Moreover, the Republic's financial incentive to argue that National Assembly approval was required extends beyond the 2020 Notes: because PDVSA has not sought National Assembly approval before issuing any foreign debt, a holding that National Assembly approval is required could call into question the validity of other PDVSA debt. Although PDVSA claims that the Republic's "most fundamental" interest is in the "correct" interpretation of Venezuelan law, Br. 48, the district court properly determined that the Republic had a substantial financial interest in this case, *see* SPA130 (noting "th[e] obvious synergy" between the Republic and PDVSA). Elsewhere, PDVSA itself appears to concede the point, acknowledging that the Republic maintains a strong financial interest in the ownership of its "precious national resources." Br. 47.[3]

Relatedly, the district court also determined that the "context and purpose" of the Republic's submission was to "supplement [PDVSA's] submissions." SPA130. It emphasized the close coordination between PDVSA and the Republic in the course of the litigation. *See* SPA130. Indeed, the court

---

[3] PDVSA's ownership structure illuminates the Republic's financial interest in this case for purposes of the Court's *Animal Science* analysis, but that parent-subsidiary relationship does not mean that the Republic itself was a party to the 2020 Notes, because "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." *Gater Assets*, 2 F.4th at 55.

explained that PDVSA and the Republic appear to have coordinated their submissions in this very case. *See* SPA130. For example, the Republic filed a letter outlining its views the day before opening briefs were due in the district court, and PDVSA's brief "cit[ed] to and rel[ied] on the Republic's letter, despite it having been submitted just one day prior." SPA41. That happened again when the Republic submitted its amicus brief two days before PDVSA's supplemental brief; this time, PDVSA accidentally left a placeholder citation to the Republic's amicus brief. *See, e.g.*, JA3756 (original version of PDVSA's supplemental brief with a placeholder citation to "Republic's Br. ___"). And in the *Crystallex* litigation currently before the Third Circuit, PDVSA and the Republic have likewise litigated in lockstep. *See, e.g.*, *Crystallex*, 2025 WL 3281353, at *11-12, *36-37. In light of those facts, the district court was correct to determine that the Republic's account, offered "in the context of litigation," bears less weight. *Animal Science*, 585 U.S. at 43.

Further supporting the district court's analysis, the "role and authority" of the Republic reduces the weight of its views. *Animal Science*, 585 U.S. at 43. Under the Venezuelan Constitution, only the Constitutional Chamber has the authority to provide "binding" interpretations of Venezuelan law. SPA131. To the extent the Republic advances a "contrary" interpretation in this case, that interpretation cannot override the Constitutional Chamber's binding interpretation in *Andrés Velásquez*.

46

In short, the district court "carefully considered the Republic's position" alongside "the parties' expert submissions," but it had to "temper[] due deference" given the "context and purpose" of the Republic's submission and its "role and authority" under the Venezuelan Constitution. SPA130-131. Ultimately, the court "f[ound] that it simply cannot square the Republic's views with what Venezuelan law requires." SPA131. That careful and balanced analysis is precisely what *Animal Science* requires. *See* 585 U.S. at 43.

2.    PDVSA's and the Republic's contrary arguments are unavailing. PDVSA first contends that the district court adopted "a rule of anti-deference" or failed to give the Republic's submission "due respect" because of its interest in the litigation. Br. 47-48. But that simply misreads the district court's opinion. The court "carefully consider[ed]" the Republic's submission and acknowledged the factors cutting in favor of deference, but it ultimately found "cause for caution" given the unusual level of coordination, the Republic's stake in the case, and the clarity of *Andrés Velásquez*. SPA129, SPA131 (quoting *Animal Science*, 585 U.S. at 43). While PDVSA and the Republic claim that the district court failed to "give sufficient weight to the Republic's consistent, well-reasoned interpretations of its own law," PDVSA Br. 42, and that it gave those views "woefully inadequate consideration," Venezuela Br. 11, they do not identify what the district court should have done differently besides ruling for them. And to the extent PDVSA and the Republic argue that

47

the court should have simply accepted the Republic's views, *Animal Science* expressly rejects the rule of absolute deference they urge. *See* 585 U.S. at 43. The district court fully considered the Republic's views, and it gave those views all the weight they deserved.

