# 25-2652-cv

## In the United States Court of Appeals for the Second Circuit

PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., AND PDV HOLDING, INC.,

*Plaintiffs-Counter-Defendants-Appellants*,

*v.*

MUFG UNION BANK, N.A. AND GLAS AMERICAS LLC,

*Defendants-Counter-Claimants-Appellees*.

*On Appeal from the United States District Court for the Southern District of New York*

### FINAL FORM REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

IGOR V. TIMOFEYEV
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C. 20036
(202) 551-1792

JAMES L. FERGUSON
ZACHARY D. MELVIN
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166

*Counsel for Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.*

MICHAEL J. GOTTLIEB
WILLKIE FARR & GALLAGHER LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111

ERICA L. ROSS
SAMUEL G. HALL
KRISTIN E. BENDER
WILLKIE FARR & GALLAGHER LLP
1875 K STREET, N.W.
WASHINGTON, D.C. 20006

*Counsel for PDV Holding, Inc.*

[Additional Counsel on Inside Cover]

KURT W. HANSSON, ESQ.
7 DRUM ROAD
ROWAYTON, CT 06853

*Counsel for Petróleos de Venezuela, S.A. and PDVSA Petróleo, S.A.*

AARON E. NATHAN
WILLKIE FARR & GALLAGHER LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019

ALYXANDRA VERNON
WILLKIE FARR & GALLAGHER LLP
333 Bush Street
San Francisco, CA 94104

*Counsel for PDV Holding, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................3

I.   THE DISTRICT COURT MISINTERPRETED ARTICLE 150...................3

    A.   The District Court Misread Andrés Velásquez ...................................3

        1.   Andrés Velásquez Does Not Address Contracts by
            Decentralized State Entities ...........................................3

        2.   Andrés Velásquez Did Not Depart from Settled
            Constitutional Tradition of Applying Article 150 to
            Decentralized Entities ............................................................6

        3.   Venezuelan Courts' Decisions Refute the Bondholders'
            Reading of Andrés Velásquez......................................................8

    B.   The Bondholders Misrepresent the Views of the PDVSA
        Parties' Experts...................................................................12

    C.   Decades-Long Practice Confirms that PDVSA's Contracts Are
        National Public Interest Contracts .................................................14

II.  THE 2020 NOTES ARE VOID AB INITIO, AND THE DOCTRINE
    OF LEGITIMATE EXPECTATIONS DOES NOT APPLY. .....................19

III. THE DISTRICT COURT ERRED IN REJECTING VENEZUELA'S
    OFFICIAL INTERPRETATION OF VENEZUELAN LAW.....................22

IV.  THE ACT OF STATE DOCTRINE APPLIES AND RENDERS THE
    2020 NOTES INVALID AND VOID AB INITIO. ...................................25

CONCLUSION...................................................................................................32

-

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banco Nacional de Cuba v. Sabbatino,*
  376 U.S. 398 (1964)...........................................................................25, 27

*In re Charter Commc'ns, Inc.,*
  691 F.3d 476 (2d Cir. 2012) ........................................................................22

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
  No. 17-151 (D. Del. Jun. 19, 2017) .............................................................24

*DRFP L.L.C. v. Republica Bolivariana de Venezuela,*
  622 F.3d 513 (6th Cir. 2010) ...............................................................11, 25

*Guar. Tr. Co. of N.Y. v. United States,*
  304 U.S. 126 (1938)......................................................................................25

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.,*
  153 F.3d 82 (2d Cir. 1998) ..........................................................................14

*Konowaloff v. Metro. Museum of Art,*
  702 F.3d 140 (2d Cir. 2012) ........................................................................26

*O'Melveny & Myers v. FDIC,*
  512 U.S. 79 (1994)........................................................................................31

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.,*
  41 N.Y.3d 462 (2024)....................................................................................16

*Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.,*
  51 F.4th 456 (2d Cir. 2022) ...................................................................25, 28

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct.*
  *for the S. Dist. of Iowa,*
  482 U.S. 522 (1982).......................................................................................24

*United States v. Pink,*
  315 U.S. 203 (1942)................................................................................26, 27

ii

*In re: Vitamin C Antitrust Litig.*,
8 F.4th 136 (2d Cir. 2021) ......................................................................23

*VR Global Partners, L.P. v. Petróleos de Venezuela, S.A.*,
2024 WL 4891271 (2d Cir. Nov. 26, 2014) ...................................1, 21

*Whitman v. Am. Trucking Assn's*,
531 U.S. 457 (2001).................................................................................3

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015).................................................................................27

**Venezuelan Cases**

Supreme Tribunal of Justice, No. 618,
*Brigitte Acosta Isasis*, July 8, 2016 ....................................................10

Supreme Tribunal of Justice, No. 1460,
*Attorney General of the Republic II,* July 12, 2007............................10

Supreme Tribunal of Justice, No. 2241,
*Andrés Velásquez and others, the partial annulment of
Article 80 of the Organic Law of the Financial Administration
of the Public Sector*, Sept. 24, 2002............................................*passim*

Supreme Tribunal of Justice, No. 953,
*Electrificación del Caroní S.A.*, Apr. 29, 2003 ("*EDELCA*") ........9, 10

Supreme Court of Justice, *Simón Muños Armas (Apertura Petrolera)*,
Aug. 17, 1999 ..........................................................................................8

iii

**INTRODUCTION**

The Bondholders attempt to enforce a Pledge that is invalid under Venezuelan law, in contravention of the Republic's authoritative views and the act-of-state doctrine. The Bondholders' main theme is fairness, yet they and other investors knew, and priced in the risk, that the Pledge might be found invalid. The Bondholders knowingly made a "risky" wager on a failing authoritarian regime, *VR Global Partners, L.P. v. Petróleos de Venezuela, S.A.*, 2024 WL 4891271, at *3 (2d Cir. Nov. 26, 2014), and it is entirely fair to hold them to the consequences of the risks they voluntarily accepted in the hopes of reaping windfall profits.

Article 150 of the Venezuelan Constitution requires that all national public interest contracts with foreign non-domiciled companies receive National Assembly approval. This requirement has been a critical part of the Venezuelan separation-of-powers framework for over sixty years, and courts and scholars have understood it as applying to the entire Venezuelan Public Administration—core executive organs and decentralized entities alike.