## II. THE 2020 NOTES WOULD BE ENFORCEABLE EVEN IF THEY WERE NATIONAL PUBLIC INTEREST CONTRACTS

Even if National Assembly approval had been required, the appropriate remedy at this stage is not to deem the 2020 Notes void *ab initio*; the lack of approval would merely render the contracts *voidable*. And powerful considerations of reliance and equity weigh against voiding the Notes now, after PDVSA's default. The Court can affirm on this alternative basis, which was raised below but which the district court had no occasion to reach. *See United States* v. *Graham*, 51 F.4th 67, 81 (2d Cir. 2022); SPA132.

As Venezuela's Special Attorney General has recognized, under Venezuelan law, "a lack of National Assembly approval would at most be considered a legal defect affecting an entity's *legal capacity* to contract, which renders a contract merely voidable, not void." CA201-202 (Doe Rebuttal). And voiding the contracts would not be warranted in these circumstances. Under Venezuelan law, "courts may only declare the illegality of . . . a contract concluded by the Public Administration when the evidence provided proves categorically—*i.e.*, creates certainty—that . . . the contract being challenged is in fact illegal." CA124 (Doe Report). Unless that "high burden" is satisfied, a

48

contract is presumed to be legal and valid and "must remain in full force and the contracting parties are obliged to perform their obligations in good faith." CA123-125 (Doe Report).

PDVSA cannot carry this "high burden" because voiding the contract would be inconsistent with the Venezuelan principle of legitimate expectations. That legal principle provides that "legitimate expectations condition and govern all acts by the Public Administration, and that parties may rely on reasonable expectations of the Public Administration when engaging with it." CA126 (Doe Report). It is akin to the equitable-mootness doctrine in American law, under which a court will dismiss a bankruptcy appeal that stands "unjustly [to] upset[] a debtor's plan of reorganization" after it "has been substantially consummated." *In re Charter Communications, Inc.*, 691 F.3d 476, 481 (2d Cir. 2012).

PDVSA—and its Venezuelan counsel at Hogan Lovells—made numerous representations that these specific governing documents were valid, and PDVSA had a multi-decade history of issuing debt without National Assembly approval. *See* pp. 5-6, 27, *supra*. The legitimate-expectations principle requires the enforcement of the governing documents—even if they failed to get required National Assembly approval—in order to protect the substantial reliance interests of the 2020 noteholders, the trustee, and the collateral agent. CA131-133 (Doe Report).

## III.   THE ACT-OF-STATE DOCTRINE DOES NOT APPLY

The district court correctly held that the act-of-state doctrine does not apply here.  The "judicially created" act-of-state doctrine generally "render[s] non-justiciable claims that challenge" certain "acts of foreign sovereigns": namely, acts effectuating "a taking of property within [a foreign sovereign's] own territory." *Allied Bank International* v. *Banco Credito Agricola de Cartago*, 757 F.2d 516, 520 (2d Cir. 1985) (internal quotation marks and citation omitted).  That principle, however "must always be tempered by common sense," and it "does not necessarily preclude judicial resolution of all commercial consequences that result" from the acts of foreign sovereigns within their own borders.  *Id.* at 521 (internal quotation marks and citation omitted).

Here, PDVSA claims that some combination of three National Assembly resolutions were acts of a foreign sovereign that invalidated the 2020 Notes: the May 2016 resolution, which expressed the Assembly's general objection to the National Executive entering public interest contracts without National Assembly approval, *see* JA646-648; the September 2016 resolution, which objected to the Exchange Offer on various grounds (including by purporting to "reject" the pledge of CITGO shares), JA115; and the October 2019 resolution, which claimed to "ratify that the 2020 [Notes] violated Article 150 of the [Venezuelan] Constitution" due to lack of National Assembly approval, JA124.

50

For three principal reasons, the act-of-state doctrine does not require deeming the Notes invalid. *First*, the act-of-state doctrine insulates only the foreign sovereigns' official acts, but the National Assembly was not "sovereign" in 2016. *Second*, the act-of-state doctrine applies only to acts purporting to effectuate a taking entirely within the foreign sovereign's own territory, but the situs of these notes was (at least in part) in the United States. *Third*, neither of the National Assembly's 2016 resolutions purports to invalidate the 2020 Notes, so affirming the district court's judgment that these bonds are valid does not "challenge" any sovereign's domestic official act. *Allied Bank*, 757 F.2d at 520. Although the National Assembly subsequently attempted to invalidate the bonds in 2019, "*Allied Bank* forecloses any argument that the October 2019 Resolution could operate on its own to retroactively void the 2020 Notes." 51 F.4th at 466 n.6.