The Bondholders ask this Court to reject this long-standing interpretation—one endorsed by the Venezuelan government (in contemporaneous resolutions and *amicus* briefing) and by nearly all Venezuelan constitutional scholars (including Article 150's drafter). They seize on an isolated statement by the Supreme Judicial Tribunal's Constitutional Chamber in *Andrés Velásquez*, but that case did not

1

concern contracts by decentralized public entities—indeed, the decision neither references them nor excludes them from Article 150's scope.

The Bondholders' invocation of PDVSA's past practices is misleading. Their examples involve either PDVSA's U.S. affiliates (who are not subject to Article 150) or instances where the Maduro regime similarly disregarded Article 150. And the Bondholders have no response to PDVSA's actual decades-long practice of submitting joint venture contracts for National Assembly approval.

Any doubt regarding the meaning of Venezuelan law should be resolved by the Republic's official explanation. If the district court's summary rejection of the Republic's clear and thorough interpretation of Venezuelan law counts as "respectful consideration" under *Animal Science*, that standard would effectively be meaningless.

The act of state doctrine also compels reversal. The doctrine applies to the National Assembly's acts prior to its official recognition by the United States as the sovereign government of Venezuela. Thus, U.S. courts must accept as valid the National Assembly's 2016 Resolutions, and give those Resolutions the effect they purported to have: depriving the Exchange of the requisite legislative authorization under Article 150. The *Allied Bank* "extraterritorial takings" exception is inapposite because the Resolutions prevented the Notes, Indenture, and Pledge from coming into existence.

2

## ARGUMENT

### I. THE DISTRICT COURT MISINTERPRETED ARTICLE 150.

#### A. The District Court Misread *Andrés Velásquez*

The Bondholders argue (Br. 20-23, 28-30) that the Constitutional Chamber in *Andrés Velásquez* overturned the established understanding that Article 150 applies to decentralized entities without expressly saying so, and without addressing prior precedent, scholarly opinion, or Article 150's intent. But like legislatures, high courts "do[] not … hide elephants in mouseholes." *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 468 (2001).

#### 1. *Andrés Velásquez* Does Not Address Contracts by Decentralized State Entities

As the Bondholders acknowledge (Br. 20), the question in *Andrés Velásquez* was the constitutionality of Article 80 of the Organic Law on Financial Administration, which permitted *the Republic* to borrow from foreign non-domiciled entities without National Assembly authorization. A-2079; PDVSA Br. 32-33. The Constitutional Chamber held Article 80 unconstitutional as applied to contracts with foreign entities. A-2092. Contracts by decentralized entities had no bearing on that issue, and so the Constitutional Chamber did not address whether decentralized entities could borrow from foreign non-domiciled entities without prior approval.

The Bondholders question whether the "common-law concepts of 'dictum' and 'holding'"" apply here. Br. 29. But Venezuelan constitutional law recognizes

3

that the Constitutional Chamber's binding interpretation of a constitutional provision "is limited to the *thema decidendum* [the matter to be decided] of the decision and not 'to the *dictum*.'" A-363 ¶ 52 & n.71 (citations omitted). Whether contracts by decentralized entities are national public interest contracts sheds no light on "the matter to be decided" in *Andrés Velásquez*.

That is how Venezuelan constitutional scholars understood the decision. As Rafael Badell Madrid observed, the Constitutional Chamber was not asked

> for clarification as to the scope of Article 150 … , nor any determination as to whether legal entities of the functional public administration may enter into public interest contracts. The case … referred to contracting by the Republic, and consequently the ruling was limited to consideration of public interest contracts to be entered into by the Republic.

A-1807. Thus, *Andrés Velásquez* does not "exclude functionally decentralized administration entities as possible subjects of public interest contracts, thus subject to parliamentary authorization." A-1807; *see also* A-1746-47 ¶ 13.

The Bondholders focus (Br. 21, 30) on *Andrés Velásquez*'s observation that "the determining factor" of "national … public interest contracts" is "the participation of the Republic." A-2116. But the Chamber was engaged in a "doctrinal discussion" about the relationship between "public interest" and "national interest" contracts. A-2115-16. This debate was resolved by Article 150, which established "the genus-species relationship" where "the determining factor" in all

4

public interest contracts was the participation of the relevant polity, be it "the Republic, the States or the Municipalities." A-2116. As Román J. Duque Corredor—a former Justice of the Supreme Court and President of the Venezuelan Academy of Political and Social Sciences—observed, the decision "equate[s] the Republic with the National Executive" because it concerned a law that "governs the public credit operations of the Republic"; the decision "does not do so for the purpose of excluding decentralized entities, such as state-owned companies, [from] compliance with Article 150." A-3245; *see also* PDVSA Br. 3-36; Republic Br. 15-16 & n.3. After all, as this case demonstrates, contracts concluded by decentralized entities can have grave "implications [for] the economic … life of the Nation." A-2093.

The Bondholders also do not explain how their reading of *Andrés Velásquez* can be squared with the law at issue there. The Organic Law on Financial Administration expressly required certain debt issuances by decentralized entities be submitted to the National Assembly for approval, *see* A-3111 (art. 98); A-4921-22 ¶ 110, and then exempted some decentralized entities (like the Central Bank or PDVSA) from the requirement, *see* A-3112 (art. 101.1, 101.4); A-4921-22 ¶ 110. Under the Bondholders' interpretation, Article 98 of the law would be unconstitutional (since the National Assembly would have no authority to require authorization for such debt issuances) while Article 101 would be superfluous (since

5

no exemption would be needed). *See* PDVSA Br. 34-35. The fact that the Constitutional Chamber made no mention of these consequences—even while expressly invalidating another provision of the same law (Article 80)—demonstrates the incoherence of the Bondholders' reading.

### 2. *Andrés Velásquez* Did Not Depart from Settled Constitutional Tradition of Applying Article 150 to Decentralized Entities

The Bondholders' reading of *Andrés Velásquez* is also contrary to settled Venezuelan constitutional tradition, which views decentralized entities as subject to Article 150. *Andrés Velásquez* nowhere rejects this historical understanding— meaning it did not.[1]

Prior to 1961, the Venezuelan constitution prohibited public entities from contracting with foreign companies. A-5476-77 ¶ 40. The 1961 Constitution relaxed this prohibition, but required legislative authorization. CA-1360-1361 ¶ 40 & n.78. From its inception, this requirement applied to decentralized state entities.