### A. The 2016 Resolutions Were Not Official Acts Of A Foreign Sovereign

1. The act-of-state doctrine has no bearing on this case for the simple reason that PDVSA has identified no "official act of a foreign sovereign" that prohibited the issuance of the 2020 Notes and rendered them void *ab initio*. *W.S. Kirkpatrick & Co.* v. *Environmental Tectonics Corp., International*, 493 U.S. 400, 405 (1990). At the time of the 2016 resolutions, the United States recognized the Maduro regime, and the resolutions expressed the views of only one of the branches of Venezuela's government. JA2244, JA2253-2254.

Those views were no more "sovereign" than proposed legislation enacted by Congress but never signed into law. *See Von Saher* v. *Norton Simon Museum of Art at Pasadena*, 897 F.3d 1141, 1153 (9th Cir. 2018) (noting that "[a]dvisory recommendations that cannot bind the sovereign are not acts of state").

2.     PDVSA contends that all the National Assembly's actions in 2016 retroactively became "sovereign" in 2019, when the United States recognized the National Assembly as the sole legitimate political actor in Venezuela.  Br. 51.  In accepting that mistaken argument, SPA145-146, the district court overread prior decisions concerning the retroactive effects of the recognition of a foreign government.

Although recognition of a foreign government by the United States can apply retroactively, *see, e.g.*, *United States* v. *Pink*, 315 U.S. 203, 233 (1942), recognition "operates only to validate to a limited extent acts of a *de facto* government which by virtue of the recognition, has become a government *de jure*," *Guaranty Trust Co.* v. *United States*, 304 U.S. 126, 140 (1938).  Accordingly, the Supreme Court and this Court have applied the retroactive-recognition rule only where a de facto government "originat[ing] in revolution or revolt" was later recognized by the United States as the "de jure government." *Oetjen* v. *Central Leather Co.*, 246 U.S. 297, 302-303 (1918); *see also id.* at 303 (confiscation "in the progress of a revolution"); *see also Pink*, 315 U.S. at 233 (Bolshevik "revolutionary government"); *Underhill* v. *Hernandez*, 168 U.S. 250,

253-254 (1897) ("the revolutionary party"); *Konowaloff* v. *Metropolitan Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) (Bolshevik Revolution). That rule originates in the principle that American courts will not "judge" the "merits of the quarrel" between two sides in a civil war. *Underhill*, 168 U.S. at 253. And it comports with basic fairness: where a country is in a state of revolution or revolt, all entities interacting with the government are on notice that the chain of authority is disputed.

That principle does not apply to the National Assembly's 2016 resolutions, which did not purport to be the sovereign acts of a revolutionary government or one side in a flagrant civil war. When the National Assembly issued the 2016 resolutions, it was only one branch of Venezuela's government and made no claim to sovereignty, and the United States recognized Maduro as the legitimate head of state. *See* SPA26. Neither PDVSA nor the district court has identified a single case supporting extension of the retroactive-recognition principle to prior acts of a single branch of government that at the time did not claim to be the sole legitimate sovereign.

### B. The Resolutions Are Extraterritorial And Thus Not Protected By The Act-Of-State Doctrine

1. Even if the 2016 resolutions had been the official acts of a foreign sovereign, the act-of-state doctrine would still be inapplicable because those resolutions have extraterritorial effect. As this Court has explained, the doctrine applies only to "acts of the government of another [country] done within

53

its own territory." *Allied Bank*, 757 F.2d at 520 (quoting *Underhill*, 168 U.S. at 252). That reflects the reality that nullifying a "taking" that "is wholly accomplished within the foreign sovereign's territory[]would be an affront to such foreign government" and "would almost surely be disregarded within the borders of the foreign state." *Id.* at 521 (internal quotation marks and citation omitted).

Critically for present purposes, the act-of-state doctrine applies "only if" "the situs of the debts" was in Venezuela at the time that decrees purporting to invalidate the acts were promulgated. *Allied Bank*, 757 F.2d at 521. The situs of a debt "for act of state purposes" depends on whether "the purported taking can be said to have come to complete fruition within the dominion of the foreign government." *Id.* (internal quotation marks and citation omitted). Under that test, this Court held in *Allied Bank* that "Costa Rica could not wholly extinguish the Costa Rican banks' obligation to timely pay United States dollars to [an entity] in New York." *Id.* So too, Venezuela could not invalidate the 2020 Notes—payable in United States dollars in New York City and secured by collateral physically located in New York. *See* SPA28-31; SPA140, SPA147-150.