---

[1] Since *Andrés Velásquez* did not address decentralized entities' contracts, it could not have established a "binding" rule of constitutional law on the issue. The Bondholders argue otherwise (Br. 29-30), but offer no explanation why the Constitutional Chamber would depart from its standard practice of announcing a binding constitutional interpretation expressly. PDVSA Br. 36-37. The Bondholders insist it was enough that the Chamber said "it was proceeding as the 'maximum and ultimate interpreter of the Constitution.'" Br. 29. But that interpretive authority belongs to *all chambers* of the Supreme Judicial Tribunal; the Constitutional Chamber's exclusive authority to issue binding rulings comes from a different section of Article 335. PDVSA Br. 36-37.

As constitutional scholar Luis Henrique Farías Mata (later, Attorney General and Justice of the Supreme Court) wrote in 1965, the answer to whether National Assembly authorization applied to "contracts formalized with independent [i.e., decentralized] institutions … cannot be other than in the affirmative." A-2864. Otherwise, the executive could "circumvent[]" the Constitution by "avail[ing] itself of an independent institution" when contracting with foreign parties. A-2865. Other scholars shared that view. *See, e.g.*, A-4635-36 (Britto García); A-4628 (Boscán de Ruesta); *see also* A-3575 ¶ 11 n.10; A-1268. As Jesús Caballero Ortíz (a Justice of the Supreme Court and Acting Attorney General) explained, since decentralized entities "form part of the Public Administration," "national interest contracts that can be formalized by autonomous entities require … the approval of [the legislature]." A-4808-09.

Unlike the 1961 Constitution, which exempted national public interest contracts "necessary for the normal operation of the Public Administration," Article 150 authorized legislative control over all national public interest contracts, including contracts by decentralized state entities. A-5354; CA-1357-58 ¶ 35. As Professor Brewer—Article 150's main drafter—explained at the time, Article 150 was meant to counter the draft provision proposed by then-President Hugo Chávez, which would have limited the scope of national public interest contracts to those entered into by the Republic. A-5227; A-5475 ¶ 37. Instead, Article 150

7

"maintained" the 1961 Constitution's requirement that contracts by "the decentralized entities of public law … be considered a contract of public interest." A-5225; A-5230; *see also* A-5474-76 ¶¶ 36-38; A-3139 (Huen Rivas) ("contracts of public interest" are contracts where "at least one of the parties is a public entity").

### 3. Venezuelan Courts' Decisions Refute the Bondholders' Reading of *Andrés Velásquez*

The Bondholders' reading of *Andrés Velásquez* also cannot be squared with other judicial decisions. In a 1991 decision, *Simón Muñoz Armas*, the Supreme Court of Justice considered whether joint venture contracts between PDVSA subsidiaries and foreign oil companies could include arbitration mandates given the constitutional requirement that all national public interest contracts ensure state immunity from suit. A-5267; *see also* A-5500 ¶¶ 86-87. While the Bondholders assert *Simón Muñoz Armas* "'did not consider the meaning of Contracts of National Interest,'" Br. 36 (citation omitted), the Supreme Court necessarily decided the predicate issue—that the contracts were "contracts of public interest," such that the constitutional immunity provision applied. A-5286-87; *see also* CA-653 ¶ 13; A5501-02 ¶ 89; PDVSA Br. 41-42.

The Bondholders claim *Simón Muñoz Armas* is inapposite because it addressed Article 150's predecessor provision. Br. 36-37. But the scope of the term "national public interest contract" was the same under both provisions, and both required legislative authorization for contracts with foreign entities. CA-1386-87

8

¶ 91; PDVSA Br. 41-42. The Bondholders observe that *Andrés Velásquez* did not reference *Simón Muñoz Armas*. Br. 36. That cuts the other way: If the Constitutional Chamber was adopting a new understanding of "contract of public interest," it would not have ignored a prior on-point decision by its predecessor court.

The Constitutional Chamber's subsequent decisions refute the Bondholders' reading of *Andrés Velásquez*. In *EDELCA*, the Constitutional Chamber held that an electricity supply contract between EDELCA (a national state-owned utility provider) and a Brazilian company was a national public interest contract. A-4530-32; A-3580-81 ¶ 17(c); A-3645 ¶¶ 104-05; A-5423 ¶ 38; PDVSA Br. 38-40. Thus, in *EDELCA* "the Constitutional Chamber included decentralized entities among those authorized to enter into public interest contracts." A-5220 (Badell Madrid); *see also* A-3245 (Duque Corredor) (under *EDELCA*, "state-owned companies … may enter into contracts of public interest but subject to Article 150"); A-2546; A-5498 ¶ 81.

The Bondholders argue the *EDELCA* contract was "'a consequence'" of an international agreement between Venezuela and Brazil designed "'to discharge the Republic's international obligations.'" Br. 35 (citations omitted). But, as the Constitutional Chamber emphasized, the contract was "a stipulation, of a contractual nature, which constitutes a *public interest contract*." A-4529 (emphasis in original);

9

*see also* A-2546 n.65. And while the contract "committed" "a high interest of the Republic," A-4529, that simply reflected that the contract affected important interests of the national polity. *See* A-2546 (Badell Madrid); Republic Br. 17-18. By that measure, the Exchange at issue here, which pledged the majority shares of a strategic Venezuelan national asset, certainly qualifies. PDVSA Br. 39-40.