The same result follows from an "ordinary situs analysis." *Allied Bank*, 757 F.2d at 521. That analysis "focus[es] on the place of payment; the location of the parties; and the location of the contracting for the debt." SPA30 (citing

54

*Allied Bank*, 757 F.2d at 521). Here, the "clear center of gravity," *i.e.*, the traditional situs, of the debt was in New York, where the paying agent, transfer agent, registrar, and depository are all based; where the collateral is held; and where PDVSA is obligated to pay the debt. SPA31. Indeed, just as in *Allied Bank*, the interest of the United States in "ensuring that creditors entitled to payment in the United States in United States dollars under contracts subject to the jurisdiction of United States courts" is high, while Venezuela's interest "is essentially limited to the extent to which it can unilaterally alter the payment terms." *Allied Bank*, 757 F.2d at 521-522. "The act of state doctrine is, therefore, inapplicable." *Id.* at 522.

2. PDVSA does not challenge any of the district court's determinations regarding the debt's situs or dispute that the October 2019 resolution alone could not invalidate the 2020 Notes. Instead, PDVSA argues that the debt was null and void when issued because the Assembly's 2016 resolutions supposedly prohibited the Exchange, preventing holders of the 2020 Notes from acquiring any property interest in the first place. PDVSA thus attempts to distinguish *Allied Bank* "because it involved a *retroactive* repudiation of debt that was indisputably valid when issued," Br. 62, whereas this case involves voiding the Notes *ab initio*. That argument is wrong for three reasons.

*First,* PDVSA is asking the Court to apply the act-of-state doctrine to a retroactive repudiation of debt. The 2020 Notes were issued in 2016 with the

support of Venezuela's then-recognized government. PDVSA's argument that the National Assembly prospectively voided the bonds relies on the legal fiction that American recognition in 2019 retroactively made "sovereign" the Assembly's 2016 resolutions trying to repudiate the bonds. But PDVSA tellingly points to no precedent embracing an application of the act-of-state doctrine that gives effect to similar legal fictions. *See* SPA151. Rather, as *Allied Bank* explains, the doctrine "demands a case-by-case analysis" that "must always be tempered by common sense." 757 F.2d at 521. Shorn of that legal fiction, PDVSA is simply trying to invalidate previously issued bonds outside Venezuelan territory, much as Costa Rica did in *Allied Bank*. That makes this a heartland extraterritoriality case.

*Second*, PDVSA likewise cites no authority limiting *Allied Bank* to only "retrospective" takings. *Allied Bank* does not refer to, much less rely on, any distinction between "preemptive" invalidation and "retrospective" taking. Likewise, in *Braka* v. *Bancomer, S.N.C.*, 762 F.2d 222, 224-225 (1985), this Court held that the act-of-state doctrine barred review of Mexican government actions restricting access to the plaintiffs' Mexican bank accounts—a decision that rested wholly on the situs of the property in question, not on the timing of the relevant government actions.

56

The other cases PDVSA cites (Br. 63-64) likewise provide no support for its theory. In *Federal Treasury Enterprise Sojuzplodoimport* v. *Spirits International B.V.*, 809 F.3d 737, 744 (2d Cir. 2016), there was no claim to property at issue and there was no situs in the United States; indeed, the case was about which claims the Russian government may pursue in court. *United States ex rel. Von Heymann* v. *Watkins*, 159 F.2d 650 (2d Cir. 1947), and *United States Olympic Committee* v. *Intelicense Corp., S.A.*, 737 F.2d 263 (2d Cir. 1984), both predate *Allied Bank* and do not even mention the act-of-state doctrine (let alone preemptive invalidation). And PDVSA's out-of-circuit cases, *Sea Breeze Salt, Inc.* v. *Mitsubishi Corp.*, 899 F.3d 1064 (9th Cir. 2018) and *Emden* v. *Museum of Fine Arts, Houston*, 103 F.4th 308 (5th Cir. 2024), simply apply the act-of-state doctrine; they do not discuss, much less support, PDVSA's invented preemptive-invalidation exception.[4]