Likewise, *Attorney General II* held that a debt issuance by a decentralized entity—Venezuela's state-run agricultural development bank ("BANDAGRO")—was a national public interest contract. Although the Republic was the guarantor, Br. 35, it was BANDAGRO's status as a state-run enterprise that brought it within the scope of national public interest contracts. A-343-44 ¶¶ 10-12. Again, Venezuelan constitutional scholars are in accord. A-5220 (Badell Madrid) ("the Chamber again recognized the possibility that functionally decentralized entities (such as BANDAGRO) may enter into public interest contracts").[2]

---

[2] The Bondholders invoke *Brigitte Acosta*, which exempted a loan agreement by the Central Bank of Venezuela from Article 150's authorization requirement. Br. 32-34. But the Constitutional Chamber's main rationale was that the Central Bank is "neither part of the Central Administration or the Functionally Decentralized Administration, but … is part of the so-called Administration with functional autonomy." A-2221-22; *see also* PDVSA Br. 41; Republic Br. 18. The Bondholders downplay that explanation as merely one of the "reasons why the Central Bank is independent of the Republic." Br. 33-34. But the Constitutional Chamber viewed the Central Bank as not part of the Decentralized Public Administration, but as "a legal entity … of a unique nature." A-2215. And decentralized entities are not "independent of the Republic"; the National Executive oversees and coordinates their work. A-284 ¶ 33; A-5462 ¶ 15; PDVSA Br. 7.

Decisions by the Supreme Tribunal of Justice's Political-Administrative Chamber after *Andrés Velásquez* similarly recognized contracts by decentralized state entities as national public interest contracts. *See, e.g.*, A-2583 (*Diques y Astilleros Nacionales (DIANCA)* decision) (Jul. 16, 2013); A-3044 (*Compañía Anónima Venezolana de Televisión (VTV)* decision) (Apr. 5, 2006); A-2656 (*Minera Las Cristinas (MINCA)* decision) (Dec. 7, 2011); *see also* A-5460 ¶ 11 & nn.18-20; A-3575 ¶ 10 & n.9. The district court dismissed these decisions, reasoning that the Supreme Judicial Tribunal's Political-Administrative Chamber cannot establish binding constitutional interpretation and therefore "cannot supersede *Andrés Velásquez*." SPA-125. That misses the point. These decisions demonstrate that other Venezuelan courts—including another chamber of Venezuela's highest court—have not read *Andrés Velásquez* as excluding contracts by decentralized entities from the universe of "national public interest contracts." This Court should not either.

In sum, "the district court has read too much into the Venezuelan Supreme Court opinion." *DRFP L.L.C. v. Republica Bolivariana de Venezuela*, 622 F.3d 513, 519-20 (6th Cir. 2010). This Court, reviewing de novo, should correct the district court's misreading.

11

### B. The Bondholders Misrepresent the Views of the PDVSA Parties' Experts

The Bondholders repeatedly attack the credibility of the PDVSA Parties' experts, claiming that, prior to being retained, Professors Brewer and Araujo read *Andrés Velásquez* as "establishing a binding rule that a 'national public interest contract' requires that the Republic be a party." Br. 23-25. But Professors Brewer and Araujo never viewed the decision as setting forth that binding rule. Rather, they were concerned the Maduro regime would weaponize *Andrés Velásquez* to exempt itself from National Assembly oversight.

Several years prior to his engagement as an expert here, Professor Brewer stated that the lack of reference to decentralized state entities in *Andrés Velásquez* could not constitute a binding constitutional rule because it was not "necessary to resolve the *thema decidendum*." A-2506; *see also* A-3603-04 ¶ 52. Rather, Professor Brewer warned that *Andrés Velásquez* "*could lead* to a restrictive (although not binding) interpretation of the concept of a national public interest contract, one that would exclude contracts concluded by state-owned enterprises." A-3600 ¶ 46 (emphasis added).[3]

---

[3] Professor Brewer has explained, both below and in public writings, that his past reference to *Andrés Velásquez* as adopting a binding rule was an inadvertent error that contradicted his prior consistently held views. A-3598-3606 ¶¶ 43-58; PDVSA Br. 37.

12

Professor Brewer's warning was prescient. The Maduro regime used *Andrés Velásquez* to "sow confusion … for the specific purposes of reducing the powers of control over the National Assembly on the government and the Public Administration," particularly once "the Assembly became controlled by the opposition." A-2509; *see also* A-3603-04 ¶ 52. In 2016, Maduro announced his intention to enter into national public interest contracts without National Assembly authorization, and then pressed ahead with the Exchange at issue. *See* PDVSA Br. 8-9.

Professor Araujo was similarly concerned that *Andrés Velásquez* "could be read incorrectly to suggest a restricted interpretation of the concept of the public interest contract in Article 150." A-5430 ¶ 62; *see also* A-4320. While the relevant case law has been "contradictory regarding the nature of public contracting parties," A-4319, Professor Araujo stated that, under *EDELCA*, "the State companies … may enter into contracts that qualify as contracts of public interest and, therefore, [be] subject to the parliamentary control regime established by the Constitution," A-1154-55; *see also* A-3636-37 ¶ 73.

Professors Brewer and Araujo are not alone. As Professor Duque Corredor observed, the Maduro regime's argument that "PDVSA is not subject to Article 150 of the Constitution" "was based solely on … a manipulation of the interpretation of

13

[*Andrés Velásquez*]," while "[i]n reality, that judgment does not say that state-owned companies are excluded from Constitutional Article 150." A-3243.

In any event, even if Professors Brewer and Araujo's past academic writings contain any tension, in cases involving the meaning of foreign law, "it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998) (citation omitted). Here, Professors Brewer and Araujo—two of the foremost Venezuelan constitutional and administrative law scholars—have persuasively explained why *Andrés Velásquez* does not contradict the established understanding that decentralized entities can enter into national public interest contracts subject to Article 150. The contradictory opinion of the Bondholders' remaining expert, whose expertise in Venezuelan constitutional law is limited at best, *see* PDVSA Br. 15-16; CA-1336-37 ¶ 3, cannot outweigh their detailed legal assessments.

## C. Decades-Long Practice Confirms that PDVSA's Contracts Are National Public Interest Contracts

The Bondholders' invocation of past practice (Br. 26-27) is misdirection. Actual practice demonstrates that the National Assembly repeatedly reviewed contracts by PDVSA's affiliates under Article 150.