*Third*, PDVSA's theory would provide a get-out-of-debt-free card to sovereign borrowers and threaten to throw international debt markets into con-

---

[4] PDVSA (Br. 62) briefly quotes a colloquy between the district court and an attorney representing the United States, in which the attorney stated that, depending on how the judge assesses "the facts of this case and the issues of Venezuelan law," "there is a world in which *Allied Bank* may be distinguishable." JA3352. PDVSA neglects to mention that the government also affirmed its longstanding "policy of seeking to avoid contradicting creditors," JA3351, and took no stance on whether the act-of-state doctrine applies to this case, JA3349-3351; JA3254-3255.

fusion. Under PDVSA's theory, a foreign sovereign weary of paying international creditors could claim that the issuance of the debt violated local law and declare the debt void *ab initio*, and the act-of-state doctrine would compel American courts to accept that claim. That rule would harm New York's status as "one of the foremost commercial centers in the world," *Allied Bank*, 757 F.2d at 521, and undermine parties' reliance interests in enforcing transactions involving then-existing governments, *see Banco de Espana* v. *Federal Reserve Bank*, 114 F.2d 438, 440, 444 (2d Cir. 1940); *see also Guaranty Trust*, 304 U.S. at 140-141 (recognizing that diplomatic recognition of a new government does not invalidate business transactions entered under predecessor government).[5]

### C. Even If The 2016 Resolutions Were Not Extraterritorial, Neither Disapproved The Exchange Offer

The act-of-state doctrine is also inapplicable because PDVSA has not identified any official act that invalidated the 2020 Notes. Accordingly, affirming that the 2020 Notes are valid and enforceable does not require this Court to "challenge" or call into question any official act by the National Assembly.

---

[5] Under the so-called "permissive" act-of-state doctrine, American courts can recognize acts of foreign governments that purport to have extraterritorial effects "if they are consistent with the law and policy of the United States." *Allied Bank*, 757 F.2d at 522. The district court held in its first decision that this doctrine did not apply, SPA44-47, and PDVSA did not challenge that conclusion either on remand, JA4961, or in this appeal.

1.    a.    As the district court correctly concluded, the May 2016 resolution was "not directed at contracts entered into by PDVSA." SPA148. The Exchange Offer had not been announced at the time of that resolution. Unsurprisingly, that resolution said nothing about the exchange. Instead, as PDVSA admits, the May 2016 resolution "single[d] out the 'National Executive.'" Br. 53. The Assembly issued that resolution in response to a decree concerning the power of the "National Executive." *See* p. 5, *supra*. The resolution, which was in relevant part titled, "Contracts of Public Interest Signed By and Between the National Executive," expressly addressed contracts "concluded by and between the National Executive" and "companies not domiciled in Venezuela," and it warned that those contracts "shall be null and void" absent "the approval of the National Assembly." JA646-648. Because PDVSA is not part of the "National Executive," *see* pp. 4, 41-42, *supra*, the May 2016 resolution could "not effectuate an invalidation of the 2020 Notes," SPA33.

b.    The September 2016 resolution also did not "purport to invalidate the Exchange Offer." SPA150. In that resolution, the National Assembly "reject[ed]" the pledge of CITGO shares to secure the 2020 Notes; "summon[ed]" PDVSA's president to answer for offering CITGO as collateral; "urge[d] the Public Ministry to open an investigation" into the Exchange Offer; and "urge[d]" PDVSA to "present" a different "refinancing" plan. JA115. But the resolution was "not accompanied by any recognition of the Exchange Offer as

59

a contract of national public interest"; did not declare that the Exchange Offer "violate[d] Article 150 of the Venezuelan Constitution"; and did not "deem the Exchange Offer to be illegal, invalid, or void in any manner." SPA35; *see also* SPA149-150.

. JA2036, JA2040.

Whatever the National Assembly's discontent with aspects of the Exchange Offer, the September 2016 resolution did not assert the National Assembly's power to prohibit the Offer or to render the resulting bonds void *ab initio*. The resolution did not prohibit the Exchange Offer but merely criticized it.

2. PDVSA's arguments to the contrary are incorrect. PDVSA contends that, because the September 2016 resolution "reject[ed]" the pledge of an interest in CITGO, it voided the pledge and the 2020 Notes by implication. Br. 57-58; *see* Venezuela Br. 28-29. But the resolution never claimed authority to render the pledge unenforceable.