14

### 1.      The Bondholders Misrepresent PDVSA's Past Practice

The Bondholders claim PDVSA has not sought National Assembly approval for other debt transactions. Br. 26-27. But these transactions were either (1) entered into under the 1961 Constitution, which contained a critical exemption not present in the 1999 Constitution, *supra* at 6-8; (2) did not involve counterparties domiciled outside Venezuela (A-5505-06 ¶ 97; CA-782 ¶¶ 386-87, 389; CA-795 ¶ 454); or (3) occurred, like the Exchange, after Chávez and Maduro began to disregard constitutional checks and balances (A-5506-07 ¶ 98). Notably, the Bondholders point to *no transaction* between 2000 and 2007—when the 1999 Constitution was in force and followed—where legislative approval was not sought for a contract between a Venezuelan state entity and a foreign non-domiciled company.

The Bondholders focus on three transactions: (*i*) PDVSA's purchase of CITGO in 1986, (*ii*) the Rosneft 49.9% pledge, and (*iii*) recent transactions purportedly "secured by CITGO assets." Br. 26. None supports their position.

As to the CITGO acquisition, assuming it did not fall within the 1961 Constitution's exemption, there is testimony that the transaction "was presented to the National Assembly … and approval was granted." CA-271 (63:21-25).

The Bondholders' reliance on the Rosneft pledge (Br. 26) is ironic. That transaction took place in November 2016, one month after the Exchange. A-756-57. The National Assembly has consistently maintained the Rosneft pledge is invalid,

just like the CITGO pledge at issue. A-756-57. That the Maduro regime trampled upon the Constitution twice in two months does not make either constitutional.

As to "PDVSA" pledging "CITGO assets" (Br. 26) that debt was actually issued by CITGO or other *U.S.* corporate entities, A-5505-06 ¶ 97; A-4970-76 ¶¶ 557-565—*not* by PDVSA or its Venezuelan subsidiaries. CITGO, a Delaware corporation, is not part of the Venezuelan Decentralized Public Administration, and its debt issuances are governed by U.S. law. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 41 N.Y.3d 462 (2024) (transactions are governed by the law of the issuer's jurisdiction).

The Bondholders quote a 2019 tweet by a former National Assembly member Mr. Guerra that "PDVSA does not require authorization from the [National Assembly] to issue debt." A-211. But a statement on social media made three years later is not representative of legislative intent. And there is no evidence that Mr. Guerra was "involved in authoring" the September 2016 Resolution. Br. 27. By contrast, Freddy Guevara, President of the Comptroller's Commission, spoke on the floor of the National Assembly on behalf of the governing coalition (which commanded a legislative majority) during debate over the September 2016 Resolution, and unambiguously stated that the Exchange "was a national public interest contract that was not recognized or authorized" by the Assembly. A-3611

16

¶¶ 13-15. Under Venezuelan law, this contemporaneous statement, evincing the "spirit of the legislators," is given "substantial weight." A-3613 ¶ 22.

Finally, the Bondholders invoke the memorandum and legal opinion by Hogan Lovells that the Exchange Offer did not require National Assembly approval. Br. 27. But the former contained no analysis of Venezuelan law, A-395, and the latter included limited analysis riddled with errors and omissions, CA-521-23; CA-628-34 ¶¶ 102-116.

### 2. The Bondholders Cannot Sidestep PDVSA's Undisputed Past Practice of Submitting Joint Venture Contracts for National Assembly Approval

The Bondholders have no answer to the actual, undisputed practice of the National Assembly enacting numerous resolutions authorizing PDVSA's or its affiliates' contracts pursuant to the Hydrocarbons Law. PDVSA Br. 28-32. These resolutions invoke the National Assembly's approval authority under Articles 150 and 187(9). PDVSA Br. 29-30. They conclusively demonstrate that contracts by decentralized entities *are* national public interest contracts subject to National Assembly approval.

The Bondholders argue this practice simply "illustrates that the National Assembly can enact laws providing that certain contracts require its approval," Br. 40, but that begs the question. Unless a contract qualifies as a national public interest contract, the National Assembly lacks the power to enact a law subjecting

17

that contract to legislative approval under Article 150. A-5457-61 ¶¶ 5-12; A-5510-11 ¶¶ 104-105. In fact, the Bondholders' own expert conceded Article 33 of the Hydrocarbons Law is "an example of the National Assembly exercising [its] vested power" under Article 150. A-4932 ¶ 142.

The Bondholders contend that, while the National Assembly can pass laws requiring submission of some national public interest contract for its approval, that "does not render all PDVSA contracts 'national public interest contracts' that *require* National Assembly approval under Article 150." Br. 40. Of course not. Article 150 requires National Assembly approval in two circumstances: (*i*) when required by statute or (*ii*) when the contract is with a foreign non-domiciled counterparty. The first requirement depends on implementing legislation (like Article 33 of the Hydrocarbons Law); the second is self-executing, as *Andrés Velásquez* confirmed. A-2121. The Exchange falls within the second category. Thus, it does not matter that the National Assembly has not passed a law that "speak[s] to financing contracts." Br. 40. Indeed, in *Andrés Velásquez* the Constitutional Chamber invalidated a law that purported to *exempt* certain financing contracts from Article 150's authorization requirement. *Supra* at 5-6.

The Bondholders suggest the PDVSA Parties are arguing Article 150 "independently require[s] the National Assembly to approve" the joint-venture agreements, thereby rendering the Hydrocarbons Law "superfluous." Br. 40. But

18

the PDVSA Parties never argued Article 150 requires approval of national public interest contracts in all circumstances. Article 150's second sentence *does* independently require such approval, but only when the counterparty is domiciled outside Venezuela. Separate enabling legislation—such as Article 33 of the Hydrocarbons Law—is needed to subject any other national public interest contract to legislative approval under Article 150's first sentence.

## II. THE 2020 NOTES ARE VOID AB INITIO, AND THE DOCTRINE OF LEGITIMATE EXPECTATIONS DOES NOT APPLY.

The Bondholders argue that even if the Court concludes the 2020 Notes violate Article 150, it should nonetheless enforce them based on the Bondholders' "legitimate expectations." Br. 48-49. That extraordinary request has no basis in Venezuelan law. The weight of authority establishes that lack of National Assembly approval renders the Exchange void *ab initio*, rendering irrelevant the doctrine of legitimate expectations. *See* A-385-91 ¶¶ 103-114; CA-1076-79 ¶¶ 31-39; A-3591-92 ¶¶ 33-35; A-3623 ¶¶ 23-25; A-3655 ¶¶ 144-152; A-5514-15 ¶¶ 115-118.

The Bondholders' argument rests on an erroneous premise: that the lack of constitutionally required National Assembly authorization is merely "a legal defect affecting an entity's *legal capacity* to contract, which renders a contract merely voidable, not void." Br. 48 (quoting CA-201-02 ¶¶ 169, 171). But failure to obtain required authorization reflects lack of *consent*, rendering the contract void *ab initio*. The lack of required authorization results in "the non-existence of the manifestation

19

of the will by [the Public Administration entity]" necessary "to be liable" on a contract. CA-1079 ¶ 38 (quoting A-1304). A public contract lacking the required authorization "never comes into valid legal existence" and is, accordingly, void *ab initio*. CA-1079 ¶ 38; *see also* A-3590-91 ¶ 32; A-3657 ¶ 149; A-696-97 ¶ 107.

Because failure to obtain National Assembly authorization would render the 2020 Notes an "absolute nullity," the doctrine of legitimate expectations does not apply. *See, e.g.*, A-3657-58 ¶¶ 148-52. That limitation is confirmed by the very scholars the Bondholders and their experts invoke. *See, e.g.*, A-698 ¶ 110 (legitimate expectations cannot be based on "a promise that does not comply with the rules, or even, is contrary to the rules") (quoting A-1344); A-698 ¶ 110 (citing A-2941).[4]

The doctrine of legitimate expectations also would not apply since the Bondholders knew or should have known of the constitutional defect. Under Venezuelan law, the doctrine considers whether (using the "faculty of appreciation of an average citizen") the private contractor "knew of the illegality of the agreement or did not exercise requisite diligence in ascertaining its legality." A-3656 ¶ 146.

---

[4] The Bondholders' original expert, Doe, never addressed Professor Brewer's extensive analysis, *see* CA-123-40 ¶¶ 178-228; *see also* CA-817-38, and their replacement expert, Roe, simply parroted Doe, *see* CA-1184-86 ¶¶ 171-176. The Bondholders quote Doe's report (mischaracterizing it as a statement from Special Attorney General's 2019 memorandum). Br. 51. Regardless, that memorandum cannot override established law.

This standard is easily satisfied. Venezuelan law presumes familiarity with applicable law, A-3656 ¶ 146, and the constitutional defect was publicly known. The National Assembly published both the May Resolution and September Resolution. A-3656-57 ¶ 147. And the National Assembly's opposition to the Exchange was widely reported in the financial press. *Id.* Market analysts at Nomura, UBS, Goldman Sachs, J.P. Morgan, and others flagged the legal risks. A-3656 ¶ 147 & nn. 131-33.

The Bondholders protest that Hogan Lovells's opinion letter evinces PDVSA's representation of the documents' validity. Br. 52. But the opinion letter does not address Article 150 (A-395), and PDVSA's own representations (made under Maduro's instructions) cannot vest an unconstitutional act with legitimacy. *See* CA-126-27 ¶ 185. Regardless, this Court has previously reached the opposite conclusion: It held that PDVSA opinion letters, the National Assembly's resolutions, and Assembly members' statements "show that, in 2016, the Maduro-controlled PDVSA offered the 2020 Notes despite the opposition-led National Assembly's categorical rejection of the exchange offer," and that the Exchange reflected "a risky investment due to a public fight for control of PDVSA." *VR Global*, 2024 WL 4891271, at *3. The Bondholders "were aware, or should have

21

been aware under Venezuelan law, of the illegality and unconstitutionality of the Transaction Documents." A-3708-09 ¶ 147.[5]

## III. THE DISTRICT COURT ERRED IN REJECTING VENEZUELA'S OFFICIAL INTERPRETATION OF VENEZUELAN LAW.

The Bondholders maintain (Br. 44) that the district court "conscientiously complied" with *Animal Science* by "articulating" and "engaging" with the Republic's views. But "substantial weight and respectful consideration," SPA-127, require more than the empty formalism of the decision below. The district court merely cited *Animal Science*, summarized the Republic's submission, and then dismissed the sovereign's detailed explanation of its own law in two paragraphs. SPA-130-31. The court privileged its own analysis of Venezuelan law over the Republic's interpretation even though *all but one* of the *Animal Science* factors "cut in favor of the Republic[] or are at the very least neutral." SPA-130. If that amounts

---

[5] The Bondholders' comparison to the American bankruptcy doctrine of "equitable mootness" (Br. 49) is misplaced. Equitable mootness concerns whether a "substantially consummated" reorganization plan should be disturbed when it is challengeable on procedural or substantive grounds. *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481–82 (2d Cir. 2012). But here, no valid contract was formed in the first place. Additionally, this analogy inverts the equitable calculus: in bankruptcy, equitable mootness aims to protect innocent third parties from the unwinding of a consummated plan—but here, they are asking the Court to enforce a deal they knew was unconstitutional against a sovereign whose constitutional prerogatives were circumvented. Equity should protect the interests of the Venezuelan people—not the Bondholders.

to "respectful consideration" under *Animal Science,* it is unclear what (if anything) the standard would accomplish.

Echoing the district court, the Bondholders contend that because the submission's "context and purpose" was to "vindicat[e] the Republic's own interests," it is not entitled to weight. Br. 44. But that cannot be a correct reading of *Animal Science*, because no genuinely *disinterested* foreign government would voluntarily incur the costs of participating in U.S. litigation. The Bondholders focus on the Republic's "substantial financial interest," but there is no authority limiting deference to a foreign sovereign's non-economic interests.[6] Instead, this Court has deferred to foreign sovereigns' views in litigation directly affecting their economic interests—including in the decision on remand from *Animal Science* itself, which the Bondholders never even mention. *See* PDVSA Br. 49; *In re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 141, 156-57 (2d Cir. 2021) (accepting China's position on its law designed to "retain its domestic producers' competitive advantage"). In any event, preservation of state assets, including ownership of CITGO—"a central piece of the national patrimony," A-3274 (U.S. State Dep't)—is a vital sovereign issue for Venezuela. Whatever economic interest the Republic may have do not diminish its

---

[6] Venezuela's natural resources are vital to Venezuela's sovereignty, and the regulation and management of those resources is enshrined in the Venezuelan Constitution. A-3552 ¶ 1; A-443 (arts. 302-303); *see also* A-5526.

23

sovereign interest in enforcing Venezuela's constitutional separation-of-powers requirements. Republic Br. 5-6.

The Bondholders accuse PDVSA and the Republic of "close coordination," pointing to the cadence of filings in this case and cross-references in the briefing. Br. 45-46.[7] But a "sovereign interest expressed by a foreign state" is still owed "due respect" in lawsuits in which the sovereign has "a coordinate interest in the litigation." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 546 (1982). It was entirely appropriate for the Republic to submit its *amicus* briefs, and for the parties' briefs to address the Republic's position. PDVSA Br. 48. And any perceived "synergy," SPA-130, between the Republic's explanations and Appellants' arguments does not establish that the Republic's position was manufactured for litigation or otherwise cut against its persuasive value. To the contrary, the Republic's position, submitted on behalf of the democratically elected National Assembly, is one it has articulated and relied upon for years. *See* Republic Br. 24 & n.1; SPA-127 n.11; A-647; A-115.

Finally, the Bondholders urge the Court to discount the Republic's "role and authority" because the Constitutional Chamber has the exclusive authority to issue

---

[7] They also reference the Republic's "lockstep" participation in other litigation, Br. 49, an unremarkable observation given the Republic and PDVH are both parties there. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17-151 (D. Del. Jun. 19, 2017).

24

binding interpretations of Venezuelan law.  Br. 46.  But it is the sovereign government recognized by the Executive Branch (here, the National Assembly)—not a foreign court—that speaks for a foreign state in U.S. courts.  *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 137 (1938); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410-11 (1964); SPA-130; Republic Br. 24.[8]  The requirement of respectful consideration extends to the foreign sovereign's views as to the meaning of domestic judicial decisions—including decisions by that country's highest court.  *See DRFP*, 622 F.3d at 519-20 (considering Venezuela's views when interpreting a Venezuelan Supreme Court decision).  Given that the National Assembly is not just the recognized sovereign of Venezuela, but also the "first-instance interpreter of the Constitution," and the body constitutionally empowered to authorize national public interest contracts, the Bondholders' argument is meritless.  A-292 ¶ 53.

## IV.    THE ACT OF STATE DOCTRINE APPLIES AND RENDERS THE 2020 NOTES INVALID AND VOID AB INITIO.

The act of state doctrine requires courts to "accept as valid the acts of foreign sovereigns taken within their own jurisdictions" and presume they have the legal effect they purport to have.  *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 466 (2d Cir. 2022) (citation omitted).  Correct application of this

---

[8] By contrast, the United States has called into question the legitimacy of the Supreme Judicial Tribunal.  A-3557-58 ¶¶ 15-16.

doctrine required the district court to accept as valid the 2016 Resolutions—and to give those Resolutions the effect they *purported to have*, namely, to deprive the Exchange of legal authority before it was ever executed. The Bondholders' contrary arguments are unconvincing.

*First*, the Bondholders part ways with the district court, arguing that the 2016 Resolutions were not acts of a foreign sovereign because the United States did not formally recognize the National Assembly as Venezuela's government until 2019. Br. 51-53. But the United States has recognized the National Assembly's legitimacy since its inception in 2015, A-3553-54 ¶ 7, all while condemning the Maduro regime, A-3553 & n.8. And it is well established that "[a]fter the Executive Branch's recognition of a foreign state, the act of state doctrine applies retroactively to acts that were undertaken by the foreign state prior to official United States recognition." *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012); *see also United States v. Pink*, 315 U.S. 203, 223 (1942).

The Bondholders try to avoid that rule by grafting a novel requirement onto it: they assert that recognition applies retroactively "only where a de facto government '*originat[ing] in revolution or revolt*' was later recognized by the United States as the 'de jure government.'" Br. 52 (emphasis added). The Bondholders' extra requirement of "revolution or revolt" confuses the facts of particular cases for the expansive holdings of *Pink* and *Konowaloff*. Although cases

dealing with the retroactive effect of recognition have often (and unsurprisingly) involved revolutionary governments, none turned on the revolutionary status of the later-recognized sovereign. To the contrary, as the district court previously explained, "there is no authority restricting retroactive application of the doctrine to such violent circumstances," and "such a restriction would nonsensically limit the effect of the Executive Branch's actions to certain factual scenarios, which runs directly counter to the separation of powers concerns animating the act of state doctrine." SPA-25; *see also Pink*, 315 U.S. at 299 (presidential "recognition of a foreign sovereign conclusively binds the courts and is retroactive"); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015).

The Bondholders' "revolution or revolt" requirement would impose a novel limitation on the President's recognition power and invite judicial scrutiny where precedent forbids it. Rather, for purposes of the act of state doctrine, the relevant "sovereign" is the one "extant and recognized by this country at the time of suit." *Banco Nacional*, 376 U.S. at 428. The Bondholders do not dispute that when this action was commenced, the 2015 National Assembly was in existence and recognized by the Executive Branch as the sovereign government of Venezuela. The 2016 Resolutions are therefore official acts of a foreign sovereign entitled to application of the act of state doctrine.

27

*Second*, the Bondholders contend that the act of state doctrine is inapplicable under the *Allied Bank* exception because the Resolutions seek to "take" property sited in New York. Br. 53-58. But the 2016 Resolutions have no such extraterritorial effect because they purported to prevent the Notes, Indenture, and Pledge from ever coming into existence. *Petróleos de Venezuela*, 51 F.4th at 466 & n.6; PDVDA Br. 65-67. The *Allied Bank* exception has no application to this case because the Notes were void *ab initio,* meaning there is no valid property interest that could be taken.

Because the PDVSA Parties do not ask this Court to apply the act of state doctrine to any retroactive repudiation of debt, the Bondholders' *Allied Bank* argument is unavailing. The situs of the Notes, Indenture, and Pledge is irrelevant to the question whether the 2015 National Assembly acted, as Venezuela's sovereign, to deprive those documents from having the legal authority necessary to come into valid existence. Similarly, the Bondholders' "common sense" argument that even a prospective repudiation must fall under *Allied Bank* because "American recognition" of the National Assembly came later in time merely restates their mistaken retroactive-recognition arguments. *Supra* at 26-27.

*Allied Bank*'s exception turns on the distinction between acts taken within a sovereign's territory and acts taken outside it. PDVSA Br. 62. The reason the prospective nature of the 2016 Resolutions is dispositive is that before the Notes,

28

Indenture, and Pledge came into existence, there was no extraterritorial property to take. In preemptively rejecting the Pledge, the National Assembly applied provisions of the Venezuelan Constitution within Venezuela, and U.S. courts must give effect to that sovereign act. Case law further bolsters this understanding, proving that wholly domestic exercises of sovereign authority, like the National Assembly's 2016 acts, require deference under the act of state doctrine. *See* PDVSA Br. 63-64.

Nor would the PDVSA Parties' position "provide a get-out-of-debt-free card to sovereign borrowers." Br. 57. The PDVSA Parties do not argue that a foreign sovereign may retroactively cancel a validly issued debt sited abroad. And the Bondholders purported concern for "confusion" in "international debt markets" is particularly inapposite, as the Bondholders cannot seriously contend that they (or any creditors) were surprised by the National Assembly's acts given extensive contemporaneous warnings by legislators, news outlets, and market analysts that the Exchange could be void absent National Assembly approval. *See* Br. 49. Indeed, the United States government itself publicly cautioned that the Maduro regime was circumventing the National Assembly's constitutional prerogatives. A-1993; A-3240.

*Third*, the Bondholders fare no better in arguing that no official act invalidated the Notes. Br. 58. In fact, the PDVSA Parties identify two: the Assembly's decision

to withhold authorization and its categorical rejection of the Pledge. *See* PDVSA Br. 55.

Contrary to the Bondholders' suggestion (Br. 61-62), neither U.S. nor Venezuelan law required the Assembly to formally declare that the Exchange was a national public interest contract. The Assembly's invocation of Article 187(9) in the September 2016 Resolution, which reviewed and rejected the Exchange, clearly demonstrates that the Assembly deemed the Exchange a national public interest contract. The Bondholders argue (Br. 61) that Article 187 was invoked only to "obtain information" about the Exchange, but the Assembly has repeatedly rejected this characterization (including via the Republic's submissions to this Court). And it is belied by the plain text of the Resolution, which invoked Article 187(9) not to inquire whether the Exchange was subject to the Assembly's approval authority, but whether the Maduro regime could marshal any evidence that the Exchange adequately protected Venezuelan national property to warrant approval (at some future time) by the Assembly. PDVSA Br. 58-59.

The Special Attorney General's report upon which the Bondholders rely provides further support. It expressly and repeatedly states that "the indenture is a national public interest agreement." A-2012 ¶ 2; A-2039 ¶ 142; A-2042 ¶ 170(b). Because the Exchange involved national public interest contracts, to nullify the Exchange, all the Assembly needed to do was to withhold its authorization (which

30

the Assembly indisputably did).  It did not have to issue a preemptive declaration that the Exchange, if enacted, would be "illegal, invalid, or void," or utter any other magic words.  Indeed, the Bondholders have cited no example of the National Assembly *ever* issuing such a preemptive declaration of invalidity, which would have been at best premature given that the Exchange was a mere proposal subject to further review in the Assembly following the September Resolution.  A-3612 ¶ 17.

The Bondholders' remaining arguments (Br. 60-63) likewise fail.  There is no dispute that the Pledge was the key component used to induce the Bondholders to swap their 2017 Notes for 2020 Notes.  The Bondholders nonetheless contend that "ordinary principles of interpretation" suggest that "the National Assembly's rejection of one particular aspect of the transaction"—the Pledge—"implies acceptance of the transaction as a whole."  Br. 60-61.  That reasoning is facially absurd, and the Bondholders' reliance on *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994)—which applied the *inclusio unius, exclusion alterius* canon to a statute irrelevant here—does not help it.  The National Assembly did not "accept[]" the Exchange when it summoned PDVSA's President to appear before the Assembly to testify about the Exchange in the same Resolution that expressly and "categorically" rejected its key term.  A-115.  Nor do the Bondholders suggest that an Exchange *without* the Pledge was ever proposed, approved, or implemented.  To the extent there is any doubt as to the Assembly's intent in rejecting the Pledge, that doubt is

31

better resolved by the explanation offered by the Republic, or members of the Assembly itself, that the Assembly understood its actions to deprive the Maduro regime of the requisite legislative approval to consummate the transaction.[9]

## CONCLUSION

The judgment should be reversed.

Dated: March 2, 2026

Respectfully submitted,

*/s/ Igor V. Timofeyev*
IGOR V. TIMOFEYEV
PAUL HASTINGS LLP
2050 M STREET, N.W.
WASHINGTON, D.C. 20036
(202) 551-1792
igortimofeyev@paulhastings.com

JAMES L. FERGUSON
ZACHARY D. MELVIN
PAUL HASTINGS LLP
200 PARK AVENUE
NEW YORK, NY 10166

KURT W. HANSSON, ESQ.
7 DRUM ROAD
ROWAYTON, CT 06853

*Counsel for Petróleos de Venezuela, S.A.*
*and PDVSA Petróleo, S.A.*

---

[9] The Bondholders are wrong (Br. 62-63) to discount the October 2019 Resolution. That resolution corroborates what the National Assembly intended to accomplish by the 2016 Resolutions, which are entitled to act-of-state treatment.

/s/ Michael J. Gottlieb
MICHAEL J. GOTTLIEB
WILLKIE FARR & GALLAGHER LLP
2029 Century Park East
Los Angeles, CA 90067
(310) 855-3111
mgottlieb@willkie.com

ERICA L. ROSS
SAMUEL G. HALL
KRISTIN E. BENDER
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000

AARON E. NATHAN
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

ALYXANDRA VERNON
WILLKIE FARR & GALLAGHER LLP
333 Bush Street
San Francisco, CA 94104
(415) 858-7468

*Counsel for PDV Holding, Inc.*

33

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify the following:

1. This reply brief complies with the type-volume limitation of Local Rule 32(a)(4)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Local Rule 32(g), this brief contains 6,984 words.

2. This reply brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 19, 2026 　　　　　 */s/ Igor V. Timofeyev*
　　　　　　　　　　　　　　　 Igor V. Timofeyev

34