PDVSA maintains that, by rejecting the "key feature" of the Exchange Offer, the National Assembly necessarily disapproved the Exchange Offer as

60

a whole, *see* Br. 57, but that argument flouts ordinary principles of interpretation. To the contrary, the National Assembly's rejection of one particular aspect of the transaction implies acceptance of the transaction as a whole. *Cf. O'Melveny & Myers* v. *FDIC*, 512 U.S. 79, 86 (1994).

PDVSA also contends that the September 2016 resolution's "express invocation" of Article 187(9) indicates that the Assembly was asserting the power to disapprove the exchange. Br. 58. As the district court explained, however, the National Assembly invoked Article 187 to "obtain information" about the Exchange Offer, including by urging the Public Ministry to open an investigation. SPA11-12. PDVSA insists that, even if "the Assembly had intended the September 2016 Resolution only to urge further investigation, that decision would convey that the National Assembly had withheld the requisite approval." Br. 59; *see also id.* at 55 (arguing that "the National Assembly needed only to withhold" its approval to void the Notes). But the act-of-state doctrine applies only to "official act[s]," which "must be imbued with some level of formality." *Kashef* v. *BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019). PDVSA is thus mistaken that the lack of National Assembly approval is itself an "official act" to which the act-of-state doctrine could apply.

Unable to identify anything in the 2016 resolutions that prohibited the Exchange Offer and prospectively invalidated the 2020 Notes, PDVSA faults the district court for examining the resolutions rather than simply deferring

61

to the Republic or inferring the Assembly's unexpressed intent from the resolutions' penumbras. *See* Br. 56 (criticizing district court's "hair-splitting" and "fly-speck[ing]" of the September 2016 resolution); Br. 59 (arguing that intent to reject Exchange Offer should be inferred from Assembly's "summon[ing] the president of PDVSA" and "request[ing] a refinancing plan"). Unsurprisingly, PDVSA cites no authority for the idea that the act-of-state doctrine requires reflexive deference to a foreign sovereign's self-serving post hoc claims about its own law (which would contravene *Animal Science*) or a foreign legislature's unexpressed intent (which would eviscerate the doctrine's official-act requirement). Because neither of the 2016 resolutions purports to invalidate the 2020 Notes, determining that the Notes are valid does not require an American court to second-guess any foreign sovereign's domestic official act. The act-of-state doctrine is thus inapplicable.

Finally, as this Court already recognized, the October 2019 resolution cannot independently void the 2020 Notes. 51 F.4th at 466 n.6. PDVSA and the Republic argue that the 2019 resolution "ratifie[d]" or "corroborate[d]" the National Assembly's 2016 resolutions. Br. 13, 60-61; *see* Venezuela Br. 7, 21. As noted, however, the 2016 resolutions did not invalidate the 2020 Notes, so there was nothing for the October 2019 resolution to "ratif[y]." And to the extent PDVSA means to suggest that any ambiguity in the 2016 resolutions

should be interpreted in conformity with the October 2019 resolution, that argument upends ordinary principles of interpretation: the National Assembly's attempt to repudiate the 2020 Notes in 2019 would be superfluous if the 2016 resolutions had already repudiated the Notes. *See Stone* v. *INS*, 514 U.S. 386, 397 (1995) (noting that an amendment is presumed "to have real and substantial effect," "not just to state an already existing rule").

For all those reasons, PDVSA's attempt to stretch the act-of-state doctrine to encompass this case is meritless. As a matter of legal doctrine, common sense, and basic fairness, PDVSA cannot reap the benefits of the Exchange Offer while holding back an act-of-state trump card. PDVSA's extreme position would have deeply destabilizing effects on international markets, and it should be rejected.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

63

March 19, 2026

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM
MASHA G. HANSFORD
AUSTIN W. PIATT
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

JEFFREY J. RECHER
PAUL A. PATERSON
S. CONRAD SCOTT
JOSHUA A. ALTMAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

CHRISTOPHER J. CLARK
ANDREW J. RODGERS
BRIAN T. BURNS
CLARK SMITH VILLAZOR LLP
  *666 Third Avenue, 21st Floor*
  *New York, NY 10017*

64

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellees and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1(a)(4), that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 13,929 words.


MARCH 19, 2026

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM